Pages 1 - 80

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. CR 17-0175 CRB |
| | ) |
| LEN TURNER and LANCE TURNER, | ) |
| | ) San Francisco, California |
| Defendants. | ) Tuesday |
| | ) August 21, 2018 |
| _____ | ) 9:00 a.m. |

**EXCERPT OF JURY TRIAL PROCEEDINGS**
**TESTIMONY OF LAURA CROSBY**

**APPEARANCES:**

| | |
|---|---|
| **For Plaintiff:** | ALEX TSE |
| | Acting United States Attorney |
| | 450 Golden Gate Avenue |
| | San Francisco, California  94102 |
| BY: | **KIMBERLY HOPKINS** |
| | **ANDREW DAWSON** |
| | **ASSISTANT UNITED STATES ATTORNEYS** |
| | |
| **For Defendant** | RIORDAN & HORGAN |
| **Len Turner:** | 523 Octavia Street |
| | San Francisco, California 94102 |
| BY: | **DENNIS RIORDAN, ESQ.** |
| | |
| **For Defendant** | BOERSCH SHAPIRO, LLP |
| **Lance Turner:** | 1611 Telegraph Avenue |
| | Suite 806 |
| | Oakland, California 94612 |
| BY: | **MARTHA BOERSCH, ESQ.** |

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

 1  **Tuesday - August 21, 2018**                    **10:00 a.m.**

 2                        **P R O C E E D I N G S**

 3                           ---oOo---

 4      (Prior proceedings held herein, reported

 5       but not transcribed.)

 6          *         *         *         *         *

 7             **THE COURT:**  Call your next witness.

 8                         **LAURA CROSBY**,

 9  called as a witness for the Government, having been duly sworn,

10  testified as follows:

11             **THE WITNESS:**  I do.

12             **THE CLERK:**  Thank you please be seated.

13      Please state your full name for the record and spell your

14  last name, and use the microphone.

15             **THE WITNESS:**  Sure.

16      Good morning.  My name is Laura Boris Crosby.  My last

17  name is C-R-O-S-B-Y.

18                      **DIRECT EXAMINATION**

19  **BY MR. DAWSON**

20  **Q.**  Good morning, Ms. Crosby.

21  **A.**  Good morning.

22  **Q.**  To just ask, we have a court reporter here and we have had

23  a lot of fast talkers this morning.  So if you could be sure to

24  speak as slowly and clearly as you can.  I'll try and do the

25  same.

CROSBY - DIRECT EXAMINATION / DAWSON

1    **A.**    Okay.  I will do my best.

2    **Q.**    Ms. Crosby, where do you work?

3    **A.**    I work at the Lawrence Berkeley National Laboratory.

4    **Q.**    What is the Lawrence Berkeley National Laboratory?

5    **A.**    The Berkeley laboratory, we commonly call it Berkeley Lab

6    instead of Lawrence Berkeley National Laboratory, because

7    that's really long.

8         The Berkeley Laboratory is a science lab.  We are a

9    research laboratory and we're run by the University of

10   California, but our primary mission is to conduct scientific

11   research in a lot of different areas.

12   **Q.**    And who primarily funds the Lawrence Berkeley National

13   Laboratory?

14   **A.**    Our primary funder is the federal government.  It's the

15   U.S. government through -- so the Government has many branches;

16   right?  So ours is through the Department of Energy.

17   **Q.**    What kind of work does the Berkeley Lab do?

18   **A.**    Lawrence Berkeley National Laboratory is diverse in the

19   type of science it does.  So we have scientists that focus on

20   probably 20 different areas, and I won't list all 20, but, for

21   example, we have researchers that will do genomics research for

22   fighting cancer.

23        But we're very diverse, so we also have people that run

24   our super computer.  So we have a massive super computer.

25   There are about ten of them in the world.  Our scientists will

CROSBY - DIRECT EXAMINATION / DAWSON

1   run that computer and other people will want to use it.  So we

2   do super computer research.

3        And just also, by way of example, we have researchers that

4   do alternative energy.  So if we need to find diverse fuel

5   instead of using fossil-based fuels, like gas or oil, our

6   researchers will look for bio-based fuels, plants material,

7   things like that.

8        So we're a very diverse science laboratory.

9   Q.   And what kind of work do you personally do at the lab?

10  A.   I'm not a scientist.  I am a contracting officer.  So my

11  title is actually a subcontract manager.  And the reason is

12  we're -- all the contracts I issue are sub to our prime

13  contract with the federal government, but essentially I'm a

14  contracting officer in the federal arena.  That would be my

15  title.

16       I write contracts.  I review contracts.  And I have a team

17  right now of ten employees that write and issue contracts.  My

18  focus primarily is on design and construction contracts.

19  Q.   And is the field that you work in sometimes also known as

20  procurement?

21  A.   Yes.

22  Q.   If you could give a brief definition of what, in your

23  view, an experienced procurement is?

24  A.   Sure.  Actually, our department is called procurement.

25  We're the procurement department.

1      And what we do in procurement, really briefly, is we look

2  for people or companies that can give us the goods or the

3  services that we need.  So imagine if you're going to renovate

4  this building here and you might need wood paneling.  We would

5  search for suppliers for that wood, but also the company that

6  would build it out and renovate it.  The team that I manage

7  does just that.

8      We also hire the design professionals that do the design

9  for the space and then the construction companies that build it

10 out.

11     But our department, and procurement in general, is that

12 process.  It's finding people that do the sources -- that do

13 the work, sourcing it, issuing them a contract and awarding

14 that contract.

15 Q.   And where is the Berkeley Lab located?

16 A.   We are in Berkeley, right above the University of

17 California campus.  So if you're at U.C. Berkeley, that's a

18 little lower in the hills.  Berkeley Lab abuts it and it's --

19 if you look straight uphill, you don't notice our buildings

20 because most are very gray on purpose, to be sort of not

21 very -- we don't stand out very much.

22     But anyway, it's in the hillside above the U.C. Berkeley

23 campus.

24 Q.   Does the Berkeley Lab have any satellite locations

25 elsewhere in the Bay Area?

CROSBY - DIRECT EXAMINATION / DAWSON

1   **A.**   We do.  About 25 percent of our laboratories actually off

2   site.  The lab itself is pretty small.  It sounds like a lot.

3   It's 200 acres.  But 200 acres isn't enough for all of our

4   science teams.

5        So 25 percent of our science teams are in Emeryville and,

6   also, in Berkeley downtown, as well as on the waterfront.  They

7   are in what's just leased facilities.  Private landlords have

8   leased space to us.  We use it for laboratory research.  We do

9   our work there.

10  **Q.**   Is there some land in Richmond that's associated with the

11  Berkeley Lab?

12  **A.**   Well, the Richmond land is not really directly run by the

13  laboratory.  Our scientists are allowed to use it.  So we're

14  very distantly related.

15       The university manages that property.  It owns that

16  property.  But Berkeley Lab -- our science teams, a few of them

17  over the last 15 years that I'm aware of, have used that space,

18  but it's not one of our major satellite facilities.

19  **Q.**   And technically speaking, you have been discussing the

20  Lawrence Berkeley Lab.  Are you a lab employee, a DOE employee

21  or something else?

22  **A.**   I'm -- we call yourselves lab employees, but I am actually

23  a University of California employee.

24  **Q.**   Do you know who actually funds your salary?

25  **A.**   Department of Energy, the federal government funds my

CROSBY - DIRECT EXAMINATION / DAWSON

1    salary.

2    **Q.**   And is that typical for employees at the Berkeley Labs?

3    **A.**   Uh-huh.  Yes.

4    **Q.**   Setting aside salaries, who pays for the remainder of the

5    operations at the Berkeley Labs?

6    **A.**   All of our operations primarily that I'm aware of, over

7    90 percent are paid for by the federal government through the

8    Department of Energy, federal.

9    **Q.**   And do you have an idea of what the annual operating

10   budget for the Lawrence Berkeley Labs is?

11   **A.**   Yes.  Historically we have been about around 850 to

12   $950 million.  In 2019 we're going to be at approximately

13   $1.4 billion to run the laboratory.

14   **Q.**   And that's a yearly budget?

15   **A.**   It is.  It's our annual funding.  It pays for people like

16   me, my salary; our scientists, their buildings.

17        Our biggest expenses are our buildings, our real estate,

18   our staff, our employees, our payroll, and then also their

19   equipment.

20        So, like, the super computer alone, each -- if we buy one,

21   if we procure one every single year, that's about 110 to

22   $150 million for just that super computer.

23   **Q.**   As you testified a few minutes ago, is that budget paid by

24   the Department of Energy?

25   **A.**   Yes.

1  Q.    What role do the U.C. regents, who you referred to a few

2  minutes ago, play in the operations of the Berkeley Labs?

3  A.    Sure.  So at its simplest level, it's pretty state

4  forward.  The regents, they are a legal entity in California.

5  They have a contract with the Department of Energy.  So these

6  two teams, these two entities have a contract together.

7        So the regents have a contract with the federal government

8  through DOE and then they pay -- the federal government gives

9  the university, the regents, U.C. Berkeley -- I'm sorry, U.C.

10 itself, money to operate what's called Berkeley Lab.  So

11 Berkeley Lab is just a place.  The legal entity that operates

12 it is the regents.

13       I'm an employee of the regents, but all the money we get

14 to run the place and have the laboratory is funded by the

15 federal government.

16 Q.    And how long have you worked for the Berkeley Labs?

17 A.    Sixteen years.

18 Q.    And how much of that time has been in the procurement

19 field you were testifying about a minute ago?

20 A.    All of my career has been in the procurement department at

21 Berkeley Lab.  I have been on different teams, but it's all

22 been in that department.

23 Q.    And when you first started in that department at the Labs,

24 what kind of procurement did you work on?

25 A.    My first approximately seven, nearly eight years was as a

CROSBY - DIRECT EXAMINATION / DAWSON

1    buyer in the design and construction team.  So I would do the

2    design and construction POs that would get awarded to companies

3    that needed to get paid for the services that they were going

4    to deliver to us.

5    **Q.**   You just mentioned a term there a moment ago a "buyer" and

6    then earlier you mentioned a "contracting officer."  What's the

7    difference or relationship between those positions?

8    **A.**   They are very similar.  A buyer is a contracting officer,

9    in essence.  The buyer may just have a much lower dollar

10   authority.

11        So, for example, I have a team of ten right now.  And each

12   of them, if they are very junior and entry level in career,

13   maybe they have only been doing procurement for a few years,

14   they might be given what's called a warrant -- it's their

15   delegation -- of 25- or $50,000 to spend.  They are a C.O.

16   They can sign contracts at that level.  But let's say they are

17   working on a contract that's $200,000.  I have to sign those

18   because it's above their level.

19        So the buyer at that level is just a lower level, less

20   experienced person.

21        I have been doing procurement for, well, a lot of years

22   and so I just have a higher delegation because I have more

23   experience and I'm also now a team lead and a manager.

24   **Q.**   And so when you started, which I believe you mentioned was

25   in 2002, did you start with those smaller kinds of projects you

CROSBY - DIRECT EXAMINATION / DAWSON

1   were just testifying about?

2   **A.**   I did.  Our buyer levels are five.  So I was, like, a

3   buyer level two.  We've got one, two, three, four and five.  I

4   moved up and was promoted.

5       So my initial delegation was really low.  It was about

6   $25,000.  And then I -- over time as I was promoted and gained

7   more experience, it went up to $500,000 when I was a buyer.

8   **Q.**   And looking at the department overall, the procurement

9   department, what's the range of goods and services that the

10  procurement department is responsible for acquiring?

11  **A.**   We are responsible for acquiring 100 percent of what the

12  Berkeley Lab buys, from simple pens and pencils and, you know,

13  laboratory coats and safety glasses to really expensive

14  $150 million super computers.

15      My team, the highest things that they handle are usually

16  80 to $150 million contracts for building out a brand new

17  building, for example.  But it can also be simple renovations.

18  Maybe, you know, $5,000 for some new carpet or paint.

19      Our department handles all of the goods and all of the

20  services that the Berkeley Lab needs.  We have a system where

21  people put in a requisition, ties to their account and money,

22  and then we place the order for them.

23      For really, really simple stuff, low, low dollar stuff, we

24  have an internal Amazon.  People can go online.  It's secured.

25  So if you need those pens and pencils, we don't want to make it

CROSBY - DIRECT EXAMINATION / DAWSON

1   complicated because it's really low dollar.  They can just

2   click and buy the pens and pencils they need.  They get

3   delivered to them.

4        For a more moderate to highly complex work, we do need a

5   buyer to handle that because then that's the sourcing process.

6   They need to go find qualified companies and be able to give us

7   proposals.  Then we evaluate and can award.

8        So we do the whole array, from really simple, moderate to

9   highly, highly complex.

10  Q.   So when you use the term "buyer," does the buyer apply

11  both to tangible goods and services, or goods you can take off

12  a shelf, in addition to things like construction projects or is

13  it more limited?

14  A.   No, it's the same.  A buyer can do all of those.

15       Entry level jobs are usually like a P-card buyer, a credit

16  card holder.  What you can't buy on our little internal Amazon

17  catalog list, we'll -- we don't disallow people to buy it if

18  it's related to their work.  So a buyer might need to place

19  that on a credit card, and those limits are usually about

20  $2,000 or less.

21  Q.   And at some time in your tenure at the Berkeley Labs, did

22  you start working on construction-type projects, as opposed to

23  the other fields within procurement?

24  A.   Uh-huh.

25  Q.   When was that?

1        (Interruption in the proceedings.)

2   **Q.**   Sorry.  Go ahead.

3   **A.**   That's okay.  Can you repeat the question?

4   **Q.**   I can't remember quite where I left off, but when did you

5   first get involved in the construction side of procurement, as

6   opposed to the other things you were mentioning?

7   **A.**   Sure.  So actually I started in the design and

8   construction team from the very beginning of my career, which

9   was about 16 years ago at Berkeley Lab.

10       I worked in other parts of industry in procurement for a

11   number of years before going to Berkeley Lab.  So I've always

12   done design and construction contracts.

13       In other parts of my tenure I moved to different teams, so

14   I would buy goods, but for the past 16 years I have always been

15   involved in design and construction contracts.

16   **Q.**   And in your tenure, you mentioned a bit ago that the

17   Lawrence Berkeley Lab is the direct employer.

18       Are any of your duties focused on U.C. Berkeley as opposed

19   to the Department of Energy, or is it all Lab/Department of

20   Energy business?

21   **A.**   I'm not allowed to do any other work except Department of

22   Energy business.  So when the Department of Energy gives the

23   money to the University of California to run this place called

24   Berkeley Lab, they really strictly limit our work to be

25   directly to the federally funded projects or any money that

1    they approve.

2          So if the University of California, U.C. Berkeley or

3    U.C.S.F. or U.C. Davis, have projects and they want our help or

4    they want our expertise, I'm actually not allowed to work on

5    those projects.  I'm directly funded by the federal government

6    and so my duties are limited to work on DOE projects.

7    **Q.**   You mentioned a bit ago that you now have a team that

8    works for you.  When did you first take a management position

9    at the lab?

10   **A.**   I did in 2009.  We have an early leadership program, so

11   instead of just switching people to manager without really

12   supporting them and knowing how to do that different role, I

13   took a team of two employees and I was a manager in training.

14   And then I took about a year of leadership training to

15   understand how to, you know, recruit, hire people, train

16   people, try to help them, you know, be good successful

17   employees, things like that.

18         So that was in 2009.  That was my first step into

19   leadership.  And then I continued after that.

20   **Q.**   And at some point did you take a managerial role,

21   specifically over construction type projects?

22   **A.**   I did.  That was in 2012.  And then I was there for a few

23   years, rotated to a few other teams, and then since 2017 I have

24   been 100 percent dedicated again to design and construction

25   contracts.

CROSBY - DIRECT EXAMINATION / DAWSON

1    Q.   Can you remind the jury, I believe you mentioned a bit

2    ago, how many people work on your team?

3    A.   Currently I have ten employees.

4    Q.   And what does your supervisory job involve over those ten

5    employees?

6    A.   I assign their work daily and weekly and any contracts

7    that are above their authority.  So let's say they have

8    $100,000 where they can sign contracts, but they might be

9    working on a contract that's $200,000.  I would review that and

10   sign it.

11       I also recruit for our team, for our whole department.  So

12   if there is a vacancy in another team because someone has

13   retired or taken another job, I will do recruitment.  So I work

14   with HR to make sure we've got incoming team members that can

15   backfill.

16       I also oversee their quality.  So, for example, if they do

17   a 20 contracts over a month, I will pull samples randomly and

18   make sure that they hit our compliance requirements.

19       The federal government puts a lot of requirements on us,

20   so I have to make sure that they are all met.  And then when

21   they are not, I tell the employee so that they can correct it.

22       I also have regular one-on-ones with my team so that I can

23   assess their workload and, you know, challenges they might be

24   facing.  And then I also write contracts, too.

25   Q.   And you mentioned a bit ago that the relationship between

CROSBY - DIRECT EXAMINATION / DAWSON

1    the regents and the Department of Energy had some

2    contractual -- I believe you mentioned a subcontract and a

3    prime contract.

4        Let's start with the prime contract.  What was that a

5    reference to?

6    **A.**   The prime contract, we call it Contract 31 because it's a

7    really, really, really long number and the last two numbers

8    happen to be 31.  So we just call it Contract 31.  That's the

9    federal contract that the Department of Energy has granted to

10   the university.

11       So I think in 2005 the federal government put out a bid to

12   see who else could run Berkeley Lab.  They will do this

13   regularly if they so choose.  The university put in a bid and

14   won that contract.  So the federal government, DOE, gave the

15   regents a contract, which is now going to be on $1.4 billion

16   next year, to operate Berkeley Lab.

17       So that's our prime contract.  That prime contract gives

18   us the money, but it also has a scope in it that says you must

19   continue to do scientific research that meets the criteria we

20   establish.  That's our prime contract.

21       Do you want me to talk about subcontract now?

22   **Q.**   Let's stay on the prime for a moment.  Do the terms of the

23   prime contract affect how you do your job and how your team

24   does its job in the procurement department?

25   **A.**   Yes.  It dictates nearly -- well, I won't say 100 percent,

CROSBY - DIRECT EXAMINATION / DAWSON

1    but a substantial percentage of how we do our work.

2    **Q.**   Okay.  And then what's the subcontract you referred to as

3    well?

4    **A.**   So the prime contract says you're allowed to issue other

5    contracts to do your work.  So what my team and our department

6    does is issue subcontracts under that prime.

7        So when I'm cutting a simple purchase order, a PO, to a

8    company to sell us just a laptop computer, for example, or an

9    iPhone, we issue that PO and in it, in all of our contracts,

10   even the simple ones, it says, "This is subject to the terms

11   and conditions of prime contract 31."

12   **Q.**   Understood.

13   **A.**   So we just call them all subcontracts for convenience and

14   actually requirements.

15   **Q.**   Now, I'd like to turn back to the physical lab again.  You

16   testified, I think, or -- first of all, I think we will start

17   at the beginning.  Where is the main campus located

18   specifically?

19           **THE COURT:**  Maybe we should take a break now if we're

20   changing -- slightly changing gears.

21       Okay.  Ladies and gentlemen, we're going to take our

22   recess now.  We will be in recess until 10:35.

23       Remember the admonition.  Don't discuss the case, allow

24   anyone to discuss it with you, form or express any opinion.

25       (Jury exits the courtroom at 10:19 a.m.)

CROSBY - DIRECT EXAMINATION / DAWSON

1      **THE COURT:**  Let the record reflect the jurors have

2  left.

3      Ms. Crosby, let me ask you a question to make sure I

4  understand the relationship.

5      As I understand the relationship, it is that you are an

6  employee of Berkeley Labs; is that correct?

7      **THE WITNESS:**  That's correct.

8      **THE COURT:**  So you get a check from Berkeley Labs?

9      **THE WITNESS:**  I get a check from the University of

10  California.

11      **THE COURT:**  All right.  You get a check from the

12  University of California because the University of California

13  has a number of labs.  And you are an employee, then, of the

14  University of California, I assume?

15      **THE WITNESS:**  That's correct.

16      **THE COURT:**  Okay.  And you run the procurement

17  section of Berkeley Labs.  I don't know if it's larger than

18  that or smaller.

19      **THE WITNESS:**  Uh-huh.  That's correct.

20      **THE COURT:**  Now, there is something unusual about

21  the -- when I say "unusual," the Richmond Lab, unlike the other

22  Berkeley Labs, is -- unlike some, I don't know whether all --

23  is actually owned by the University of California, as distinct

24  from some of the other labs; is that right?

25      **THE WITNESS:**  That's correct.  Also --

CROSBY - DIRECT EXAMINATION / DAWSON

1        **THE COURT:**  And they operate it?

2        **THE WITNESS:**  Pardon me?

3        **THE COURT:**  And they operate it?  So it's owned and

4    operated?

5        **THE WITNESS:**  That's correct.

6        **THE COURT:**  So I'm trying to figure out if a fraud

7    occurs with respect to the Riverside -- Riverside.  The

8    Richmond Lab, quote, who is defrauded?  Who is the victim?  Is

9    it the University of California or is it the -- or is it the

10   Department of Energy?

11       I don't know that you can answer that, but other than

12   the -- and I have to ask the Government that.

13       **MR. DAWSON:**  I think maybe I should ask a clarifying

14   question.

15       **THE COURT:**  Go ahead.

16       **MR. DAWSON:**  Is there actually a lab located at the

17   Richmond site?

18       **THE WITNESS:**  What kind of --

19       **MR. DAWSON:**  Like a laboratory, to your awareness?

20       **THE WITNESS:**  Not that I'm aware.

21       **THE COURT:**  What is it?

22       **MR. DAWSON:**  When we refer to the National Lab, the

23   actual laboratory, that's the location in Berkeley.

24       **THE WITNESS:**  Yes.

25       **THE COURT:**  I'm sorry.  What is Richmond?

1          **MR. DAWSON:**  So there's a satellite location, there

2    was some testimony about, in Richmond.  But my understanding of

3    the testimony is that the Lawrence Berkeley National Laboratory

4    itself is the site at Berkeley.

5          **THE COURT:**  So there is no Richmond.

6          **MR. DAWSON:**  There is a place in Richmond, but as the

7    witness testified, it's used, but it's not the sort of central

8    location.

9          **THE COURT:**  Is Richmond at all involved in this?

10         **MR. DAWSON:**  There is some references on some

11   recordings.

12      The building in question was at -- it's at the Berkeley

13   site.  I want -- the Richmond shows up on some recordings, so

14   its relationship --

15         **THE COURT:**  The building is at Berkeley, but people

16   refer to it as Richmond?

17         **MR. RIORDAN:**  No, your Honor.

18      What's going on is that there is a Berkeley, University of

19   California facility in Richmond that is not a DOE facility.

20         **THE COURT:**  Right.

21         **MR. RIORDAN:**  The Berkeley National Lab is funded by

22   the DOE.  And as the witness has said, she can't do anything

23   related to Richmond because that isn't related to the DOE.

24         **THE COURT:**  And so my question is, let's say I'm

25   there and I want to submit a bid to build a building in

CROSBY - DIRECT EXAMINATION / DAWSON

1     Richmond.  What does that have to do with DOE?

2              MR. DAWSON:  In 2013 there was a proposal between

3     Berkeley and DOE to develop buildings in Richmond, in 2013 and

4     2012.

5         But the focus of the contract here, the plans here, the

6     building here, that's not in Richmond.  That's in Berkeley.

7              THE COURT:  Well, that's all perfectly unclear.

8         Okay.  Thank you.

9         (Whereupon there was a recess in the proceedings

10           from 10:24 a.m. until 10:40 a.m.)

11             THE COURT:  Let the record reflect all parties are

12    present.  You may proceed.

13             MR. DAWSON:  Thank you, your Honor.

14    BY MR. DAWSON

15    Q.   Ms. Crosby, before the break I think we were talking about

16    some of the different locations associated with the lab.  I

17    think there may have been a bit of confusion, so I wanted to

18    circle back and make sure that everybody was clear.

19        The facility in Berkeley itself, who owns the actual

20    laboratory, the buildings that sit at that laboratory?

21    A.   So the buildings are all owned by the Department of

22    Energy, federal government.  The land that they sit on is owned

23    by the regents, University of California.

24    Q.   And is there some kind of a lease arrangement?  Do you

25    know the details of that?

CROSBY - DIRECT EXAMINATION / DAWSON

1   **A.**   Yes.   As part of that prime contract, in it we have

2   agreements that have the regents, U.C., gives the land to DOE

3   and then DOE builds buildings on it.   So all of those buildings

4   are federal property, but they sit on regents' land and they

5   are encumbered by a real estate lease.

6        It's very common in industry to have a 50 or a 99 year

7   lease.   Most of our leases are 99 years long.   So the federal

8   government knows it can have its property not moved or

9   anything, the buildings.   And usually the landlord will get

10  rent for that, the regents here.   We're not-for-profit.   We're

11  promoting research and education, so we rent that land for a

12  dollar.

13  **Q.**   And now there was a brief reference to a location in

14  Richmond the last time you were testifying.   Do you recall

15  that?

16  **A.**   Yes.   Yes, I do.

17  **Q.**   And at the moment, today in 2018, do you know who owns

18  that land?

19  **A.**   Yes.   The Richmond Field Station is owned by the regents

20  also, by U.C.

21  **Q.**   And in the 2012 and 2013 time frame was there a proposal

22  or a consideration to put a department of Department of Energy

23  facility on that land?

24  **A.**   Yes, there was.

25  **Q.**   And did you have any role in that process?

1    **A.**    I did.

2    **Q.**    What was your role?

3    **A.**    My role was, as a procurement contracting officer, to

4    issue a solicitation, which is called a Request For Proposal.

5    So I issued an RFP that asked companies about the potential to

6    build out that space for future laboratory use.

7    **Q.**    Am I correct that this was essentially made public, that

8    the Department of Energy was considering developing this land?

9    **A.**    Yes.

10   **Q.**    Do you know whether that project ultimately was

11   implemented?

12   **A.**    I do.  It was not implemented or funded.

13   **Q.**    Do you know why?

14   **A.**    There were a lot of reasons, but primarily because of

15   cost.

16   **Q.**    And who would have paid for the development of that

17   location?

18   **A.**    The federal government, DOE.

19   **Q.**    And so the land is still there, and did you testify

20   earlier that scientists make use of it still?

21   **A.**    They do on occasion.  So one of our scientists, for

22   example, in the last three or four years used a portion of the

23   land to bury metal so that he could do research on detection of

24   mines that would explode.  We didn't have explosives there,

25   but, you know, just inert metal.  And so they do research out

1    there on occasion.

2          The proposal that I was issuing back in 2012 and '13 was

3    to actually develop the property, put utilities into it, build

4    it out for laboratory use.

5    Q.    And did you ultimately receive proposals in that process?

6    A.    We did.  We received initial proposals and we started

7    evaluating.  And as part of that, the Department of Energy

8    assessed that it was really quite expensive to build out there.

9    Q.    And now turning back to the Berkeley location, the actual

10   Lawrence Berkeley National Laboratory.

11   A.    Okay.

12   Q.    Approximately how many buildings make up the lab that's

13   located at Berkeley?

14   A.    The main campus at the Berkeley Lab has over 100

15   buildings.

16   Q.    And those buildings are owned by DOE?

17   A.    Yes.

18   Q.    Is that campus accessible to the public?

19   A.    The campus isn't.  You need guest access and gate entry

20   with a visitor.

21   Q.    And do you know why access is restricted?

22   A.    Yes, because it's a federal facility.  Even though the

23   land is U.C. regents' land, nearly all of the buildings are

24   federal.

25          So there are a couple of buildings that are not federal,

1    but 99.9 percent are federal.  So because it's a federal

2    facility, it's protected and gated and we have guards at our

3    gates.

4    Q.   And if somebody working for the lab, if a scientist wanted

5    to build a new building or renovate an old building, which

6    department would handle the process to implement that?

7    A.   So my department works in partnership with our facilities

8    team.  They are our really estate office.  They have project

9    managers that will talk to a researcher and say:  What do you

10   need?  What does your space need?  And what renovations are you

11   thinking about?  Or if it's a new building:  What will your new

12   building need to do to meet your scientific need?

13   Q.   If it's a new building, who would pay to construct that

14   building?

15   A.   Department of Energy.

16   Q.   If they are renovating an existing building, who would pay

17   to renovate the building?

18   A.   Again, it would be the Federal Department of Energy.

19   Q.   Do you know whether there's a building at the Berkeley

20   location of the laboratory known as Building 84?

21   A.   I do.

22   Q.   Is there one --

23   A.   Yes.

24   Q.   -- to be clear, for the record?

25   A.   Yes.  There is a Building 84 on the main Berkeley Lab

CROSBY - DIRECT EXAMINATION / DAWSON

1   campus.

2   **Q.**   And if that building were to be renovated, who would pay

3   for that?

4   **A.**   Same.  It would be Federal Department of Energy that would

5   pay for renovations.

6   **Q.**   And if the building were to be renovated, would it be

7   somebody on your team who would be responsible for running that

8   process?

9   **A.**   Yes.  A buyer would -- I would assign a buyer to work with

10  the project manager and the scientists to see what they need

11  and then start the sourcing process to get designers,

12  architects, engineers and builders to do that work.

13  **Q.**   Okay.  Now, when that process kicks off, are there any

14  regulations or guidelines that apply to how your group does its

15  work?

16  **A.**   Yes.  We're guided primarily by what's called the FAR,

17  Federal Acquisition Regulation.

18  **Q.**   And is that a felt of regulations unique to the Department

19  of Energy or does that apply more broadly?

20  **A.**   It's actually broad.  The federal government, across even

21  defense spending for military equipment, will abide by the FAR,

22  Federal Acquisition Regulation, although every department has

23  what's called an overlay.

24      So, for example, Department of Energy has DEAR, D-E-A-R.

25  That's the Department of Energy Acquisition Regulation.

1     But if you were to get a book of both, the FAR is, like,

2  two inches thick and DEAR would just be a little bit of rules

3  on top of it, very thin.

4     So it's an overlay.  The primary base is the Federal

5  Acquisition Regulation.

6  **Q.**   Can you give the jury an example of what kinds of rules or

7  regulations or guidelines are found in the FAR?

8  **A.**   Sure.  Yes.  So the Federal Acquisition Regulation has 52

9  sections, and they start with definitions.  They say when

10 you're going to go buy things, follow these rules.  And as a

11 result, if you get to design or construction services, that's

12 FAR part 36, so you will go to that section and it says when

13 you're going to hire design architects, here is how you do it.

14 If you need construction contractors, here is how you do that.

15     So for construction contractors, it might limit people who

16 are in that industry, have a certain safety record.  You want

17 to assess other qualifications.  And the FAR lays out some of

18 those parameters.

19 **Q.**   Do these regulations you're referring to relate in any way

20 to the prime contract you were talking about earlier that

21 governs the relationship between DOE and the lab?

22 **A.**   Yes, they do.  They relate directly.

23 **Q.**   How so?

24 **A.**   The prime contract tells us at Berkeley Lab that when we

25 go procure things and buy them, we need to abide by certain

1   sections of the Federal Acquisition Regulation.

2   **Q.**   Do you and your staff receive training in those

3   requirements?

4   **A.**   We do.

5   **Q.**   Now, I'd like to get into some of the specifics in the

6   procurement process.

7        So in the event a building had to be renovated, who, first

8   of all, makes the decision on whether a renovation is going to

9   happen or not?

10  **A.**   Primarily our scientists and users.  So I sit in office

11  space.  I'm not in laboratory space.  So it could be my

12  department head, which might say:  Oh, our sinks need

13  renovation and our bathrooms aren't as nice or as functional as

14  they could be or they need to be more ADA compliant.  So

15  whoever the user is, usually it's our scientists, will say:  I

16  need different things for my laboratory, so I want to build out

17  or renovate this space.

18  **Q.**   And who decides whether or not to spend the necessary

19  money to complete one of those projects?

20  **A.**   Well, ultimately it's the Department of Energy, because

21  they give us the money, but the ask will come from our

22  scientists.  They will say:  I need more fume hoods.  I need

23  more lab benches.  I need a deeper sink.  Whatever they need to

24  do their research.

25       So they will have an ask.  So it's -- I'll compare it to

1  maybe renovating your house.  You might think about renovating

2  your bathroom.  Your budget might be pretty limited; right?  It

3  might be $20,000, but your desire might be 30- to $40,000.

4  That right sizing happens by having a conversation with the

5  scientist that says:  Here is what I'd like, and then their

6  budget, which is here is how much money you can have.

7  **Q.**   And so once you have the necessary budget, if the

8  Department of Energy agrees to fund, what's the next step that

9  you and your team go through for a building renovation?

10 **A.**   We hire architects and engineers by having them assist us

11 in laying out the plans and specifications for what the

12 renovations entail.  That's step one.

13 **Q.**   And can you give us a little explanation of plans versus

14 specifications?

15 **A.**   Sure.  So plans are usually drawings.  They may still have

16 details on them that describe what the drawings are.

17 Specifications will be how you do that work at Berkeley Lab.

18        So there are general construction industry standard

19 specifications for electrical, plumbing, concrete, all kinds of

20 trades.  But at Berkeley Lab we have our own specifications

21 that say when you work at Berkeley Lab, the specifications when

22 you work on our equipment or lighting, keep in mind these

23 certain things.  We might have these kind of lights or that

24 kind of light.

25        The plans themselves are typically drawings that will lay

CROSBY - DIRECT EXAMINATION / DAWSON

1    out what that building configuration is.  So, you know, here in

2    this courtroom there is the hallway, each of the court centers,

3    the restroom.  The plans will lay that out.

4    **Q.**    Okay.  I'm going to show you what's been admitted as

5    Exhibits 39.

6          (Whereupon document was tendered to the witness.)

7    **Q.**    Can you tell what kind of document that is?

8    **A.**    Yes.  This is typically what we refer to as plans,

9    drawings and plans.

10   **Q.**    And so you were describing this in the abstract a few

11   minutes ago, but looking at them, what are the kinds of details

12   that are contained in plans?

13   **A.**    So, for example, here there is first floor east demolition

14   plan, and it shows a lot of rooms with the main corridor

15   hallway.  So that layout of a drawing is what's typical in

16   plans.

17   **Q.**    And what -- what different kind of information would be in

18   a specification for a project?

19   **A.**    A specification would list, mostly verbally instead of in

20   drawings, a list of the detail of what might be in the guts of

21   this location and then what you should be aware of if you're a

22   construction contractor when you come in to do that work.

23   **Q.**    And so in the process that you were describing earlier,

24   once you've obtained specifications and plans, what happens

25   next?

1   A.   We work with the facilities team, usually a project

2   manager, that gives us information about the potential

3   suppliers, but also the nature of the work that needs to be

4   completed.  So it's really the scope.

5        And based on the scope we receive, we're going to look for

6   companies that can do that work by issuing either information

7   requests to companies, calling them, emailing them and seeing

8   who can actually do that work.  So we start searching for the

9   source.

10  Q.   Is there a step in this process where you, on your team or

11  somebody else, would generate an independent estimate of what

12  the project will cost?

13  A.   Yes.  We do get independent estimates, not for every job

14  when they are low dollar.  They are required at $150,000 or

15  more.

16       So if the renovation is that high or higher, the

17  facilities team, their project manager has an independent

18  estimator that gives a cost of what it may be to do the

19  renovation that the scientist needs.

20  Q.   I believe you made a reference to this earlier, to

21  something called a Request For Proposals.  Is that a term that

22  you're familiar with?

23  A.   It is.

24  Q.   What does that refer to?

25  A.   A request for a proposal is a solicitation.  It will be

CROSBY - DIRECT EXAMINATION / DAWSON

1    issued to whoever can do the work by saying:  I'm asking you.

2    Here is a request for you, company, to give me a proposal.

3    Q.    And is there something in the process also known as an

4    Invitation To Bid?

5    A.    There is.

6    Q.    What's that mean?

7    A.    It's a request -- it's very similar.  It's nearly

8    identical.  Invitation To Bid is the same thing.  We issue it

9    to companies to say:  Here is an invitation for you, companies,

10   to give us a bid.

11   Q.    And what's the relationship, if any, between a proposal

12   and a bid?

13   A.    They are very similar.  Typically a bid might be a hard

14   dollar amount that tells you here is how much it costs to do

15   this work.

16         A proposal might be a little lengthier, with a little

17   information about how they might do that work.

18         And in the invitation if I asked for their request to

19   address certain things, how they are going to do that work, a

20   proposal might give a little bit more detail, plus the bottom

21   line price.

22   Q.    And so you referred to what you may ask as the contracting

23   officer.  Does the contracting officer have discretion to

24   include the kinds of information that she wants to see in a bid

25   or proposal?

1   **A.**   Yes.   We have a lot of discretion.   It's not unlimited.

2   If you'll recall, the prime contract and the FAR, the Federal

3   Acquisition Regulation, it dictates things that I don't have

4   discretion to waive.

5        But as far as discretion about how I ask for things or

6   what I need, yes, we have latitude.

7   **Q.**   And does a contracting officer have discretion as to

8   whether to proceed with a Request For Proposal as opposed to an

9   Invitation To Bid?

10  **A.**   Yes, we do.

11  **Q.**   I would like to take a look at what's been admitted into

12  evidence as Exhibit 45.

13            **MR. DAWSON:**   And, Ethan, if we can pull this up since

14  it's in evidence?   Page 2.

15        (Whereupon document was tendered to the witness.)

16  **BY MR. DAWSON**

17  **Q.**   Now, Ms. Crosby, I know your name is not on this document,

18  but from your experience do you recognize what kind of document

19  this is?

20  **A.**   Yes, I do.   Is it --

21  **Q.**   What is -- please, go ahead.

22  **A.**   It looks like a submission of a proposal in response

23  probably to a request for a proposal.

24  **Q.**   And do you see, does it reference a lump sum bid about

25  halfway through?

1    **A.**    Ye.

2    **Q.**    Does this resemble the kind of bid letter that somebody in

3    your office might receive?

4    **A.**    Yes, it does.

5    **Q.**    In terms of the information that's included in this bid

6    letter, does the contracting officer have discretion to require

7    the bidders to provide extra information beyond what you can

8    see here?

9    **A.**    Can you repeat that?  Does the contracting officer do

10   what?

11   **Q.**    Does the contracting officer have discretion as to what

12   kind of information a bid must include?

13   **A.**    Yes, a contracting officer does.  They can ask for

14   additional explanation, for backup documents.

15   **Q.**    Does this document appear to be the kind of document that

16   you would receive in the normal process that you oversee at the

17   Lawrence Berkeley Labs?

18   **A.**    It does.

19        **MR. DAWSON:**  And if we could turn to the next page?

20   And, actually, let's move on to Page 4.  One more.

21        (Document displayed)

22   **BY MR. DAWSON**

23   **Q.**    Are you on Page 4, Ms. Crosby?

24   **A.**    Not yet.

25   **Q.**    I believe --

CROSBY - DIRECT EXAMINATION / DAWSON

1    **A.**   I am now.

2    **Q.**   Is the format of that document familiar to you?

3    **A.**   It is.  Yes, it is familiar to me.

4    **Q.**   What does it appear to be?

5    **A.**   It's a screening questionnaire and sometimes we call these

6    qualification questionnaires.  It's asking a company to

7    identify certain things about what they do.

8         So it could be -- for example, number one, Experience

9    Modification Rate.  We regularly ask for that.  We want to see

10   that it's one or below.  It's a rate by the insurance industry

11   that will tell us that this company has a pretty good safety

12   record.  They don't have high incidents of injury for their

13   laborers, their construction workers, or other, you know,

14   safety things that have happened on their jobs.

15        So it looks like a questionnaire that says:  Can you do

16   this job and can you meet our -- some of our basic

17   requirements?

18   **Q.**   Sorry to interrupt, but are these the typical kinds of

19   questions that one would ask in this process from your

20   position?

21   **A.**   Yes.  These are very typical, especially the license.

22   Number six, Do you hold a license, B contractor's license?

23   That's required.

24   **Q.**   This may be obvious, but what's the purpose of soliciting

25   this kind of information from a bidder?

CROSBY - DIRECT EXAMINATION / DAWSON

1    A.   In order for a bidder to be able to do our work, we want

2    to make sure that they are responsive to what we ask for and

3    responsible.  Responsibility is really critical --

4            THE COURT:  Let me ask the jury, can you see this?

5        Mr. Dawson, why don't you blow up any portion.  You show a

6    document to the jury, do you want them to see it?

7            MR. DAWSON:  Good point, your Honor.

8            THE COURT:  Then I think you should blow up the

9    portion so they can see it.

10           MR. DAWSON:  Everybody see fair enough now?

11           THE COURT:  You can highlight a portion.  You can --

12           MR. DAWSON:  Why don't we highlight the first one

13   through four.

14       (Document highlighted.)

15           THE WITNESS:  Oh, that helps.

16   BY MR. DAWSON

17   Q.   So you were testifying a little earlier about the

18   modification rate?

19   A.   Yes.  Experience Modification Rate.

20   Q.   Where is that on this form?

21   A.   It's Item No. 1.

22   Q.   And then there is a reference under number two about OSHA?

23   A.   Uh-huh.

24   Q.   Do you know what that's a reference to?

25   A.   It is.  It's their environment -- it's their health and

CROSBY - DIRECT EXAMINATION / DAWSON

1    safety.

2        So the health and safety requirements by California OSHA

3    will tell us whether they have reported citations for violating

4    it by having employees that were injured on a job.  If they had

5    other incidents that had to be reported to OSHA because they

6    didn't have strong and good safety practices.

7    Q.   And is this the type of information that you would

8    typically solicit in the process?

9    A.   Yes.

10       MR. DAWSON:  So if we could remove that magnification

11   and then go down five to eight?

12       (Document highlighted.)

13   BY MR. DAWSON

14   Q.   You mentioned a little bit ago about a license?

15   A.   Yes.

16   Q.   What kind of license are you looking for?

17   A.   Companies need to generally have either an A or a B

18   license.  B is very common.  It's a general contractor license.

19   A is an engineering license.

20       Anybody that holds an A or a B license within the state

21   can hire lower tiers, plumbers, electricians, trade specific

22   companies that can then perform that work.  We always want a

23   company to be licensed and typically a B license is very

24   common.

25       MR. DAWSON:  And then if we could remove that

CROSBY - DIRECT EXAMINATION / DAWSON

1   magnification and just magnify the number nine.

2        (Document highlighted.)

3   **BY MR. DAWSON**

4   **Q.**   Do you see that that's highlighted on the screen?

5   **A.**   Yes.

6   **Q.**   What kind of information is that requesting?

7   **A.**   We typically want to make sure that the company that

8   performs the job has relevant experience and we will check

9   references.

10        So we'll ask them:  Have you done work similar to our

11   project?  And can we know the name and contact information for

12   that other project?  And we'll call them and ask them questions

13   about their performance.  Would you hire them again, or was

14   their performance satisfactory?

15   **Q.**   Okay.  Now I'd like to move on to a slightly different

16   variation on this theme.  You testified earlier --

17             **THE COURT:**  Wait.  Could you explain what paragraph

18   eight is?  Highlight that.

19        (Document highlighted.)

20             **THE WITNESS:**  Absolutely.  So paragraph eight asks if

21   they are capable of bonding the job.  And bonding capacity is

22   important because it's a FAR requirement, Federal Acquisition

23   Regulation.

24        So it will ask -- this is asking:  Can you bond the job?

25   And if you can, at what level?  And then to make sure that we

CROSBY - DIRECT EXAMINATION / DAWSON

1    can cover the work.  So bonds ensure two things primarily,

2    performance and payment.

3        On occasion our general contractors don't pay lower tiers.

4    So we want to make sure that they are going to get paid.  So

5    the bond does that, because we would go to the surety, we would

6    go to the insurance company to make sure they are paid.

7            THE COURT:  What are the responses here?

8            THE WITNESS:  So --

9            THE COURT:  What does that mean?

10           THE WITNESS:  So this is asking about:  Can you get

11   the bonding?  And if you can, at what level?

12       So they have responded:  Do you have a relationship with

13   the bonding surety -- so, I apologize.

14       First is:  How quickly can you get bonded, and to what

15   dollar value, and do you have an ongoing relationship with the

16   bonding surety and insurance company?

17       Their response, I think, is in the lighter font.  It's

18   ASAP.  And the surety levels would be 2 million in a single,

19   4 million aggregate, or 10 million single and aggregate.  That

20   would be to cover that job based on the nature of umbrella or

21   general coverage we would want.

22           THE COURT:  Can you explain?  It says single,

23   aggregate for fixed price, and single and aggregate.  Would you

24   explain each of those things.

25           THE WITNESS:  Sure.  So single is usually -- I'm not

CROSBY - DIRECT EXAMINATION / DAWSON

1  100 percent sure because I don't have -- I haven't really seen

2  this.  And, also, I don't know the context fully of what was

3  asked for by the contracting officer.

4      But typically single is for a single incident that might

5  happen on the job.  We want to make sure that they have

6  insurance coverage up to $2 million.

7      Aggregate --

8          THE COURT:  So that's not a performance bond.  That's

9  simply an insurance that it could cover any accident or

10  something of that nature.

11         THE WITNESS:  That's correct.

12         THE COURT:  A single occurrence.

13         THE WITNESS:  That's correct.  That's usually their

14  general liability insurance.

15         THE COURT:  Okay.  Now move to the next one.

16         THE WITNESS:  And then aggregate would be, well, this

17  is for fixed price contracts.  So if the contract is at some

18  level, let's say $5 million.  They have $4 million of aggregate

19  coverage for other incidents that would happen, and that would

20  be sort of for any general claim usually.

21     And then 10 million looks like it's their combined, single

22  or aggregate, cost plus project.  So cost plus projects are

23  higher risk.  It's not just do the job for a fixed price, but

24  do the job for what it costs you and we'll cover you.

25     So the government is covering a lot more risk and as a

1    result, they usually ask for a higher coverage and here they

2    have provided 10 million.

3                    THE COURT:  Thank you.

4                    THE WITNESS:  You're welcome.

5    BY MR. DAWSON

6    Q.    And now if we can turn to the financial process when one

7    of these projects gets going.

8          You testified earlier that the money would come from the

9    Department of Energy.  How does that federal money ultimately

10   get to a contractor who is working on a project?

11   A.    So the federal money comes from the United States

12   Treasury.  It gets transferred to Berkeley Lab through our bank

13   account.  The U.S. Treasury transfers money to the regents.

14   The regents hold it in a federal account, or a bank account,

15   and then the money goes into project accounts at the lab level.

16         So the scientists that wanted to renovate their laboratory

17   might get, you know, $1 million of that allocation and that

18   goes through projects and IDs that we set up within our

19   institution.

20   Q.    And when the bids come in or when a bid comes in, is it

21   always reviewed by a team or is a single contracting officer

22   authorized to accept bids?

23   A.    They are typically within a team.  A contracting officer

24   does have authority to accept them.  However, they usually do

25   it not in isolation, but with the people that need the work

CROSBY - DIRECT EXAMINATION / DAWSON

1    done.  So the project manager and the scientist.

2    Q.   And so in terms of on your team, does one contracting

3    officer have to consult with a supervisor, for instance, if

4    there is a bid that's within their authority?

5    A.   No, they don't need to consult with me or a supervisor.

6    Q.   Do prospective bidders for a construction project ever

7    visit the site that's to be renovated or constructed?

8    A.   Yes.

9    Q.   Do you know why they do that?

10   A.   Well, visiting a site gives you an enormous amount of

11   intelligence.  So if you're coming to a job site to do

12   construction work, imagine visiting a very flat space with a

13   nice big parking lot.  Berkeley Lab doesn't have any of that.

14   We are on a hill.  We're really steep.  And it's really

15   informative to do a job site visit so that you can see the

16   conditions.

17       If you're working in downtown San Francisco or in

18   Berkeley, it's a lot, lot smaller versus, you know, a very

19   expansive area, let's say, in Livermore.

20       So job site visits are pretty typical and the companies

21   that come will see a lot of conditions that they won't be able

22   to pick up from plans and specifications.

23   Q.   And you mentioned earlier that the site is not accessible

24   to the public.  So how does a bidder come to visit the

25   location?

CROSBY - DIRECT EXAMINATION / DAWSON

1   **A.**   Bidders are invited.  They also get guest passes.  So if

2   they are interested after we've called them and emailed them,

3   they will say:  Put me name on the list.  And we give our

4   guard -- guard gate entrance people the list of people that may

5   show up.  We also tell them:  Don't close off the doors if

6   other people show up as well because this is a public bid.

7        So what we'll do is leave our cell phone with a guard and

8   the guard will have a list of their names.  And then they get

9   access to the site, and they will get directions, and they will

10  let us know in email and telephone calls that they are going to

11  attend.  If they bring others that might be invited, they are

12  also included.

13  **Q.**   And you mentioned first you have the site visits, which

14  some people take advantage of.  Do you tend to also provide

15  copies of the plans and the specifications to a prospective

16  bidder before the bid is sent in?

17  **A.**   Yes, we do.

18  **Q.**   Why is that?

19  **A.**   It gives companies a lot of opportunity to read and study

20  them and also, really more importantly, to ask questions about

21  them.

22       If the specifications or the plans, which are the

23  drawings, don't really clearly show the number of door handles

24  and what we want as doors, they can ask those types of

25  questions.

CROSBY - DIRECT EXAMINATION / DAWSON

1   Q.   And how long do prospective bidders typically have on a

2   construction contract to study the specifications and study the

3   plans before the bids are due?

4   A.   Typically they have 20 to 30 days.  The average comes out

5   to usually about 30 days.

6   Q.   You mentioned as well that sometimes a bidder will have

7   questions about plans once they have reviewed them.  How does

8   the bidder go about getting those questions answered?

9   A.   They submit the questions -- well, they can call or submit

10  questions in email.  Once they call, we always say:  Great

11  question, please write it down.  And then they will email us.

12       So the preferred method and the standard is to email all

13  questions to the contracting officer.  Then the contracting

14  officer gathers all the questions and provides answers and then

15  submits them all back to company simultaneously, so they all

16  have the ability to get the same questions and the same answers

17  all at the same time.

18  Q.   Why is it your practice to send the answers to the

19  question to everybody, even though only one bidder asked the

20  question?

21  A.   That way you're allowing everybody to have an even playing

22  field when they submit a proposal or a bid.

23  Q.   Now, you testified a little bit ago about the FAR and the

24  Department of Energy overlay.  So we don't -- I don't want to

25  get back into those, but can you explain what the overall goal

CROSBY - DIRECT EXAMINATION / DAWSON

1    of the procurement process is for the Department of Energy?

2    **A.**    Sure.  So I think my core job and our department's core

3    function is to make sure we have fair and reasonable prices.

4    Fair and reasonable isn't always the absolute lowest price, but

5    it needs to be pegged to fair and reasonable so that we, as

6    taxpayers -- I'm a taxpayer -- I want to make sure that my

7    money is used by the federal government not in an excessive

8    way, but in a very fair way and a reasonable way.  So that's

9    really our core function in procurement.

10   **Q.**    And you mentioned earlier that it's common to have

11   multiple bidders; that when you get a question, you would give

12   the answer to everybody.

13        Does the presence of multiple bidders play a role in your

14   goal of ensuring the best price?

15   **A.**    Yes.  It's the absolute best way to know you have fair and

16   reasonable prices.

17   **Q.**    Why is that?

18   **A.**    You can take -- let's say there are four companies giving

19   you a bid.  You can take each of those bids and compare them to

20   one another and get an immediate gauge of whether they are in

21   the ballpark for the price of the project that you estimated.

22   And, also, it gives you immediate competition.  Competition is

23   really healthy.  It's very good.  And then it tells me, as a

24   contracting officer, okay, I know now I'm awarding this based

25   on bids that I receive from companies who are all really

1    fighting for the opportunity to win that award.

2    **Q.**    And does the competitive process play a role in ensuring

3    that the Government doesn't overpay for a particular project?

4    **A.**    Yes, absolutely.

5    **Q.**    And in terms of the contract administrator or the buyer,

6    what role does that individual play in ensuring this

7    competitive process you were testifying about?

8    **A.**    We're independent from the people that need the job done.

9    We're not part of their department.  We are officers that

10   represent the money and to make sure that the money that's

11   spent is spent with integrity.

12       So because we're independent, it gives a level of distance

13   from the people that want the project done to make sure that

14   it's being spent fairly, reasonably and not wastefully.

15   **Q.**    And do the rules within which you operate permit a

16   contract administrator to award a contract to somebody prior to

17   even sending out a solicitation for bids or proposals?

18   **A.**    Yes.  That would be a sole source award.  We can do that.

19   **Q.**    What's the review process like that?

20   **A.**    Well, depending on the dollar value, if you're spending

21   anything before $25,000, we need to demonstrate that the prices

22   we're paying are fair and reasonable.  It's very hard to do

23   that without competition.

24       So if you can imagine trying to justify a price for

25   something that you don't have any competition for, it just

1    takes a lot more work.  You can do it, but it can slow you down

2    and, also, doesn't have a good gauge in the market to show that

3    the price you're paying is really fair.

4    **Q.**    And if the contracting officer has chosen to proceed with

5    the bids, in that context can the contracting officer promise

6    the contract to a particular contractor in advance of receiving

7    those bids?

8    **A.**    No.  That's illegal.

9    **Q.**    How would something like that undermine DOE's goals for

10   getting the best product for the best price?

11   **A.**    Essentially DOE would have no gauge to know that the price

12   is fair or reasonable and that the integrity of the process has

13   been maintained.  It really undermines the integrity of the

14   process, so there wouldn't be any gauge to do that.

15   **Q.**    You testified earlier that one of the steps in the process

16   would be maybe to get an independent estimate of a project?

17   **A.**    Yes.

18   **Q.**    How does that come about?

19   **A.**    An independent estimate is done usually by internal

20   employees.  They are separate from the scientist or the person

21   that needs their place renovated.  They are in-house people

22   that review the plans, the specifications, and then assess what

23   the price may be ultimately for that build-out.

24         They are a really good gauge to get an assessment of what

25   the should cost is.  So if the project should cost a million

CROSBY - DIRECT EXAMINATION / DAWSON

1   dollars or something else, they give us that immediate gauge.

2   Q.   And what do you do -- what do you use this estimate for?

3   A.   I'm required to -- my team and I are required to get an

4   independent estimate at $150,000 or above for a contract.  We

5   use it to know the estimate value, approximate value of what

6   the bids should come in at and, also, for budgeting.

7        It's really important for the scientists.  So if they come

8   in with a budget ask of $5 million, but they only have a

9   million, our estimator will say:  You have want so many other

10  things in your build-out, you just can't afford all of that.

11  So they will start taking things out of their project.  So it's

12  a good way to budget.

13  Q.   And is that internal cost estimate ever made public to the

14  potential bidders?

15  A.   No, never.

16  Q.   Why not?

17  A.   It would provide a really unfair advantage to bidders and

18  companies that want to win that award.

19  Q.   How so?

20  A.   They would all know our internal gauge of what the price

21  should be.  They could peg it at that price or just below or

22  just above.  It would not be fair.

23  Q.   And is that the equivalent of inside information about the

24  project?

25  A.   Yes.

1  Q.   And in the normal process do bids ever come in lower than

2  what your independent estimate may have been?

3  A.   They do.

4  Q.   Do bids ever come in higher than what the independent

5  estimate would have been?

6  A.   Yes, they do.

7  Q.   And if that happens, what's the process?

8  A.   When they come higher, we can go into discussions with

9  companies to understand the basis of their estimate.  Usually

10 the construction company might have an internal estimator also.

11 They might give us details about what made up their estimate.

12      We can also go back to our scientist or whoever needed the

13 renovation or the new building and ask them to take things out

14 that might not be critical for the building.  Maybe a very

15 pretty awning that cost a lot of money could go.

16      So that's called value engineering and it will reduce the

17 scope and the price of the project.

18 Q.   And who is responsible for starting that value engineering

19 proposal or process?  Is that the contracting officer?

20 A.   It is, as well as the project manager.  Because I can't

21 sign a contract that I don't have money for.  It needs to meet

22 my budget.

23 Q.   Are you familiar with the phrase "fraud, waste and abuse"?

24 A.   I am.

25 Q.   Do those terms come up in your work with the Berkeley

CROSBY - DIRECT EXAMINATION / DAWSON

1   Labs?

2   **A.**   Yes, they do.

3   **Q.**   How so?

4   **A.**   We receive training in fraud, waste and abuse, how to

5   identify it, how to avoid it, how to report it.  Yeah.

6   **Q.**   And what kind of -- first of all, who provides the

7   training you were just referring to?

8   **A.**   We have two forms of training.  Sometimes they are from

9   external and a lot of internal training.

10       So internal training is for our whole department.  We have

11   a policy team that will do internal training.

12       Then externally we'll have Department of Energy IG,

13   Inspector General provide training.  On occasion it could be by

14   the FBI or other law enforcement that will come to us and give

15   us training on identifying fraud, waste or abuse.  Those are

16   primarily the two ways that we get a lot of training.

17   **Q.**   And in the context of this phrase, do you have a

18   particular understanding of what the word "fraud" is referring

19   to?

20   **A.**   I do.

21   **Q.**   What's that?

22   **A.**   Fraud is when you're trying to present material that isn't

23   accurate or truthful.

24   **Q.**   And how about "waste"?  What is "waste" a referral to?

25   **A.**   Waste is when you're overprocessing or taking steps that

CROSBY - DIRECT EXAMINATION / DAWSON

1  really aren't necessary, that you could eliminate to save money

2  or save time.

3  Q.  And lastly, how about "abuse"?

4  A.  Abuse can be abuse of the process or even of authority.

5  So if people on my team or myself act outside of our authority

6  and do things that are unethical or illegal, that's abuse of

7  power.

8       Or abuse could be also if a company is trying to take

9  advantage of a process by not following it or circumventing it

10  somehow, that could be abuse as well.

11  Q.  And in the normal practice, is it your expectation that

12  bidders on a project are going to share their bids with each

13  other?

14  A.  No.

15  Q.  Why not?

16  A.  They would be sharing information when they are trying to

17  be competitors, it would be, first, illogical to do that when

18  you're trying to win an award.  Companies work really hard to

19  try to get business with us.  So if they shared their

20  information, it would be collusion and that's illegal.

21  Q.  Now, you mentioned circumventing the process a few moments

22  ago.  Would this be an example of circumventing the process?

23  A.  Yes, that's a good example.

24  Q.  In the context of processing bids or proposals, are there

25  any red flags that you have been trained to look for in

CROSBY - DIRECT EXAMINATION / DAWSON

1   connection with fraud, waste or abuse?

2   A.   There are.

3   Q.   And what are some examples of those?

4   A.   We have been given case studies of actual prior examples

5   that were presented to contracting officers.  When our internal

6   team provides the training, or even externally, they have given

7   us overviews of markers and ways to identify it.

8        One example might be if bids come in and they -- I have

9   knowledge of information that other people have shared with

10  each other before they've come in.  I've seen maybe emails

11  between them.  That might be one way.  Yeah.

12  Q.   And in your time at the lab, are you aware of any

13  employees in your job who have encountered a real life example

14  of this?

15  A.   Yes.  Our policy lead has been in federal contracts and

16  government audit for over 45 years, and he has some examples

17  that he's run across.

18  Q.   And now when a contractor submits a bid on a project, can

19  the contractor decide after submitting the bid that the bid was

20  incorrect and should be higher?

21  A.   They can.

22  Q.   And what's the process for that?

23  A.   If they did that, they would essentially be revising the

24  bid they proposed and they would need to let us know right

25  away.

1    I -- depending on what happens, if they try to increase

2    their price, I could go to the surety, which would have a bid

3    bond, and ask for them to cover the expense of even having to

4    re-procure.

5    If they tried to revise their price after bid was

6    submitted, I would have some serious questions about why

7    they're do that.  Because usually the bid they present is the

8    bid they present and it's final.

9    If there are clarifications that -- if there are

10   clarifications that change that price, I would want to know

11   why.

12   Q.   And if there is a justification for a bid to be changed,

13   has the Department of Energy relied on a bid once it's accepted

14   a given number?

15   A.   Can you repeat that?

16   Q.   Sorry.  That was a confusing questions.

17   When you receive a bid and you accept a bid, does the

18   department rely on that number in the process of choosing which

19   contractor to go with?

20   A.   Yes.  We definitely rely on the numbers that are presented

21   to make our selection.

22   Q.   And you mentioned a moment ago something called a bid

23   bond.  Can you explain what that is?

24   A.   Sure.  A bid bond is security from a bidder that gets an

25   insurer that says once you submit your bid, we're going to

1    cover, making sure that the contractor performs that work at

2    the price that they submitted.

3    **Q.**    And do bids always have a bid bond or is that one of the

4    things at the discretion of the contracting officer?

5    **A.**    It's not at the discretion.  It's at a threshold.  And not

6    all jobs are required to be bid bonded.  If you have a small

7    job for $50,000 or $30,000, we don't require a bid bond.

8    **Q.**    In your experience is it typical to ever see, once a

9    contract has been awarded, that two of the bidders on the

10   contract are collaborating on the actual construction?

11   **A.**    No.

12   **Q.**    Would that strike you as suspicious?

13   **A.**    Yes.

14   **Q.**    Why is that?

15   **A.**    It would be very strange to have two of the bidders

16   submitting a proposal, after I have requested proposals, in

17   their response, when they submit a bid, to then show up --

18   let's say I award it to the second one, for the first one to

19   also be working with them.

20        Usually they are competitors and competition inherently

21   means that they are trying to get the business separate of each

22   other, not together.

23   **Q.**    Does the Department of Energy take any steps to ensure

24   that the Lawrence Berkeley Lab is complying with the FAR and

25   the other regulations?

1   **A.**   It does.

2   **Q.**   What kind of steps are those?

3   **A.**   We have regular audits by internal auditors, federal

4   auditors, as well as a system assessment every five years.  So

5   we have federal employees that can come either prearranged or

6   unannounced and randomly select a contract and review its

7   contents and even interview employees to see -- or even

8   internal staff, anyone they select that they want to, to try to

9   see and make sure that we followed our process.  And we do have

10  very regular audits.

11  **Q.**   Okay.

12          **MR. DAWSON:**  Your Honor, if I may have a moment?

13      (Discussion held off the record between government

14       counsel.)

15          **MR. DAWSON:**  Nothing further, your Honor.

16          **THE COURT:**  Cross?

17          **MS. BOERSCH:**  Yes.  Thank you very much.

18                  <u>CROSS EXAMINATION</u>

19  BY MS. BOERSCH

20  **Q.**   Good morning, Ms. Crosby.  My name is Martha Boersch and I

21  represent Lance Turner, who is over there in the lighter

22  colored suit and the purple tie.

23          As I understand it, you are employed by the regents of the

24  University of California; correct?

25  **A.**   I am.

CROSBY - CROSS EXAMINATION / BOERSCH

1   Q.   And you're not an employee of the United States Department

2   of Energy?

3   A.   No, I'm not.

4   Q.   With respect to this contract that was discussed, the

5   proposed renovation of Building 84, had it been renovated, as I

6   understand it, the University of California, rather than the

7   Department of Energy, would have handled the procurement and

8   management of any such renovation contract; correct?

9   A.   Typically, yes.

10  Q.   Okay.  And the procurement process that you follow is a

11  process that was written by the University of California;

12  correct?

13  A.   It is.

14  Q.   And is it correct also that for a fixed price construction

15  contract of under $15 million, the University of California on

16  its own, not the Department of Energy, would be able to approve

17  any such contract under 15 million for a fixed price contract?

18  A.   The current level is 10 million.  But based on the date of

19  this document, yes, it would have been 15 million.

20  Q.   In 2012, 2013?

21  A.   Yes.

22  Q.   And that's a delegation of authority from the Department

23  of Energy to U.C. Berkeley in the prime contract, Contract 31?

24  A.   That's correct.

25  Q.   Okay.  Now, when U.C. Berkeley enters a contract under

CROSBY - CROSS EXAMINATION / BOERSCH

1    that level, I take it that the contract itself is a contract

2    between the University of California Berkeley and a contractor?

3    **A.**    That's correct.

4    **Q.**    And the contractor with whom you enter the contract in

5    this context would be the prime contractor for that job?

6    **A.**    Yes.

7    **Q.**    And I know it's confusing because you guys are also a

8    prime contractor.

9    **A.**    We are.

10   **Q.**    But whoever comes in to, say, renovate a building, that

11   contractor would be a prime contractor?

12   **A.**    That's correct.

13   **Q.**    I want to just discuss a little bit about the standard bid

14   process that U.C. follows when awarding a contract.  That

15   process is led, as you said, by a member of the procurement

16   team at the University of California, someone on your team?

17   **A.**    That's correct.

18   **Q.**    Okay.  And typically what happens is the contract is

19   advertised; is that right?

20   **A.**    No, not necessarily.  Because we follow Federal

21   Acquisition Regulations, not State of California regulations,

22   we actually are not required to advertise a project.  We can

23   reach out directly to companies to solicit bids or we can

24   advertise it, too.  It's really up to us.

25   **Q.**    Okay.  So either way, at some point you solicit bids.  You

1   go out publicly and try to get contractors interested; right?

2   A.   Yes, that's correct.

3   Q.   Either advertising or going to contractors you know.  And

4   do you have a set of contractors who you typically work with

5   repeatedly?

6   A.   We do.  Usually we will issue leveraged agreements, like a

7   master agreement, to them.  Those are a regular set of

8   suppliers that are pre-qualified that we know have good safety

9   records, insurance qualifications, things like that.

10       And there could be other companies that we do regularly

11   engage with.  We always try to find new companies because

12   bidders are very interested in doing work for us.  So we'll,

13   you know, cast that net pretty wide.

14   Q.   Okay.  But you -- you have over time developed

15   relationships with certain contractors; right?

16   A.   Yes.

17   Q.   Okay.  There is nothing improper about that, about having

18   a relationship with a contractor?

19   A.   No.  It's encouraged because you have a pool that you know

20   is qualified.

21   Q.   Okay.  To go back to the process.  After you have either

22   advertised or solicited people for a particular job, then do I

23   understand correctly that you would then send to those people,

24   those interested contractors, the prequalification form that we

25   saw an example of?

1   **A.**   We can on occasion, yes.

2   **Q.**   And if you on occasion, on what occasions would you do

3   that?

4   **A.**   Let's say, we're dealing with a new company that we don't

5   have as much experience with.  We would send them the

6   pre-qualifications to see if they have the safety record,

7   insurance coverage, relevant experience, things of that nature.

8   **Q.**   And any interested contractor can submit, if they have it,

9   the prequalification form?

10  **A.**   Sure.  Absolutely.  Sometimes that happens.  We'll send it

11  to a couple of companies and they will send to it someone --

12  they might not have the capacity and they will tell us:  I'm

13  not going to bid on this project, I'm busy, but some other

14  company might be interested.  And we get those unsolicited

15  sometimes.

16  **Q.**   Okay.  And once these -- and I can never say this without

17  stumbling over it.  One the prequalification forms are provided

18  to you, I take it your team would then vet those contractors to

19  see if they are, in fact, responsible bidders?

20  **A.**   Correct, we do.

21  **Q.**   Okay.  And that -- that vetting process that's used by

22  U.C. Berkeley, one of the reasons you do that is try to prevent

23  fraud and ensure that all the bidders are, in fact, responsible

24  potential bidders?

25  **A.**   That's correct.

CROSBY - CROSS EXAMINATION / BOERSCH

1   Q.   Okay.  And that prequalification form would be submitted

2   to you typically without a bid or regardless of whether there

3   is an actual bid; right?

4   A.   It can be.  Usually we tie it to some bid or work because

5   it's an effort for -- it takes time for people to submit those

6   things, so we try to tie it to actual projects.

7   Q.   Okay.  But in your normal process, you wouldn't accept a

8   bid from any contractor until that contractor has gone through

9   the vetting process, let's say, if it's a new company?

10  A.   Correct.

11  Q.   And the University of California -- I think you testified,

12  that you can only enter a contract with a contractor who has

13  either a Grade A or Grade B contracting license?

14  A.   We can enter into a contract with a company that doesn't

15  have a license so long as they get an active license before

16  work starts.

17  Q.   So they have to have an active California contracting

18  license?

19  A.   That's correct.

20  Q.   Okay.  After you've gone through the vetting process, I

21  think, as I understand correctly, there are usually six or

22  seven contractors who might survive that vetting process on a

23  typical job?

24  A.   It can be that high, yes.  Sometimes it's lower.

25  Q.   Okay.  And it's not until after that vetting process has

CROSBY - CROSS EXAMINATION / BOERSCH

1   been completed that contractors are notified that they can

2   submit a bid; correct?

3   A.   Well, not necessarily.  Some can still submit a bid.  They

4   would need to show that they still qualify with their

5   submission.  We wouldn't close the door.

6        On occasion for very high dollar projects we close the

7   door.  We say if you didn't make it through the first gate, you

8   haven't shown us you're qualified, you cannot submit a bid or a

9   proposal.

10  Q.   Okay.  And describe for me again, what's the difference

11  between a bid and a proposal?

12  A.   Essentially they both ask -- they are a submission to the

13  government to win some work and win a contract.

14       The fundamental difference between a bid and a proposal is

15  usually its length and brevity.  Bids are pretty brief and they

16  are usually a bottom line price.

17       A proposal usually has the means and methods or maybe more

18  detail because it's usually in response to a request for a

19  proposal that says:  Here is how I plan to do the work and here

20  is my price.

21  Q.   Okay.  And Berkeley's process for letting out contracts

22  requires a written bid, a written bidding process; correct?

23  A.   For anything over $150,000, yes.

24  Q.   Okay.  And I take it prior to 2013 or prior to now, the

25  University of California Berkeley had never done any work with

1     Turner Group Construction?

2     **A.**    Not that I'm aware of.

3     **Q.**    Is it correct that in any contract that the University of

4     California would enter with a contractor, one of these under

5     15 million in 2013 or now under 10, that when that contract is

6     entered, there is a provision in the contract that states

7     that -- that any contract -- it would be a subcontract for you.

8            "Any subcontract in the name of the contractor"

9            -- that's you -- "shall not bind or purport to bind

10           the government."

11    **A.**    I honestly don't know.

12    **Q.**    Are you familiar with a section of the prime contract

13    called Attachment J in Appendix G?

14    **A.**    I usually work with Attachment I and so I'm not as

15    familiar with J.

16    **Q.**    Okay.  Do you recall providing a document called

17    Attachment J, Appendix G to the Government?

18    **A.**    No.

19    **Q.**    You don't recall sending an email to them providing them

20    with a copy of that?

21           **THE COURT:**  Why don't you show it to the witness?

22           **MS. BOERSCH:**  I will.  Thank you.

23    **BY MS. BOERSCH**

24    **Q.**    Let me show you the copy.

25           (Whereupon document was tendered to the witness.)

CROSBY - CROSS EXAMINATION / BOERSCH

1   Q.   Do you recognize that?

2   A.   Yes.  It's Attachment J, Appendix G, Purchasing System

3   Requirements for Contract 31.

4   Q.   You've seen that document before?

5   A.   It's got a reference to appendix clause I, which is the

6   contractor purchasing system.

7        No.  I don't really recognize this document, but clause I

8   and the purchasing system reference I recognize, because that's

9   usually where we get our authority, and, also, the rules.

10  Q.   So I know you don't recognize this specific document, but

11  if you'd look at the section called Subcontracts Not Binding on

12  DOE, and the second paragraph.  Have you ever seen that

13  language before?

14  A.   I have seen this language before.

15  Q.   And what is your understanding of that language?

16  A.   At times the federal government, when they approve some of

17  our contracts that we -- so when they are above a certain

18  threshold.  So we have a bunch of different thresholds.  In

19  2012 and '13 it was 15 million for construction contracts.

20       If we sent them for approval, the approval would come back

21  at times with this language in it that says it's applicable to

22  subcontracts made by the contractor, which would be U.C.,

23  and -- yeah, and so forth.

24  Q.   Okay.  And would that language sometimes come back in

25  contracts as to which U.C. Berkeley has the authority to

1   approve, i.e., the ones under 15 million?

2   **A.**   Yes.

3   **Q.**   Okay.  Let me take that back from you.

4   **A.**   Sure.

5         (Whereupon document was returned to counsel.)

6   **Q.**   Okay.  I have nothing further at this time.

7              **THE COURT:**  Mr. Riordan.

8                    <u>**CROSS EXAMINATION**</u>

9   **BY MR. RIORDAN**

10  **Q.**   Good morning, Ms. Crosby.  My name is Dennis Riordan.  I

11  represent Len Turner.

12        I believe you testified that if you didn't have a going

13  relationship with a contractor, let's say they were applying

14  for a job or a project for the first time, they would

15  definitely have to fill out the screening questionnaire that

16  you were shown before?

17  **A.**   Typically, yes.

18  **Q.**   And the information on that, if you didn't have a

19  relationship, would be very, very important to you?

20  **A.**   It's very important, yes.

21  **Q.**   And every question on it is very important; right?

22  **A.**   Yes, it is.

23  **Q.**   The question about experience modification, you've just

24  spoken to; right?

25  **A.**   Yes.

1  Q.   Whether there has been OSHA violations, so forth?  The

2  question you just discussed about whether they have a

3  contractor's license and what time would be -- what kind would

4  be very important to you?

5  A.   Yes, it would.

6  Q.   Question nine on here is:

7       "Provide at least three references of companies,

8       agencies you have performed work for in the last two

9       years.  Information requested for each."

10      That's a very important question, right?

11 A.   It is.

12 Q.   And if you were to get a form in which somebody was unable

13 to provide any references because they hadn't done any

14 contracting work in the last two years, they would be very

15 unlikely to get any further consideration from you; right?

16 A.   Not for any project of any significance.  We do have new

17 companies that we might give very small projects to that we can

18 then test them and give them jobs and opportunities.  But for

19 anything of any significance, no.

20 Q.   And a $6 million contract is a contract of significance?

21 A.   Yes.  Any $1 million or more contract we consider

22 significant, absolutely.

23 Q.   And I think you looked at what's been marked Exhibit 45,

24 which is the submission -- it may be in front of you -- from

25 the Turner Group that was up on your screen before?

CROSBY - CROSS EXAMINATION / RIORDAN

 1   **A.**   Yes.

 2   **Q.**   And that's a very short form; right?  Two or three pages?

 3   **A.**   It is.

 4   **Q.**   And it says "Proposal" on it, right?

 5   **A.**   Yes.

 6   **Q.**   Okay.  And it has a figure of $6.1 million or something to

 7   that effect; right?

 8   **A.**   Yes, it does.

 9   **Q.**   And other than that, it provides very little information

10   about how they would do this job; right?

11   **A.**   Uh-huh.  That's correct.

12   **Q.**   And if you were in any way interested in any bid that --

13   proposal that came in like this, with this amount of

14   information, you would want to follow up and get more

15   information on how exactly they were going to do this?

16   **A.**   Well, I would want to check things like their references,

17   as well as their relevant experience.  And we have the

18   discretion also to interview project teams if we want to.

19        So, yes, I could -- and my team and I could do all of

20   those things.

21   **Q.**   Because your concern in the bidding process is not to find

22   somebody who submits the lowest bid; right?

23   **A.**   That's correct.

24   **Q.**   You need the lowest bid that is consistent with that job

25   getting done completely, consistently with what you need;

CROSBY - CROSS EXAMINATION / RIORDAN

1   right?

2   **A.**   Well, we don't always want the lowest bid, but we

3   definitely want a reasonable price to do the job.  Sometimes

4   the lowest bid is a little frightening.

5        So, yes, we want the best qualified company that can

6   absolutely do the job safely, adhering to our policies, making

7   sure their laborers are paid a minimum wage.  There are a lot

8   of federal requirements.

9        We want a company that can really do the work and make

10  sure the building that they leave us with is going to last and

11  not need rework once they are gone.

12  **Q.**   Right.  And so if the only information you had was this

13  information, at a minimum you would be following up to find out

14  more about this company and their ability to do the job; right?

15  **A.**   Most likely, yes.  If I hadn't done that work beforehand.

16  **Q.**   And you discussed the fact that not infrequently you may

17  get a company that you might be interested in and bring them in

18  on a project, but you're going to wind up negotiating with them

19  about their numbers; right?

20  **A.**   Not -- on occasion, yes, yes.

21  **Q.**   Okay.  Nothing further.

22  **A.**   Thank you.

23          **THE COURT:**  Mr. Dawson?

24          **MR. DAWSON:**  Thank you, your Honor.

25

1      <u>**REDIRECT EXAMINATION**</u>

2  **BY MR. DAWSON**

3  **Q.**   Ms. Crosby, Ms. Boersch asked some questions about the

4  contracts that are ultimately entered into and that the

5  signatories would be U.C. Berkeley and the contractor; is that

6  correct?

7  **A.**   Yes.

8  **Q.**   Does that also incorporate the relationship between U.C.

9  Berkeley and the Department of Energy?

10 **A.**   Yes.

11 **Q.**   And what -- how do the contracts do that?  How do they

12 incorporate the Department of Energy?

13 **A.**   So all of our contracts, the very first thing that they

14 list is the scope.  We're hiring you to come and renovate or

15 build some building.

16     Always the second paragraph states the terms and

17 conditions of this contract between the regents and you,

18 company, are subject to the terms and conditions of prime

19 Contract 31.

20 **Q.**   So in those contexts is U.C. Berkeley operating

21 effectively as the agent of the Department of Energy in

22 entering into these contracts?

23 **A.**   Yes.

24 **Q.**   And in terms of the procurement process and how exactly

25 your team runs the process, you testified about the FAR

1    earlier.  Is the FAR incorporated into how you run the process?

2    A.    It is.

3    Q.    And the FAR comes from the federal government; isn't that

4    right?

5    A.    Yes.

6    Q.    Does U.C. Berkeley have discretion to do its own process

7    that would be inconsistent with the FAR when operating at the

8    Lawrence Berkeley Labs?

9    A.    No, not at all.  In fact, we're held accountable to comply

10   with the FAR.

11   Q.    And do the audits that you referenced earlier address

12   questions like that, whether you're complying with the FAR?

13   A.    They do.  When the auditors come and look at our systems,

14   they assess us directly against those criteria.  And when we

15   don't comply, we have corrective actions to change our

16   processes to make sure we comply.

17   Q.    What kind of corrective actions would those look like?

18   A.    For example, many years ago we had really not very strong

19   practices to make sure that laborers on a job are paid a

20   minimum wage.  So the federal government wants to make sure it

21   protects labor.

22         So for any job in construction, $2,000 or more, every

23   single laborer on the job has to make a minimum wage.  And

24   that's set by the Department of Labor.  And there are a lot of

25   processes to protect that.

CROSBY - REDIRECT EXAMINATION / DAWSON

1      So we're supposed to conduct interviews with the laborers.

2    My team and I will, you know, put on safety hat and boots and

3    go out to the job site unannounced and interview people to see

4    how much do you make and then check it against the base pay.

5    And we weren't doing that as regularly as we could.

6      So when we had a system check, I think it was four or five

7    years ago, the Department of Labor told us -- because they can

8    come and audit us too, and they do -- you're really not doing

9    this very well and we are not sure if labor is actually paid a

10   minimum wage on construction projects.  A company can't make

11   money on the backs of labor.

12     So we strengthened those processes, so I put in a regular

13   schedule for my team to go out in the field and do regular

14   construction checks monthly.

15     So that's one example of how we must comply with the

16   Federal Acquisition Regulation.

17   **Q.**   And you were explaining to Ms. Boersch as well about the

18   thresholds at which your team is authorized to bind or commit

19   to a contract.  Can you remind the jury and me what those

20   thresholds are?

21   **A.**   Sure.  Each of us, and as contracting officers and buyers,

22   have a threshold.  So when you're a junior, you might be able

23   to sign a contract at $25,000.  My limit is $3 million, for

24   example.  The laboratory itself has a $10 million threshold.

25     So we can usually sign contracts below $10 million without

1  further review or approval.  When they are above that

2  threshold, they go to the contracting officer, who is the DOE

3  CO, and that person then has to review the contract, but we

4  still always sign those contracts.  The U.C. regents still sign

5  those contracts.

6  Q.   And the -- those thresholds, does the Department of Energy

7  have a say in where those thresholds are and how that process

8  is run?

9  A.   Yes.  They have sole discretion on what that is.

10 Q.   So the limits you mentioned, are they set by the prime

11 contract or by some other process?

12 A.   They are actually set by the contracting officer.  So they

13 could reduce it to zero and take our authority away if they so

14 elected.

15 Q.   When you say "they," that's the Department of Energy?

16 A.   Yes, Department of Energy contracting officer.

17 Q.   So the thresholds that your team operates within are

18 delegated by the Department of Energy?

19 A.   Yes.

20 Q.   And then when a project like that were to proceed, one

21 that's within that delegated range, who ultimately pays for

22 that project to be completed?

23 A.   Department of Energy pays for the completion of projects.

24 Q.   So the funding source doesn't change, whether or not it's

25 within the threshold or if it's something that's above the

CROSBY - REDIRECT EXAMINATION / DAWSON

 1   threshold?

 2   **A.**   Correct.   The signatory doesn't change either.   So above

 3   or below we still sign.   Above or below they fund it.

 4   **Q.**   Okay.   And in terms of the qualifications that would be

 5   necessary for a contractor, am I correct that the license --

 6   you referred to the contractor's license.   That the entity need

 7   not have a license at the time of the bid, but must have one by

 8   the time the job were to begin --

 9   **A.**   Yes.

10   **Q.**   -- is that right?

11   **A.**   That's correct.

12   **Q.**   I believe we addressed some of this in direct, but I

13   wanted to follow up after cross to make sure I'm understanding

14   correctly.

15       The bid letter -- I know we have been looking at

16   Exhibit 45.   But more generally, when you get a bid that has

17   information in it, the contracting officer can decide in

18   advance what kind of information they want to be included with

19   the bid?

20   **A.**   That's correct.

21   **Q.**   And so does that fall within the discretion each

22   contracting officer has about how they are going to proceed on

23   a given project?

24   **A.**   It does.   So the contracting officer can't waive minimum

25   things that are required in the FAR, the Federal Acquisition

1    Regulation.  So what I mentioned about labor and pay, they

2    can't waive that, or licensing.

3         But they can have discretion about what they ask for.  How

4    many years of relevant experience, whether it's two, three or

5    five years of relevant experience, that's something that the

6    contracting officer has discretion about.

7         There are a lot of other detailed things like that.  So in

8    the request, when you're asking people, Here is a request for

9    you to give me a proposal, they can list what they want.  And

10   then when you're submitting that proposal, a company says,

11   Okay, now here is my proposal in response to your request, they

12   need to respond to what we asked for.

13   Q.   And in the context where the response addresses everything

14   that was asked for, the contracting officer had a list and the

15   bid and the prequalification has everything that would be

16   required, would the contracting officer have to follow up and

17   do more work or could they simply accept the bid if it

18   satisfied the requirements?

19   A.   They could accept the bid if it satisfied the requirements

20   and then demand performance.  I mean, if you signed the

21   contract and they start, you would demand performance, yes.

22   Q.   What do you mean by "demand performance"?

23   A.   You promised now to do the job at a certain amount.  You

24   need to show up and do it after you have been awarded a

25   contract.  And if you don't, then I go to your insurance

1  company and ask them to cover to make sure that it's finished.

2      So it deters people from wasting my time or their time

3  and, also, taking business away from other companies that

4  really want that business.  So that's what I mean about

5  ensuring performance, you need to show up and finish the

6  project at the price you quoted.

7          MR. DAWSON:  If I could have a moment, your Honor?

8      (Discussion held off the record between government

9       counsel.)

10          MR. DAWSON:  Nothing further.

11          MR. RIORDAN:  Very briefly.

12                  RECROSS EXAMINATION

13  BY MR. RIORDAN

14  Q.  Ms. Crosby, a company bidding for a project can get burned

15  if they sign a contract for a number that proves to be less

16  than what they needed to do the job; right?

17  A.  They can.

18  Q.  So a responsible contractor is concerned about having

19  enough information to submit a bid that he or she can live

20  with; right?

21  A.  Absolutely.

22  Q.  And one of the things that any responsible contractor

23  wants to get from Berkeley, for instance, if they are going to

24  submit a bid, is specs and scope; right?

25  A.  Yes.  Absolutely.

PROCEEDINGS

1    **Q.**    Thank you.

2              **THE COURT:**  Anything further?

3         (No response.)

4              **THE COURT:**  Hello?

5         **MR. DAWSON:**  Sorry.

6              **THE COURT:**  Anything further?

7         **MR. DAWSON:**  Nothing further, your Honor.

8              **THE COURT:**  I have some questions.

9         In the typical situation -- not this, but in a typical

10   situation -- I mean, I don't know whether this is typical or

11   not.  I don't want to comment on this.  I want to ask you about

12   the typical situation.

13        In your experience, let's say you want to develop,

14   renovate, whatever it is, a building.  All right.  So you send

15   out something called a request -- first of all, you have done

16   some plans and specifications; is that correct?

17             **THE WITNESS:**  Typically, yes.

18             **THE COURT:**  Typically, the typical situation.  You

19   prepare plans and specifications.

20        You've also had a discussion with the people in your

21   office as to what appears to be a reasonable price for the

22   renovation.  We'll call it renovation, project.

23             **THE WITNESS:**  That's our independent estimate, yes.

24             **THE COURT:**  Okay.  And if the project is -- comes

25   back, these estimators come back and they say X, it should cost

PROCEEDINGS

```
 1    X, X is either within your budget or not within your budget.

 2              THE WITNESS:  Correct.

 3              THE COURT:  If it's within your budget, you want to

 4    proceed, perhaps, if there are other reasons to proceed, but if

 5    it's outside of your budget, you're probably not going to

 6    proceed.

 7              THE WITNESS:  Right, or you --

 8              THE COURT:  Without value engineering, without doing

 9    some things to it.

10              THE WITNESS:  Yes.

11              THE COURT:  Okay.  So that's the typical case.

12        Now, let's say you've done all that.  And what you want to

13    do now is to see, is there somebody out there who can build it.

14    That would be the next step; right?

15              THE WITNESS:  That's correct.

16              THE COURT:  So you send out either this thing called

17    Invitation To Bid or Request for Proposal, and one is more

18    detailed than the other.  What do you say in either of those

19    documents as to the scope of the work?  What do you say?

20        You say to a contractor:  Would you like to bid on

21    Project X.  Project X.  What is Project X?  So what do you say

22    in the typical situation?

23              THE WITNESS:  So typically we list the general scope.

24    Renovation to building, for example.  And we provide plans or

25    any specifications that we might want.  And then say give us a
```

PROCEEDINGS

```
 1   proposal based on those things and tell us what you would

 2   charge us to do that work within this time frame.

 3              THE COURT:  So it is your expectation, or is it, that

 4   somebody who does then respond to it has actually seen the

 5   plans and specifications?

 6              THE WITNESS:  Correct.  Yes.

 7              THE COURT:  And is it your experience that that

 8   information is actually necessary for a person to make a bid?

 9              THE WITNESS:  It is necessary typically.  The times

10   it's not is when we're really early and all we're thinking

11   about is a concept.

12       So, for example, at the Richmond site there aren't

13   buildings there.  We were thinking about development, so we

14   asked for conceptual ideas.  And then the potential price,

15   because those aren't -- they don't exist yet.

16       So those are -- that's the outlier.  Typically you've got

17   plans and specs and you get a bid.  You get a hard bid.  You

18   know, a price that tells you:  Here is what I would charge you

19   to do that work.

20              THE COURT:  So dividing it into two categories.

21              THE WITNESS:  Yes.

22              THE COURT:  And taking the first one first, that is

23   the undeveloped property.

24              THE WITNESS:  Right.

25              THE COURT:  You may not have plans and specifications
```

PROCEEDINGS

1    for an developed property.

2              THE WITNESS:  Correct.

3              THE COURT:  But in terms of a renovation, you would

4    have plans and specifications as a general rule.

5              THE WITNESS:  Yes.

6              THE COURT:  And what you want with respect to an

7    undeveloped property is you would still describe, would you

8    not, in your Request for Proposal, request for a bid, you would

9    say to build six buildings of so many square feet in compliance

10   with such-and-such.

11             THE WITNESS:  Correct.

12             THE COURT:  You have to tell them something --

13             THE WITNESS:  Oh, sure.

14             THE COURT:  -- not build six buildings, wouldn't you?

15             THE WITNESS:  Right.  It would be very different.

16   Imagine if you're building an amusement park or, you know, a

17   shopping -- like a Walmart or a Home Depot.  Very different

18   things.  You'd have to say:  I want an amusement park or I want

19   this other building, and tell me what the price would be for

20   each of those things.

21             THE COURT:  Thanks very much.

22             THE WITNESS:  Sure.

23             THE COURT:  Do the parties have any questions?

24        (No response.)

25             THE COURT:  Ladies and gentlemen, you should not take

PROCEEDINGS

1   anything of what I say or do as indicating what I think of the

2   evidence.  My purpose in asking questions is just to make sure

3   the testimony is as clear as it could be, at least from my

4   point of view.  I try to do it to assist the jury, but when I

5   but when I have a question, I sometimes ask it because I want

6   to make sure it's clear in my mind.

7        But it is your determination solely whether to accept a

8   witness's testimony or reject a witness's testimony.  That

9   simply is up to the jury and it's not up to the Court.

10       Okay.  Anything further?

11            **MR. RIORDAN:**  No, your Honor.

12            **MR. DAWSON:**  Nothing from the Government.

13            **THE COURT:**  Thank you very much, Ms. Crosby.

14   Appreciate it.

15       (Witness excused.)

16            **THE COURT:**  well, Let's see.  Five to 12:00.  A very

17   good time to take a recess.  We will recess, keeping with my

18   strict standards, to five to 1:00.  See you back here then.

19       Remember my admonition.  Don't discuss the case, allow

20   anyone to discuss it with you, form or express my opinion.

21       Thank you very much.  You may retire.

22       (Jury exits the courtroom at 11:56 a.m.)

23            **THE COURT:**  Okay.  The jury has retired.  So who is

24   next in the panoply of witnesses?

25            **MS. HOPKINS:**  The Government is going to call William

PROCEEDINGS

1    Myles, your Honor.

2          **THE COURT:**  So I assume there will be some playing of

3    a tape recording then, or not?

4          **MS. HOPKINS:**  Yes.  Recordings.

5          **THE COURT:**  Okay.  I don't think I have any other

6    questions.  Thank you.

7        (Whereupon at 11:57  a.m. proceedings

8         were adjourned for noon recess.)

9        (Further proceedings held herein, reported

10        but not transcribed.)

11              *          *          *          *          *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>I N D E X</u>

Tuesday, August 21, 2018 - Volume 1

**<u>GOVERNMENT WITNESSES</u>**                                    <u>**PAGE**</u>   <u>**VOL.**</u>


**<u>CROSBY, LAURA</u>**
(SWORN)                                                  3     1
Direct Examination by Mr. Dawson                         3     1
Cross Examination  Ms. Boersch                          55     1
Cross Examination  Mr. Riordan                          64     1
Redirect Examination by Mr. Dawson                      68     1
Recross Examination by Mr. Riordan                      74     1

—  —  —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

.

_Debra L. Pas_

———————————————————

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, August 22, 2018