UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR 17-0175 CRB |
| | ) | |
| LEN TURNER and LANCE TURNER, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Tuesday |
| | ) | August 21, 2018 |
| _____ | ) | 9:00 a.m. |

**EXCERPT OF JURY TRIAL PROCEEDINGS**
**TESTIMONY OF WILLIAM MYLES**

**APPEARANCES:**

| | |
|---|---|
| **For Plaintiff:** | ALEX TSE |
| | Acting United States Attorney |
| | 450 Golden Gate Avenue |
| | San Francisco, California  94102 |
| BY: | **KIMBERLY HOPKINS** |
| | **ANDREW DAWSON** |
| | **ASSISTANT UNITED STATES ATTORNEYS** |
| | |
| **For Defendant** | RIORDAN & HORGAN |
| **Len Turner:** | 523 Octavia Street |
| | San Francisco, California 94102 |
| BY: | **DENNIS RIORDAN, ESQ.** |
| | |
| **For Defendant** | BOERSCH SHAPIRO, LLP |
| **Lance Turner:** | 1611 Telegraph Avenue |
| | Suite 806 |
| | Oakland, California 94612 |
| BY: | **MARTHA BOERSCH, ESQ.** |

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
    *Official Reporter - US District Court*
    *Computerized Transcription By Eclipse*

PROCEEDINGS

**P R O C E E D I N G S**

Tuesday, August 21 2018                                    12:57 p.m.

---oOo---

(Proceedings held in open court, outside

the presence and hearing of the jury.)

**MS. HOPKINS:**  Quick question about laying foundation

for the recordings.

In an effort to be efficient, I wanted to propose that I

would lay a brief foundation with the witness as to all the

recordings and then I believe Defense counsel is going to raise

evidentiary -- an evidentiary objection or want a limiting

instruction.

**MR. RIORDAN:**  Well --

**THE COURT:**  You have raised objections.

**MR. RIORDAN:**  No, no.  We're not going back to -- as

to the pre-May 9th conversations, the Worthen, those are coming

in.

And, obviously, it's a different situation when we get to

September 9th, but we will be looking for an admonition as to

those conversations up to the first meeting with Len; that

those are admitted solely for -- well, I don't want to say

"solely" because -- those are not admitted as evidence of the

guilt of Len or Lance Turner.  That was the admonition the

Court was inclined to give.

**THE COURT:**  Yeah, that's right.  That's fine.

PROCEEDINGS

1          **MR. DAWSON:**  I think the question would be, is your

2    Honor planning to do that after each recording?

3          **THE COURT:**  Oh, no.  No, no, no, no.

4          **MS. HOPKINS:**  I will lay the foundation --

5          **THE COURT:**  There are a whole series of recordings.

6    As to all these recordings.

7          Well, as to all these recordings prior to -- what's the

8    date?

9          **MR. RIORDAN:**  May 9th.

10          **THE COURT:**  Prior to May 9th.  Okay.

11          (Jury enters the courtroom at 12:59 p.m.)

12          **THE COURT:**  Okay.  Please be seated.

13          Let the record reflect that all jurors are present,

14    parties are present.

15          You may call your next witness.

16          **MS. HOPKINS:**  Your Honor, the Government calls

17    William Myles to the stand.

18                          **WILLIAM  MYLES**,

19    called as a witness for the Government, having been duly sworn,

20    testified as follows:

21          **THE WITNESS:**  Yes.

22          **THE CLERK:**  Thank you.  Please be seated.

23          Please state your full name for the record and spell your

24    last name.

25          You can sit down.

```
 1                THE WITNESS:  William Myles.  M-Y-L-E-S is the last

 2     name.

 3                THE CLERK:  Okay.

 4                       DIRECT EXAMINATION

 5     BY MS. HOPKINS

 6     Q.   Good afternoon, Mr. Myles.

 7     A.   Good afternoon.

 8     Q.   Mr. Myles, did you play an undercover role in the

 9     investigation of Len Turner and Lance Turner?

10     A.   Yes, I did.

11     Q.   And have you ever met Len Turner in person?

12     A.   Yes.

13     Q.   Do you see him in the courtroom today?

14     A.   Yes, I do.

15     Q.   Can you describe what he's wearing and where he's sitting?

16     A.   He's sitting at, I believe, the defense counsel table.  He

17     has on, I could see a blue shirt and a stripey pink and brown

18     tie.

19                THE COURT:  Let the record reflect he's identified

20     that Defendant.

21     BY MS. HOPKINS

22     Q.   Have you met Lance Turner in person?

23     A.   Yes, I have.

24     Q.   And do you see him in the courtroom today?

25     A.   Yes, I do.
```

 1  **Q.**  And can you describe what he's wearing and where he's

 2  sitting?

 3  **A.**  He's sitting next to Len and he has -- I have bad eyes,

 4  but it look like a gray suit.

 5          **THE COURT:**  The record will reflect he has identified

 6  the second Defendant.

 7  **BY MS. HOPKINS**

 8  **Q.**  Now, when you were working undercover and met Len Turner

 9  and Lance Turner, what role were you playing?

10  **A.**  Here I played as successful developer that was willing to

11  pay to play.

12  **Q.**  And when you say "pay to play," what do you mean by that?

13  **A.**  That I would pay bribes or pay whatever I needed to to

14  further my business endeavors.

15  **Q.**  Now, what name were you going by when working undercover

16  on this case?

17  **A.**  William Joseph.

18  **Q.**  And at the time that you were working undercover, were you

19  working for the FBI?

20  **A.**  Yes.

21  **Q.**  And were you being paid by the FBI?

22  **A.**  Yes.

23  **Q.**  And so besides this case, have you done any other work for

24  the FBI?

25  **A.**  Yes.

1  **Q.**    And when did you start working for the FBI?

2  **A.**    Oh, between 2005, 2006; right in there.

3  **Q.**    And when was your first FBI task?

4  **A.**    Hartford, Connecticut.

5  **Q.**    And were you living in Connecticut at the time?

6  **A.**    I had a home there, but I wasn't living there.

7  **Q.**    And what kind of work were you doing before you connected

8  with the FBI?

9  **A.**    I had several jobs, but we had just won the largest school

10 project in the history of Connecticut.  It was a billion dollar

11 project.  So I was overseeing that project.

12     I was teaching minority contractors down at Yale

13 University how to -- just basically construction and

14 everything.

15 **Q.**    So, I'm sorry.  When you were teaching at Yale, you were

16 teaching what?

17 **A.**    It was a Yale contract.  And I was in New Haven and

18 Bridgeport, but I was teaching minority contractors.

19 **Q.**    Okay.  And what subject areas were you teaching minority

20 contractors?

21 **A.**    We started off with construction math.  We went from

22 construction math to how to get bonded and those things.

23 **Q.**    And did you -- you said that you had just been awarded a

24 $1 billion contract?

25 **A.**    Yes.

MYLES - DIRECT EXAMINATION / HOPKINS

1   **Q.**   Did you run into any difficulties while working on this

2   contract?

3   **A.**   Yes.

4   **Q.**   And can you briefly tell the jury what happened?

5   **A.**   Oh, after we won the contract, it was the largest contract

6   that a black firm had ever received, and we wasn't from that

7   area, and so a lot of people didn't like us winning.  We didn't

8   suppose to win it.  And shortly after we won it, it was a new

9   mayor seated.

10  **Q.**   It was a new what?

11  **A.**   Mayor, Mayor Eddy Perez.

12  **Q.**   Okay.

13  **A.**   And he came to me several times and he tried to talk me

14  into giving some of his friends no bid contracts.

15  **Q.**   I'm sorry.  He tried to give some of his friends --

16  **A.**   He wanted me to authorize no bid contracts to his friends.

17  **Q.**   Okay.  And so when the new mayor came to you and said

18  that, what did you do?

19  **A.**   I told him no.

20  **Q.**   And why did you tell him no?

21  **A.**   It was illegal, number one.  And to start the process --

22  we had to go through the process, so I wanted everybody to go

23  through a competitive process, so we wouldn't do it.

24  **Q.**   Okay.  If you would just pull the mic a little further

25  away from you?

MYLES - DIRECT EXAMINATION / HOPKINS

1          So when you told the mayor no, what was your intent on

2   finishing the job or how did you approach the situation?

3   Because you had this billion dollar contract that you didn't

4   want to --

5   **A.**   He kept commenting or he kept sending some of his

6   surrogates.  So a lot of people kept approaching me on behalf

7   of him.  And I kept running them off saying the same thing.

8   And pretty soon I can tell that the mayor was trying to get rid

9   of us.  I felt that.

10  **Q.**   And so did you document your conversations --

11  **A.**   Yes.

12  **Q.**   -- with the mayor?

13  **A.**   Yes.

14  **Q.**   And why did you do that?

15  **A.**   First of all, it was a big contract.  I'm going up against

16  the mayor and I needed to have evidence of what was going on.

17  **Q.**   And why did you think that you needed to have evidence of

18  what was going on?

19  **A.**   Because we legally won the bid.  The mayor is illegally

20  trying to make us give away contracts.  And at the end of the

21  day the mayor is going to win, and so I just started

22  documenting as much as I could.

23  **Q.**   Was there something in your personal life that led you to

24  contact the FBI?

25  **A.**   Yes.

MYLES - DIRECT EXAMINATION / HOPKINS

 1   Q.   And what was that?  If you could just briefly tell the

 2   jury what that was?

 3   A.   About two, maybe three years into the contract -- I was

 4   living there for a time almost, almost -- I got a call one

 5   night from my wife, maybe 1:00 o'clock in the morning, and she

 6   was crying.  And she told me that I needed to come home.  And I

 7   asked her why.  She said that our youngest son had got

 8   arrested.

 9   Q.   Okay.  And did she have the details of the arrest at the

10   time when she was talking to you?

11   A.   At that time she was emotional.  I was emotional and I

12   hung up on her.  And I remember her calling me right back, and

13   I remember her words, "This is not a teaching moment.  You need

14   to come home."  And I left the next morning and went home.

15   Q.   And so what happened when you got home?

16   A.   I had told her that night that if it wasn't a violent

17   crime -- and she assured me it wasn't a violent crime, he

18   didn't hurt anybody -- to get him out; right?  So it wasn't a

19   violent crime.  She had him out by the time I got home.

20   Q.   What was your understanding of what the crime was?

21   A.   It was drugs involved basically.

22   Q.   Okay.  And so your son has a court case.  What, if

23   anything, did you do to -- as he was going through this process

24   with this court case?

25   A.   My wife is a rehabilitation therapy, which deals with

 1   emotions and everything; and even drugs, rehabilitation.  So we

 2   asked him.  I asked Marcus, was he on drugs that day.  And if

 3   he told me the truth, I would support him; but if he lied to

 4   me, I wouldn't.  And he said he wasn't using drugs.

 5        So we took him and got a deep tissue examination that day

 6   and we found out that he didn't have any drugs -- he had a lot

 7   of alcohol and stuff, but he didn't have any drugs.  So since

 8   he told me the truth, I decided that I would do whatever I

 9   could to help him.

10   Q.   So when you said you would do whatever you could to help

11   him, what did you do?

12   A.   Get him the best lawyer I could.  If he needed a program,

13   I would put him in a program.  Whatever he needed, I was going

14   to do it.

15   Q.   Okay.  And at some point did you come in contact with the

16   FBI?

17   A.   Yes.

18   Q.   And how did that come about?

19   A.   Oh, about after a year, year and a half my wife and I

20   trying to find ways -- they had offered him -- and this is his

21   first charge.  They offered him 15 to 45 years and --

22   Q.   Is this a state case?

23   A.   Yes.

24   Q.   Okay.

25   A.   And that was hard for us to take.  So my wife tried to put

1   him in programs.  We put him in programs that he didn't need.

2   We had to pay for these programs.  And so we kept trying and

3   trying to do whatever what we could to put him in a good

4   lighting before the Court.  But it didn't seem like it was

5   working.  They weren't moving off that 15 to 45 years.

6          So one day I decided -- after spending so much money, I

7   decided that I wanted to see the evidence against him.  And I

8   remember talking to the lawyer, his lawyer, and I asked him,

9   "Let me see the evidence."  He didn't want to let me to see the

10  evidence, but I forced him to let me see the evidence or he was

11  going to get fired that day.  So he did let me see the

12  evidence.

13         And when I saw the evidence, I didn't like it.  And I

14  hadn't seen it for a whole year.  I was just going about what

15  the lawyer said.  And I sat down and listened to tapes and

16  looked at the evidence and I didn't like the evidence.

17  **Q.**   So you didn't like the evidence.  What did you say to the

18  lawyer?  Like, what did you request --

19  **A.**   My first task was I wanted to talk to the D.A. first.

20  **Q.**   Okay.  And did talking to the D.A. help at all?

21  **A.**   Kind of, sort of.  I went to the D.A. and he was firm at

22  45 years.  And then when I told him what I knew about the case

23  he said, What if he did six months?  And at that time I didn't

24  think he should do anything.  I have just didn't believe the

25  evidence.

1    And so over a couple days the D.A. said, Well, what about

2    90 days?  And my thing was, as a black father, I didn't want my

3    son to get a felony, whether it's one day or two.  If he

4    deserved it, he deserved it; but if he didn't deserve it, I

5    wasn't going to let him do one day.

6    And so after that last offer of 90 days, I asked the

7    lawyer, Let me talk to the FBI.

8    **Q.**   How did the lawyer respond to that?

9    **A.**   Hmm, he didn't want me to talk to the FBI either.  I

10   remember his quotes.  I may have said it before.  He said, I

11   don't want you to talk to the FBI because they will use you

12   like a hooker and throw you out the back seat of the car.

13   I said, Well, they are going to throw me out the back seat

14   of the car.  And that's how I got in touch with him.

15   **Q.**   So did he eventually get you in contact with the FBI?

16   **A.**   Yes.

17   **Q.**   And did you go to Connecticut and meet with the FBI?

18   **A.**   Yes.

19   **Q.**   And what happened when you met with them?

20   **A.**   When I met with them, I didn't know what I was doing when

21   I was doing the tape.  So they weren't admissible, but I had a

22   bunch of them --

23   **Q.**   You said you had tapes?

24   **A.**   I taped everything or documented everything that was going

25   on for a year.

MYLES - DIRECT EXAMINATION / HOPKINS

1  Q.   And you said just now that it wasn't admissible?

2  A.   Well, once I talked to the FBI, they -- you know, the way

3  that I gather it, I wasn't authorized to gather it.

4       My plans wasn't to give it to the FBI.  My plans was --

5  before that was the mayor probably going to run me out of town

6  and on the way out of town I'm going to give these tapes and

7  all my documents to the local newspaper and let them handle it,

8  but I never got around to that.

9       So now I'm in front of the FBI and now I've got a chance

10 to help my son with these same tapes.

11 Q.   And was the FBI interested in your information?

12 A.   Interested?  They listened to me, I guess, yes.

13 Q.   Okay.  And did you end up assisting the FBI in an

14 investigation of mayor?

15 A.   Yes.

16 Q.   And the mayor of Connecticut?

17 A.   Yes, I did.

18 Q.   Or Hartford?

19 A.   Yes.

20 Q.   Okay.  And how did you end up assisting the FBI?

21 A.   I lived down the street from the mayor and everybody that

22 the mayor wanted to give jobs, I knew that they came out the

23 house or remodeled his house for free.  And so he wouldn't do

24 it in the daytime.

25      So at night I showed -- everybody would come to the back

1   of his house, plumbers, remodelers and they would work on his

2   house for free and I led them to that.

3   **Q.**   So during the period that you worked for the FBI in

4   Connecticut, were you paid?

5   **A.**   Yes -- no.  No, no, no.  I'm sorry.

6   **Q.**   In Connecticut?

7   **A.**   Yes.

8   **Q.**   You were not paid?

9   **A.**   No.

10  **Q.**   Okay.  And when you decided to assist in the Connecticut

11  investigation, did the FBI make any promises about what they

12  might be able to do to help your son?

13  **A.**   None.

14  **Q.**   Now, after working the Connecticut case, did you end up

15  working in an undercover role in an investigation in Louisiana?

16  **A.**   Yes.

17  **Q.**   And was that in 2006?

18  **A.**   Yes.

19  **Q.**   Why did you decide to help in that investigation?

20  **A.**   I really didn't want to go.  I hadn't gotten any promises

21  from the FBI in Connecticut, and I just felt that -- after

22  awhile I just felt that if I continued working for them, just

23  maybe, just maybe I'd get a break.  And so I -- so I continued.

24  **Q.**   When you say "get a break," what do you mean?

25  **A.**   I was looking for a break for my son.  That's why I was

MYLES - DIRECT EXAMINATION / HOPKINS

1   with the FBI.

2   **Q.**   And so at some point did you start getting financial

3   compensation from the FBI for your work in Louisiana?

4   **A.**   Yes.

5   **Q.**   And when you first started working there, how much were

6   you getting paid?

7   **A.**   12- to $1,300 a week, I believe it was.

8   **Q.**   Okay.  Did that payment increase shortly after?

9   **A.**   Yeah.  Maybe, between 30 and 90 days into it they came to

10  me and told me they couldn't pay me what I was making and gave

11  me a raise up to $2,000 a week.

12  **Q.**   When you say they couldn't pay you what you were making,

13  what you were making as a developer?

14  **A.**   Right.

15  **Q.**   And without going into too much detail, what was the

16  nature of the investigation in Louisiana?

17  **A.**   It started off as Hurricane Katrina fraud.

18  **Q.**   And what role did you play in your undercover capacity in

19  that fraud case?

20  **A.**   Same that I'm playing here.  I think -- I had a lot of

21  different hats, but I started off as basically a corrupt

22  developer.

23  **Q.**   Now, just briefly going back to your son's court case,

24  when you started working on the FBI investigation in Louisiana,

25  did the FBI or any prosecutor make any promises to you in terms

MYLES - DIRECT EXAMINATION / HOPKINS

1   of what they could do to help with your son's case?

2   **A.**   No.

3   **Q.**   Did your son's case eventually get resolved?

4   **A.**   Yes.

5   **Q.**   Do you know when, approximately, it got resolved?

6   **A.**   I thought it was in August, but just studying for this

7   case, I think it was in November 2007 or somewhere.

8   **Q.**   And what happened with your son's case?

9   **A.**   He got a five year adjudicated.

10  **Q.**   And what do you understand that to mean?

11  **A.**   My understanding was if he kept his nose clean, stay out

12  of trouble, that he wouldn't have got a felony to go away.

13  **Q.**   Sorry.  He wouldn't?

14  **A.**   That he wouldn't get a felony and that those charges would

15  go away.

16  **Q.**   Back when your son's case got resolved, what, if anything,

17  did you know at that time about whether anyone in federal law

18  enforcement had made any recommendation or done anything in

19  connection with your son's case?

20  **A.**   I didn't think the FBI -- at that time I didn't think the

21  FBI had did anything, so I was a little angry with them, but I

22  didn't know anything.

23  **Q.**   And at some point did you learn anything about what

24  federal law enforcement had done or contact that they made with

25  the D.A. in your son's case?  Were you aware of any help?

1   **A.**   Can you say that again?

2   **Q.**   Let me rephrase that.

3       At some point did you learn anything about whether federal

4   law enforcement made the D.A. aware about your son's case and

5   the help you were giving?

6   **A.**   Yes.

7   **Q.**   And when did you find that out?

8   **A.**   Oh, I may have had -- don't hold me to a number, but maybe

9   three to five cases that I had done.  I was saying the same

10  thing from this witness stand, that the Government hadn't

11  helped me.

12      And then one day, one trial I had, the defense confronted

13  me with letters that the Government had sent on behalf of me,

14  detailing what I had done for the Government.  And so that's

15  when I first learned about it.

16  **Q.**   Okay.  And I'd like to show you what's been marked as

17  Exhibit 37.

18          **MS. HOPKINS:**  And maybe we can put it on the screen?

19          **THE CLERK:**  Is it admitted?

20          **MS. HOPKINS:**  It's not admitted yet.  Can we put it

21  and not have it on the screen --

22          **THE COURT:**  37 admitted.

23      (Trial Exhibit 37 received in evidence)

24  **BY MS. HOPKINS**

25  **Q.**   Okay.  So if we could take a look Exhibit 37.

MYLES - DIRECT EXAMINATION / HOPKINS

1          (Brief pause.)

2    **Q.**   So I'm going to be showing you Exhibit 37 when it comes on

3    the screen, which is letters from the U.S. Attorney's Office to

4    the state prosecutor.

5               **MS. HOPKINS:**  And if we can maybe enlarge starting

6    from "By Facsimile"?  Starting there.

7          Okay.  Let's click out of that real quick.

8          Let's enlarge starting at "Dear Mr. Deutsch."

9          (Document displayed)

10   **BY MS. HOPKINS**

11   **Q.**   Now, what was -- as far as your understanding, what was

12   the gist of letters that were sent to the state prosecutor?

13   **A.**   My understanding is they was informing -- this is a

14   person.  I think there was, like, three or four letters.  But

15   they was informing the local D.A. that me, the son of Marcus

16   Myles, who was the --

17   **Q.**   The father of Marcus Myles?

18   **A.**   Yeah.

19   **Q.**   Okay.

20   **A.**   That I was doing work and cooperating with the Government,

21   and basically they was giving them a detail of what I was doing

22   basically.

23   **Q.**   To this day --

24               **MS. HOPKINS:**  And you can take that off.

25          (Document removed from display)

1    BY MS. HOPKINS

2    **Q.**    To this day do you know, one way or the other, whether the

3    prosecutor took into account the work that you had done with

4    the FBI?

5    **A.**    Are you talking about the local D.A.?

6    **Q.**    Right.

7    **A.**    I don't know.

8    **Q.**    Now, I want to ask you a little bit about yourself.

9    What's your educational background?

10   **A.**    I -- I'm about 15 hours from two degrees.  I was a double

11   major, marketing and banking manager.

12   **Q.**    So if we could have you speak up a little?

13   **A.**    I say I'm anywhere between, I guess, 11 to 15 hours from

14   two degrees.

15   **Q.**    And you graduated from high school?

16   **A.**    Absolutely.

17   **Q.**    And have you done any military service?

18   **A.**    Yes.

19   **Q.**    When and what service?

20   **A.**    19- -- I was in the Army from 19- -- officially 1975 to

21   May 1978, but I also went early entry.  So you don't never get

22   to see that, in 1974.

23   **Q.**    Okay.  And are you married?

24   **A.**    Yes.

25   **Q.**    How long have you been married?

1    **A.**    Forty-two years.

2    **Q.**    Do you have any children, other than the son that we

3    previously discussed?

4    **A.**    Yes.

5    **Q.**    And when you started working with the FBI in 2006,

6    approximately how old were you?

7    **A.**    Oh, Lord.  2006, 2007.  I was close to -- you said the

8    FBI?

9    **Q.**    Yes.

10   **A.**    Somewhere about 46, 47.

11   **Q.**    And what kind of work had you done during your adult life

12   before connecting with the FBI?

13   **A.**    Well, when I came to the FBI, again, I was doing business

14   development and we were doing -- I have been a developer ever

15   since 1977 in and out.  You know, from residential developer to

16   commercial developer.  I've done that.

17        I have been a director of material management at several

18   hospitals.

19        I ran car dealerships.  I have been a general manager in

20   the Toyota dealership.  I even came out here to Toyota general

21   manager school out here in Antioch.  So I ran all kinds of

22   dealerships in the country.

23        And I had so many different businesses.  I get up on this

24   stand and I forget them, but I've done all kinds of businesses.

25   **Q.**    You said you worked as a developer and you did both

MYLES - DIRECT EXAMINATION / HOPKINS

1  commercial and residential --

2  **A.**   Yes.

3  **Q.**   -- work?

4      What's the difference between being a developer and being

5  in construction?

6  **A.**   They first cousin, but the developer is the one who

7  normally comes up with the idea, arrange -- get the -- acquire

8  the land, if land is part of it, or acquire the building, if

9  the building.

10     So the developer is the one who actually acquired the

11 project to be built and the financing for that.  And then the

12 developer is the one who hires the construction companies to

13 build it.

14 **Q.**   Now, you testified that you first started receiving

15 compensation for your work with the FBI when you were working

16 on the investigation in Louisiana in 2006?

17 **A.**   Yes.

18 **Q.**   Are you still working with the FBI?

19 **A.**   I have since that time full time.

20 **Q.**   Full time.  Continuously since 2006?

21 **A.**   Yes.

22 **Q.**   And you testified that your motivation originally for

23 working with the FBI was your son's pending court case;

24 correct?

25 **A.**   Yes.

1   Q.   Why did you continue to work for the FBI even after your

2   son's case was resolved?

3   A.   Again -- I say again.  I've said this so many times, but

4   during that process I guess I started drinking the Kool-Aid.

5        But, no, I thought that I was making a difference and I

6   still think I'm making a difference.  And I talked to my wife

7   about that and she decided -- she told me whatever you decide

8   she would be with me, and I decided I would keep going.

9   Q.   And has all your work with the FBI continued to be in an

10  undercover capacity?

11  A.   Yes.  Well, I say 99.9 percent it, yes.

12  Q.   What's the --

13  A.   I've done some training that wasn't in that capacity.

14  Q.   You've done training?

15  A.   Yes.

16  Q.   Okay.  Training for whom, the FBI?

17  A.   Yes.

18  Q.   What kind of training?

19  A.   Well, they are not skilled in my skill set, marketing,

20  business development.

21       I've also helped recruit for the FBI.  I've done other

22  things besides just this.

23  Q.   And can you give us a rough estimate of how many

24  investigations that you've worked on since 2006?

25  A.   Rough?  Over 100.

MYLES - DIRECT EXAMINATION / HOPKINS

1   Q.   And what types of investigations have you been involved in
2   as part of your work with the FBI?
3   A.   Public corruption, organized crimes, ponzi schemes.
4   Q.   What kind of schemes?
5   A.   Ponzi schemes.  White collar crime, national security,
6   international fugitive hunt, prison corruption.  I did a little
7   of everything.
8   Q.   Okay.  Have you continued to receive financial
9   compensation from the FBI for your work?
10  A.   Yes.
11  Q.   When you do your work for the FBI, would you describe it
12  as a 9:00 to 5:00 job five days a week or is it different than
13  that?
14  A.   Totally different than that.  We don't have days.  When --
15  from the time you wake up in the morning, and you don't dictate
16  the time you wake up.  The case dictate that.
17      But we can get up in the morning at 5:00 and we can still
18  be working patent 2:00 a.m., 3:00 a.m.
19  Q.   And have the investigations taken place all over the
20  country?
21  A.   Yes.
22  Q.   And when you're involved in an undercover investigation,
23  can you sometimes go home and see your family?
24  A.   Yes.
25  Q.   Have you been permitted to have any outside employment

1   while working for the FBI?

2   **A.**   The rules was that I -- I couldn't, but -- no, but I did

3   ask one time for some work.

4   **Q.**   You say you asked for work.  What work did you ask for?

5   **A.**   I asked, when I was in Louisiana, could I purchase a piece

6   of land, but I couldn't work it.

7   **Q.**   So you purchased the piece of land, but you couldn't --

8   **A.**   I couldn't actually do the day-to-day work.  It was an

9   investment property for me.

10  **Q.**   Okay.  Now, when you continued to work for the FBI, did

11  you become an employee of the FBI?

12  **A.**   No.

13  **Q.**   What would you -- what do you see yourself as?

14  **A.**   More or less a contractor for the FBI, more or less.

15  **Q.**   Okay.

16  **A.**   And they don't even call it contractor, but more or less.

17  **Q.**   Okay.  And what is your title in the FBI world?

18  **A.**   CHS.

19  **Q.**   And what does CHS stand for?

20  **A.**   Confidential Human Source.

21  **Q.**   And in relation to your work for the FBI, have you entered

22  into written service agreements with the FBI?

23  **A.**   Yes.

24  **Q.**   And have those agreements covered your work for the FBI

25  from when you first started up -- in 2007 to the present?

MYLES - DIRECT EXAMINATION / HOPKINS

1    **A.**   Yes.

2    **Q.**   And I say 2007, because that's when you started getting

3    paid --

4    **A.**   Right.

5    **Q.**   -- for your work?

6        Okay.  So I'd like to show you what's been marked for

7    identification as Exhibits 29 through 35.

8        (Whereupon documents were tendered to the witness.)

9    **Q.**   Just take a look at them.  Do you recognize those

10   documents?

11   **A.**   This one is empty, but yes.

12   **Q.**   Oh, okay, 31.  I think that's because it's already

13   admitted, Exhibit 31.

14   **A.**   Yes.

15   **Q.**   You recognize those documents?  What do you recognize them

16   as?

17   **A.**   Basically that's the contract that I signed with them on a

18   yearly basis.

19   **Q.**   And here is Exhibit 31.

20       (Whereupon document was tendered to the witness.)

21   **Q.**   Are these accurate copies of your personal service

22   agreements with the FBI?

23   **A.**   Pretty much.  I was just going to say they look pretty

24   much exactly like them.

25       **MS. HOPKINS:**  Okay.  The Government moves to admit

MYLES - DIRECT EXAMINATION / HOPKINS

1    Exhibits 29 through 35, with the exception of 31 because it's

2    already been admitted.

3              THE COURT:  Okay.  They are admitted.

4         (Trial Exhibits 29, 30, 32, 33, 34 and 35 received in

5          evidence).

6              MS. HOPKINS:  May I publish to the jury?

7              THE COURT:  Yes.

8    BY MS. HOPKINS

9    Q.   So do the agreements spell out how much you're going to

10   get paid?

11   A.   Yes.

12             MS. HOPKINS:  If we could take a look Exhibit 32, and

13   looking at Page 4 of Exhibit 32?

14        If you can just enlarge when the service agreement was

15   executed?

16        (Document displayed)

17   BY MS. HOPKINS

18   Q.   Can you tell the jury when this was executed?

19   A.   July 23rd, 2014.

20   Q.   And did you sign and date this document?

21   A.   Yes.

22   Q.   And taking a look at Page 1, Paragraph 4, how much was

23   the -- the FBI paying you in 2013 -- 2014.

24        Let's actually look at Exhibit 31.

25        (Document displayed)

1          **MS. HOPKINS:**  Actually, let's go back to Exhibit 32.

2     Sorry about that.

3          (Document displayed)

4     **BY MS. HOPKINS**

5     **Q.**   Okay.  So looking at number four, what were you getting

6     paid?

7     **A.**   I was making $4,500 every two weeks.

8     **Q.**   And how much does that come out to a year?

9     **A.**   It says here 117.  My math may be off.

10    **Q.**   117?

11    **A.**   Yes.

12    **Q.**   And was this before taxes?

13    **A.**   Yes.

14         **MS. HOPKINS:**  You can click out of that.

15         (Document removed from display)

16    **BY MS. HOPKINS**

17    **Q.**   During the past 11 to 12 years that you have been working

18    for the FBI under these agreements, has that been your primary

19    source of income?

20    **A.**   That's my main source because I couldn't work, but I did

21    keep all of my developments.

22    **Q.**   So are those investments or --

23    **A.**   Yes.

24    **Q.**   Okay.  And have you figured out approximately the total

25    compensation that you've received from the FBI over the last 11

1   to 12 years?

2   **A.**   I haven't figured it out, but I read it in the newspaper.

3   Everybody else had it figured out.

4        And so over a million dollars they said over ten, 12

5   years.

6   **Q.**   And have you paid taxes on that income?

7   **A.**   Yes.

8   **Q.**   Now, the average amount that you have been receiving from

9   the FBI, is that more than you were making when you -- before

10  you started to work for the FBI?

11  **A.**   No, not even close.

12  **Q.**   It's less?

13  **A.**   Absolutely.

14  **Q.**   Now, according to your agreements with the FBI, what is

15  the FBI paying you for?

16  **A.**   Services.

17  **Q.**   What kind of services?

18  **A.**   Investigative services that they choose that I participate

19  in.

20  **Q.**   Okay.  And do the payments depend on whether you work on

21  any particular investigation?

22  **A.**   No.

23  **Q.**   Do the payments depend on how many investigations you're

24  working on at one time?

25  **A.**   No.

1   Q.   And if you're in between investigations, do you still get

2   paid?

3   A.   Yes.

4   Q.   And so you just got paid a certain amount every two weeks;

5   is that correct?

6   A.   Yes.

7   Q.   And is your payment tied in any way to whether the

8   investigation results in criminal charges being filed against

9   someone?

10  A.   No.

11  Q.   So if you work on an investigation and it doesn't develop

12  any evidence leading to criminal charges, do you still get

13  paid?

14  A.   That has happened and I still got paid, yes.

15  Q.   And per your agreements with the FBI, do you get any kind

16  of bonus if people are charged?

17  A.   No.

18  Q.   And do you get any bonus if people are convicted?

19  A.   No.

20  Q.   All right.  So let's take a look -- we're already on

21  Exhibit 32, Page 1.

22       Do your service agreements with the FBI just cover

23  compensation or do they cover other things?

24  A.   No.  In my world they have rules, rules to the world.  It

25  tells me what I can do and what I cannot do.

MYLES - DIRECT EXAMINATION / HOPKINS

1   Q.   And when you do your undercover work for the FBI, are you

2   working under supervision?

3   A.   Yes.

4   Q.   At all times?

5   A.   Yes.

6   Q.   And whose supervision are you working under?

7   A.   Besides whatever my home office is, if I go -- if I decide

8   to take a case wherever it is, whoever case it is, they become

9   the person that I answer to.

10       For instance here, Ethan Quinn was the case agent that

11  brought me out -- his office did, rather -- and so he was in

12  charge.

13  Q.   So you take supervision from the case agent that's leading

14  the case?

15  A.   Yes.

16  Q.   The investigation?

17  A.   Yes.

18  Q.   Do you have any discretion in terms of deciding which

19  investigations in which you will participate?

20  A.   Yes.

21  Q.   In what way do you have discretion?

22  A.   Well, normally when I get a call, they invite me to come

23  in for an interview.  And if I don't feel good about the case,

24  I'm a perfect fit for the case, the case may be a three, four,

25  five-year case, a lot of different things, I won't take it.

MYLES - DIRECT EXAMINATION / HOPKINS

1   **Q.**   Now, according to the agreements, do you have any

2   discretion in terms of controlling the investigations that

3   you're working on?

4   **A.**   No.

5   **Q.**   Who controls the investigation?

6   **A.**   From my level the case agent, from my level.

7   **Q.**   And do you have any say in where the investigation goes?

8   **A.**   I have input.  I don't know about where it goes, but I

9   have input in the investigation; but I don't pick where we go,

10   no.

11   **Q.**   So who would make the decisions about the direction that

12   the case would go?

13   **A.**   The case agent.

14   **Q.**   And when you do undercover work, do you sometimes engage

15   in illegal activities?

16   **A.**   Yes.

17   **Q.**   What's an example of an illegal activity that you have

18   engaged in?

19   **A.**   Paying bribes is illegal.

20   **Q.**   And where did you get the funds to do that, pay the

21   bribes?

22   **A.**   The FBI supplied those.

23   **Q.**   And was that authorized activity by the FBI?

24   **A.**   Yes.

25   **Q.**   Now, let's take a look Page 2 of your service agreement.

1   What, if anything, do your agreements with the FBI allow in

2   terms of engaging in unlawful activities?

3   **A.**   Well, they spell out what I could do, but it was -- there

4   was unlawful activities that comes with this job and this role,

5   but I could only do those if I was authorized.  I just couldn't

6   go around and do those things.

7   **Q.**   So you had to get authorization to engage in unlawful

8   activities?

9   **A.**   Right.

10          **MS. HOPKINS:**  And thank you for blowing that up,

11   that's Paragraph 6.

12       (Document displayed)

13   **BY MS. HOPKINS**

14   **Q.**   Now, what happens if you engage in unlawful conduct that

15   is not authorized by the FBI?

16   **A.**   I would probably be indicted probably.

17   **Q.**   Indicted?

18   **A.**   Yes.

19   **Q.**   All right.  So when you work on undercover investigations

20   for the FBI, do you sometimes operate under an assumed

21   identity?

22   **A.**   Yes.

23   **Q.**   And was that the case in the investigation of the Turners?

24   **A.**   Yes.

25          **MS. HOPKINS:**  You can take that off the screen.

1    Thank you.

2        (Document removed from display)

3    **BY MS. HOPKINS**

4    **Q.**   Does that include identification documents and credit

5    cards in your undercover name?

6    **A.**   Yes.

7    **Q.**   And does the FBI arrange that?

8    **A.**   Yes.

9    **Q.**   So looking at Page 3, do the written agreements with the

10   FBI cover what you are not permitted to do in terms of using

11   the false identification card and credit cards that you're

12   given?

13   **A.**   Yes.

14           **MS. HOPKINS:**   Exhibit 32, Page 3.

15       (Document displayed)

16   **BY MS. HOPKINS**

17   **Q.**   And do the agreements contain any requirements about

18   maintaining the confidentiality of your work with the FBI?

19   **A.**   Yes.

20   **Q.**   And what is -- you have to make sure that you keep it

21   confidential?

22   **A.**   Just by the name that I'm working undercover tells you I

23   have to keep that under wraps.

24   **Q.**   Now, I want to turn your attention to recording

25   conversations.  If you could take a look Page 1 and it's

1   Paragraph 3.

2        (Document displayed)

3   Q.   As part of your agreements with the FBI, are you -- and

4   when you're working in an undercover role, do you audio record

5   conversations with subjects of the investigations?

6   A.   Yes.

7   Q.   And does this include phone conversations?

8   A.   Yes.

9   Q.   Does this include in-person meetings?

10  A.   Yes.

11  Q.   Are sometimes -- sometimes are your meetings video

12  recorded?

13  A.   Yes.

14  Q.   And who makes the decision about who you will record?

15  A.   The FBI does.

16  Q.   And once the FBI determines that you should record a

17  subject, do you record all conversations or just pick and

18  choose certain conversations?

19  A.   Once we decide to -- well, they decide to record a person,

20  we have to record every time.  Any time I meet them, I have to

21  record.  Any time I have any kind of contact, it has to be

22  recorded.

23  Q.   And what is your understanding of why -- if any, why it's

24  important to record all conversations?

25  A.   We trying to make a clear and total record.

MYLES - DIRECT EXAMINATION / HOPKINS

1  Q.   And when you make recordings, do the people that you're

2  recording know that they are being recorded?

3  A.   I pray not.

4  Q.   And who provides you with the equipment or the technology

5  to make the audio recordings?

6  A.   Normally the case agent in the case.

7  Q.   And does the equipment and technology give you the ability

8  to edit or alter the recordings?

9  A.   No.  You can't do that.

10 Q.   And has it ever happened that the recording device did not

11 work and you weren't able to get a recording?

12 A.   Yes.

13 Q.   Okay.  And is it -- but is it your intention to record

14 every conversation?

15 A.   Yes.  Sometimes you won't even know, you know.  It said

16 that it's working and then when you get back, it didn't record

17 anything.  So you don't know.

18 Q.   It didn't record, okay.

19      And so in a case like that, where it didn't record

20 anything, do you meet with the agents and debrief?

21 A.   We debrief regardless after every meeting.  Sometimes it

22 may carry til 2:00 o'clock in the morning and we don't talk at

23 2:00, but they up and 5:00, 6:00 o'clock in the morning we

24 debriefing.

25          MS. HOPKINS:  Thank you.  You can take it off the

```
 1    screen.
 2         (Document removed from display)
 3    BY MS. HOPKINS
 4    Q.   Now, in 2012 did you become involved in an FBI
 5    investigation in the San Francisco Bay Area?
 6    A.   Yes, I did.
 7    Q.   And were you acting in an undercover capacity?
 8    A.   Yes.
 9    Q.   And as part of that investigation, did you meet Taj Reid
10    and Eric Worthen?
11    A.   Yes.
12    Q.   Did you also meet Len Turner and Lance Turner?
13    A.   Yes.
14    Q.   Approximately how long did you work for the FBI in an
15    undercover capacity in the Bay Area investigation?
16    A.   And I keep getting -- I had other cases, but I would say
17    from a year and a half to two years.
18    Q.   And so you just said you had other cases.  Were you
19    working on other FBI investigations at the time?
20    A.   Yes.
21    Q.   And was that unusual for you to be working more than one
22    investigation at a time?
23    A.   That was the norm.
24    Q.   That was the norm, okay.  And did you come and go to the
25    Bay Area during this time?
```

MYLES - DIRECT EXAMINATION / HOPKINS

1    **A.**    Yes.

2    **Q.**    And did you get paid by the FBI pursuant to your service

3    agreements that we just talked about?

4    **A.**    Yes.

5    **Q.**    And would you have been paid even if you weren't working

6    on the Bay Area investigation specifically?

7    **A.**    I did get paid, so yes.

8    **Q.**    So you testified that the name that you went by in this

9    investigation was William Joseph?

10   **A.**    Yes.

11   **Q.**    And what was your role and who were you supposed to be as

12   William Joseph?

13   **A.**    I was a commercial developer, developer that was willing

14   to pay to play.

15   **Q.**    And so to your knowledge, when you became involved in the

16   Bay Area investigation, were individuals other than Taj Reid

17   and Eric Worthen and the Turners the subjects of the

18   investigation?

19   **A.**    No.

20   **Q.**    Of the San Francisco investigation?

21   **A.**    It was other -- I didn't even know the Turners or none of

22   them when we first started, no.

23   **Q.**    Okay.  So there were other subjects --

24   **A.**    Yes.

25   **Q.**    -- of an investigation?

1    **A.**    Yes.

2    **Q.**    Other than them?

3    **A.**    Yes.

4    **Q.**    Now, were there more than one FBI agents that you

5    primarily took direction from during the course of the Bay Area

6    investigation?

7    **A.**    In this case, yes.

8    **Q.**    And who was that?  Who did you take direction from?

9    **A.**    Well, some come and go, but mainly it was Agent Ethan

10   Quinn and Agent Roahn Wynar.

11   **Q.**    And did you work with other agents as well?

12   **A.**    Yeah, they come and go.  Yeah.

13   **Q.**    And over the course of your undercover work in the Bay

14   Area investigation, who made the decisions on the course that

15   the investigation would take?

16   **A.**    It's the case agent.  It's their case.

17   **Q.**    And did you have any decision making authority in that

18   regard?

19   **A.**    I had input in it, yes.

20   **Q.**    And did you have any role in determining who the

21   investigation would focus on?

22   **A.**    No.

23   **Q.**    Who made those decisions?

24   **A.**    The case agents made that decision.

25   **Q.**    And in the course of the investigation, did you ever pay

 1   money to people?

 2   A.   Yes.

 3   Q.   And who made the decisions about paying money to people?

 4   A.   The FBI did.

 5   Q.   And whose money did you use to make those payments?

 6   A.   The FBI's money.

 7   Q.   Now, during the periods that you were in the Bay Area

 8   working in your undercover capacity, how often were you in

 9   contact with your handling agents out here?

10   A.   Oh, when I was here, I talked to them all day long every

11   day.  And if I'm in another case, he would call me and update

12   me on this case.  So we talked every day.

13   Q.   And what was the point or the purpose of being in such

14   close contact?

15   A.   Well, it was a fluid case and he had to keep -- and it was

16   changing every minute.  Different things was happening and he

17   wanted me to be abreast of what was going on, even if I wasn't

18   here.

19        Or if I was here, a lot of things changed that I didn't

20   have access to.  He had more knowledge of what was going on.

21   He had wiretaps that I didn't know.  So he had more stuff that

22   he could help me with that I didn't have access to.

23   Q.   And in your undercover role as William Joseph in the Bay

24   Area, did you supposedly have a business?

25   A.   Yes.

1    Q.   And what type of business did you have?

2    A.   A development company.

3    Q.   And did it have a name?

4    A.   I think it was WHJ Group.  This is a six-year-old case

5    now, but, yeah, I think it was WHJ Group.

6    Q.   And as part of your role, did you make representations to

7    people about yourself and your business background?

8    A.   Yes.

9    Q.   And were all of those representations truthful?

10   A.   No.

11   Q.   Did you sometimes lie to people?

12   A.   Yes.

13   Q.   Why did you do that?

14   A.   Part of the word "undercover" is to keep -- keep the role

15   that I'm playing -- the word "undercover" means covert.  It

16   means discreet.  So we operating in a covert way.  So, no,

17   we're not telling them the truth, not even starting with my

18   name.

19   Q.   And so were there times that you would weave in truthful

20   things and non-truthful things?

21   A.   I tried to -- because you work so many cases, it's kind of

22   hard to go from state to state, city to city and do things.  So

23   I almost mirrored my real life in this role, yes.

24   Q.   So you blended aspects of your real life experiences --

25   A.   Yes.

1   **Q.**   -- at times?

2   **A.**   Yes.

3   **Q.**   So as part of your persona in the Bay Area investigation,

4   including your dealings with Taj Reid, Len Turner and Lance

5   Turner, did you have occasion to go out for meals?

6   **A.**   Yes.

7   **Q.**   And did you sometimes pay for those meals?

8   **A.**   The majority, yes.

9   **Q.**   The majority?

10  **A.**   All of them but two, and the attorneys bought that one.

11  But yes.

12  **Q.**   Okay.  And were those fancy meals?

13  **A.**   Some of them were.  Whatever the people wanted to eat, I

14  would take them to wherever they wanted to.  It was their town.

15  I didn't know too much about the town, so...

16  **Q.**   And did people sometimes drink alcohol?

17  **A.**   Yes.

18  **Q.**   Did you drink alcohol?

19  **A.**   Yes.

20  **Q.**   And how were you able to manage to do that and still be

21  effective as your role as a CHS?

22  **A.**   Well, I only drink so I can further the case, so they

23  wouldn't think I'm too much of a square.

24       But I drink one and then if I buy another one, I usually

25  leave it there or -- it just -- as long as I had it and buying

1  along with them, it was okay.  Nobody ever called me on it but

2  once maybe.

3  **Q.**   Okay.  And before incurring such expenses what, if any,

4  authorization did you need to get from the FBI agents with whom

5  you were working?

6  **A.**   Well, I don't take meetings just blindly.  We already know

7  who I'm taking a meeting with, unless somebody just

8  happenstance run into me.  But normally we already have our day

9  set, who I'm going to meet and then we go from there.

10       So I get authorization early in the morning, this is what

11  I'm going to do and these are the expenses that may occur and

12  we go and do it.

13  **Q.**   So you testified earlier that you knew co-defendant Taj

14  Reid and Eric Worthen?

15  **A.**   I didn't hear you.  Say that again.

16  **Q.**   That you knew Taj Reid and Eric Worthen?

17  **A.**   Yes.

18  **Q.**   Okay.  And did someone named Keith introduce you to them?

19  **A.**   Yes, he did.

20  **Q.**   And as part of this investigation, you testified that you

21  also met Len Turner?

22  **A.**   Yes.

23  **Q.**   And who introduced you to Len Turner?

24  **A.**   Taj Reid.

25  **Q.**   And you also met Lance Turner?

1   **A.**    Yes.

2   **Q.**    And who introduced you to Lance Turner?

3   **A.**    I believe Lance -- he wasn't at the first meeting.   I

4   believe Lance came over with his bother and that's how I met

5   him.  He came to a meeting with his brother.

6   **Q.**    And when you initially met Taj Reid, whose decision was it

7   for you to go ahead and meet with him?

8   **A.**    The FBI told me to take that meeting with him.

9   **Q.**    And what, if anything, did you learn as to whether Taj

10  Reid had any political connections in Oakland?

11  **A.**    The first meeting that I had with him he told me basically

12  that he had the hook-up, was his word.  He told me that he had

13  the vice mayor.  I don't know any of these people.  I asked him

14  who was the vice mayor.  Was it your brother?  And he said no,

15  it wasn't -- it's not my brother, it's my father.

16       And he said that they had inside trading.  He used the

17  word "inside."  Insider dealing.

18       And so right then he had told me that he had the hook-up

19  and he can make everything happen through his dad.

20  **Q.**    And so when you heard the term "insider trading," what did

21  you understand that to mean?

22  **A.**    Well, my little small world, every time I hear the word

23  "insider dealing," it sound nefarious to me.  So it piqued our

24  interest.

25  **Q.**    It piqued your interest, you said?

1   A.   Yes.

2   Q.   Okay.  Now, in regards to the work that you did in an

3   undercover capacity in the Bay Area from 2012 to 2014, what was

4   your practice in terms of recording conversations that led to

5   the investigation?

6   A.   What do you mean by that?

7   Q.   Was it the FBI's practice to record all conversations?

8   A.   Oh, once I get direction that A, B or C, naming people,

9   was predicated and we need to record them, our practice is if I

10  meet them 100 times, I got 100 recordings.

11       Once we start recording, there should never be a day that

12  there's not a recording.

13  Q.   And did you record conversations that you had with Taj

14  Reid?

15  A.   Yes.

16  Q.   And was that both over the phone and in person?

17  A.   Yes.

18  Q.   And did you also record conversations that you had with

19  Eric Worthen?

20  A.   Yes.

21  Q.   And did you record conversations that you had with Len

22  Turner?

23  A.   Yes.

24  Q.   And what about conversations that you had with Lance

25  Turner?

MYLES - DIRECT EXAMINATION / HOPKINS

1    A.    Yes.    He -- Lance was mostly with Len most of the time or

2    -- I think I had one different one where Lance called me for

3    directions, but, yes, that was recorded, too.

4    Q.    Okay.  And have you had an opportunity to review the

5    recordings of the conversations with Taj Reid, Eric Worthen,

6    Len Turner and Lance Turner in preparation for this trial?

7    A.    Yes, I have.

8    Q.    And have you tried to refresh your recollection about the

9    content of those conversations by listening to the recordings?

10   A.    It's a lot, but, yes.  I have been trying, yes.

11   Q.    Okay.  And to the best of your knowledge, are those

12   recordings accurate recordings of the conversations and the

13   meetings that you had with those people?

14   A.    Yes.

15   Q.    And when the recordings were made, did the technology

16   record the date of the recording?

17   A.    I'm told that it does.  The new technology does do it

18   internally, but for the most part if I have a chance, I do.  I

19   set the --

20   Q.    You do it verbally?

21   A.    I do.  We call it preamble, but I do it.  I tell them what

22   the date and time is on the tape.

23   Q.    And have transcripts been prepared for some of the audio

24   recordings, conversations that you have had?

25   A.    Yes.

MYLES - DIRECT EXAMINATION / HOPKINS

1  Q.   And have you had a chance to review those transcripts for

2  accuracy?

3  A.   Yes, I have.

4  Q.   Did you make some corrections to them as well?

5  A.   A ton of them.

6  Q.   And so in preparation for this trial did you also review

7  clips of recordings?

8  A.   Yes.

9  Q.   Clips of those actual recordings that -- parts of it that

10  were made for this trial?

11  A.   Yes.

12  Q.   Okay.  And were you given CDs that had the individual clip

13  on each CD?

14  A.   I was given those to check for authenticity.  Yes, I did

15  that.

16  Q.   You did that?

17  A.   Yes, I did.

18  Q.   And how did you indicate that those CDs were authentic?

19  A.   For the most part I used a blue marker on them.  I put my

20  initials "WM" on all of them, that I had checked them.

21       MS. HOPKINS:  Your Honor, at this time the Government

22  moves to admit the recordings into evidence.

23       THE COURT:  What are the numbers of the recordings?

24  Can you go through the list, so I can...

25       MS. HOPKINS:  I sure can.  We have 52-4.

MYLES - DIRECT EXAMINATION / HOPKINS

1         **THE COURT:**  Okay, wait.  52-4.

2         **MS. HOPKINS:**  Yes.

3         **THE COURT:**  Admitted.

4      (Trial Exhibit 52-4 received in evidence)

5         **MS. HOPKINS:**  54-A.

6         **THE COURT:**  54-A, admitted.

7         **MS. HOPKINS:**  Actually, not 54-A.

8         **THE COURT:**  Okay.  It's not admitted.

9         **MS. HOPKINS:**  Exhibit 58-1 and -2.

10        **THE COURT:**  58-1 and 2, admitted.

11     (Trial Exhibits 58-1 and 58-2 received in evidence)

12        **MS. HOPKINS:**  63-2 and -3.

13        **THE COURT:**  62 --

14        **MS. HOPKINS:**  63.

15        **THE COURT:**  Oh, pardon me. -2 and -3?

16        **MS. HOPKINS:**  Yes.

17        **THE COURT:**  Admitted.

18     (Trial Exhibits 63-2 and 63-3 received in evidence)

19        **MR. RIORDAN:**  I'm sorry, your Honor.  What was the

20   last number?

21        **THE COURT:**  63-3.

22        **MS. HOPKINS:**  -2 and -3.

23      68-6, -8 and -9.

24        **THE COURT:**  68-6.

25        **MS. HOPKINS:**  -8.

MYLES - DIRECT EXAMINATION / HOPKINS

1           **THE COURT:**  And -9.

2           **MS. HOPKINS:**  69-1.

3           **THE COURT:**  69-1.

4           **MS. HOPKINS:**  74-1 and -3.

5           **THE COURT:**  74-1.

6           **MS. HOPKINS:**  And -3.

7           **THE COURT:**  And -3.

8           **MS. HOPKINS:**  75-1.

9           **THE COURT:**  75-1.

10          **MS. HOPKINS:**  84-2.

11          **THE COURT:**  84-2.

12          **MS. HOPKINS:**  88-5.

13          **THE COURT:**  88-5.

14       (Trial Exhibits 68-6, 68-8, 68-9, 69-1, 74-1, 74-3,

15          75-1, 84-2, 88-5 received in evidence)

16          **MS. HOPKINS:**  And those are all the recordings that

17    are leading up to the May 9th meeting?

18          **THE COURT:**  So these all pre-date May 9th.

19          **MS. HOPKINS:**  Correct.

20          **THE COURT:**  So, ladies and gentlemen, as to the

21    recordings that I've just admitted into evidence, they are not

22    to be considered by you as evidence of the guilt of the two

23    defendants.

24       Rather, they are the background leading up to other events

25    that may reflect on the guilt or innocence of the defendants,

1    but these in and of themselves don't constitute evidence of the

2    Defendant's guilt.

3         Okay?  All right.

4              MS. HOPKINS:  Okay.

5              THE COURT:  And with that, we'll take a recess.  We

6    will be in recess until 2:15.

7         Remember the admonition given to you.  Don't discuss the

8    case, allow anyone to discuss it with you, form or express any

9    opinion.

10        (Jury exits the courtroom at 1:52 p.m.)

11             THE COURT:  Okay.  All right.  We're in recess.

12   Thank you, your Honor.

13        (Whereupon there was a recess in the proceedings

14         from 1:53 p.m. until 2:18 p.m.)

15             MS. HOPKINS:  Your Honor, may I just state something

16   for the record before the jury comes in.

17             THE COURT:  Of course.

18             MS. HOPKINS:  The Government would just ask that the

19   Court admonish the audience about General Order 58, about

20   prohibiting people from taking photos of witnesses in the

21   courtroom and in the hallway.

22             THE COURT:  I can't believe somebody is doing that.

23             MS. HOPKINS:  It's just in an abundance of caution.

24   We want to make sure the audience is aware of that.

25             THE COURT:  All right.  Well, I so admonish you.  I

MYLES - DIRECT EXAMINATION / HOPKINS

1    mean, that's something that would be treated very seriously by

2    the Court.  No photographs at all.  No recordings at all.

3              MS. HOPKINS:  Thank you.

4              THE COURT:  Period.  Within the courthouse.

5         All right.

6         (Jury enters the courtroom at 2:19 p.m.)

7              THE COURT:  All right.  Let the record reflect that

8    all jurors are present, parties are present, witness is on the

9    stand.

10        You may proceed Ms. Hopkins.

11   BY MS. HOPKINS

12   Q.   So, Mr. Myles, I'd like to draw your attention to

13   February 11th of 2013.  Is that the day that you first met Taj

14   Reid?

15   A.   Yes.

16   Q.   And an individual named Keith introduced you; correct?

17   A.   Yes.

18   Q.   Was Eric Worthen also present for that meeting?

19   A.   Yes, he was.

20   Q.   And where did that meeting take place?

21   A.   It started off in the hotel lobby, the Marriott hotel

22   lobby where I was staying.

23   Q.   And you said it started off there.  Did it go somewhere

24   else?

25   A.   We went somewhere to eat and talk.  We walked.

1    Q.   Now, what was the general tone and nature of this first

2    meeting?

3    A.   It started off as a meet-and-greet.  I didn't know Eric.

4    Q.   Meet-and-greet?

5    A.   Yeah.  I didn't know Eric nor Taj, and Keith had brought

6    them over to meet me.

7    Q.   Okay.  And so approximately how long did the meeting last?

8    A.   First meeting with Eric and Taj?  It could easily have

9    been -- it was on the other side of easily an hour and a half

10   to two hours.  It with a pretty long meeting.

11   Q.   And did you record that meeting?

12   A.   Yes.

13   Q.   And did you talk about yourself during that meeting?

14   A.   Yes.

15   Q.   And generally what did you tell them about yourself and

16   your background?

17   A.   Well, one of the questions here -- and before I answer,

18   one of the questions in an undercover role you have to always

19   answer is why are you here.  When you're not from a place, they

20   want to know why you're in our town.  And so we had to have a

21   story for why we here.

22        And so I told them about -- a little about what I had done

23   in the past.  I'm a commercial developer.  I'm looking to do

24   work.  Basically was that type of story.

25   Q.   Okay.  And did you mention any specific development

MYLES - DIRECT EXAMINATION / HOPKINS

1  projects or businesses that you had been involved in

2  previously?

3  A.   Yes.

4  Q.   And can you give us an example of one?

5  A.   A business that I had been in previously?  He knew me from

6  a commercial developer.  He knew my background in that.  I told

7  him about that.  And construction background.

8      I gave them a little smorgasbord of a lot of things that I

9  did in my -- in the past.

10  Q.   And were you telling the truth when you spoke about the

11  businesses that you had been involved in or were you making

12  them up in support of your role as William Joseph?

13  A.   For the most part I'm always telling something I had been

14  involved in.

15  Q.   So you're making --

16  A.   Not William Joseph, my undercover name, but what William

17  Myles, the real person, been involved in, yes.

18  Q.   And while at this February 11th meeting, did Taj Reid

19  raise the subject of development opportunities in Oakland?

20  A.   Yes.

21  Q.   And did Taj Reid say anything to you about his connections

22  in Oakland?

23  A.   Yes, he did.

24  Q.   And in a nutshell what did he tell you about his

25  connections in Oakland in regards to development opportunities?

MYLES - DIRECT EXAMINATION / HOPKINS

 1   **A.**   He told me that he had the hook-up and he told me he had

 2   that with the vice mayor.  I didn't know who the vice mayor

 3   was.  I didn't even know Taj.

 4        So I asked him was his hook up, the vice mayor, was it his

 5   brother?  He said, no, it's my father.  And then I said, well,

 6   you do have the hook-up then.

 7        We talked about greasing the skids.  If you want to pay to

 8   play on the other side, you have to grease the skids.  We

 9   talked about that.

10   **Q.**   What does "grease the skids" mean?

11   **A.**   Exactly what I -- you have to pay to play if you want to

12   be over there.

13   **Q.**   And so -- you already testified about this, I believe, but

14   what did you understand Taj Reid to be talking about when he

15   said insider track?  Having the hook-up, insider trading?

16   **A.**   How I understood it?  I understood that whatever he

17   needed, he had the hook-up.  His dad -- he used his dad.  So

18   I'm only using his dad because he said it.

19        But he said that he could get it done.  He had insider

20   trading, so...

21   **Q.**   And so what, if any, meetings did Taj Reid suggest that

22   you have?

23   **A.**   Other future meetings?  He also -- he suggested that I

24   meet his dad.

25   **Q.**   And based on this meeting, did you have an understanding

1   if Taj Reid and Eric Worthen were in business together?

2   **A.**   They told me that they was a PR firm, yes.

3   **Q.**   And during this meeting what, if anything, did Taj Reid or

4   Eric Worthen tell you about what they might be able to do for

5   you?

6   **A.**   Well, they -- they just told me that they can make it

7   happen.  You know, if I came over on the other side of the Bay,

8   they can make it happen for me and they had all the hook-ups.

9   **Q.**   After this February 11th meeting, did you have a follow-up

10  conversation with Taj Reid a few days later on February 15th?

11  **A.**   Yes.

12  **Q.**   And did you record this conversation?

13  **A.**   Yes, I did.

14          **MS. HOPKINS:**  I'd like to play for the jury

15  Exhibit 52-4.

16          **THE COURT:**  So ladies and gentlemen of the jury,

17  you're about to hear an audio recording, which has been

18  admitted into evidence.  It is the evidence of what was said.

19          Now, at the same time you are going to observe on the

20  screen a transcript.  That transcript has been prepared as the

21  witness testified, based upon hearing the recording.  However,

22  the transcript itself is not evidence.  It is what you hear

23  that is evidence.

24          So you should listen attentively, but we have found that

25  it is of great assistance to follow a transcript that was

1    prepared of the recording.  So I urge you to pay particular

2    attention as well to the transcript as you hear it.

3        Nevertheless, if there is something different in the

4    transcript from what you've heard, what you've heard actually

5    controls, rather than what is written on the paper.

6        Okay.

7            MS. HOPKINS:  If I could just have one moment, your

8    Honor?

9            THE COURT:  Oh, sure.  Go ahead.

10       (Brief pause.)

11           MS. HOPKINS:  Your Honor, instead of playing the

12   recording, I'm just going to ask Mr. Myles a few questions.

13           THE COURT:  Sure.

14   BY MS. HOPKINS

15   Q.   So, Mr. Myles, when you spoke with Taj Reid that day on

16   the phone, do you recall him saying, "If you want to play,

17   you've got to pay"?

18   A.   Yes.

19   Q.   And, again, in your experience, what does pay to play

20   mean?

21   A.   Pay to play, it's almost self-explanatory.  If you want to

22   get business here, you're going to have to pay for it.

23   Q.   And in this conversation did Taj Reid talk about himself?

24   A.   Yes.

25   Q.   And did he say that he knew a lot of people because of his

MYLES - DIRECT EXAMINATION / HOPKINS

1   father?

2   A.    Yes.

3   Q.    And did you discuss the conversation that you had with Taj

4   Reid with Special Agents Quinn and/or Wynar?

5   A.    Yes.  After the meetings, yes.

6   Q.    And as a result, were you given any direction in terms of

7   accepting the meeting with Taj Reid's father Larry Reid?

8   A.    Yes.  They told me to take the meeting.

9   Q.    And did that meeting take place?

10  A.    Yes, it did.

11  Q.    And at the time what was your understanding of whether --

12  do you know his name?

13  A.    Taj Reid's father?

14  Q.    Yes.

15  A.    Larry Reid.

16  Q.    And at the time what was your understanding of whether he

17  was a public official?

18  A.    Taj made it clear he was a city councilman and he was the

19  vice mayor.

20  Q.    Had you specifically ask to meet with Larry Reid?

21  A.    I didn't even know Larry Reid, no.

22  Q.    And whose idea was it to have you meet with Larry Reid?

23  A.    His son, Taj Reid.

24  Q.    I'd like to direct your attention to February 22nd, 2013.

25  Is that the day that you met Larry Reid?

1   A.   Yes.

2   Q.   February 22nd, 2013?

3   A.   Yes.

4   Q.   And where did that meeting take place?

5   A.   The first meeting took place at City Hall, Oakland City

6   Hall in Larry Reid's office after hours.

7   Q.   After hours?

8   A.   Yes.

9   Q.   And was Taj Reid there --

10  A.   Yes.

11  Q.   -- for that meeting?

12       And did you record the meeting?

13  A.   Yes, I did.

14  Q.   And were Eric Worthen and Keith also present for that

15  meeting?

16  A.   Yes, they were.

17  Q.   And what was the tone of that meeting with Larry Reid?

18  A.   That was a meet-and-greet, Larry and I.  Taj had set this

19  meeting up so I could meet his dad.

20       His dad went over some developments in the town, some

21  things that was happening in his district, as well as some

22  things that was happening in town.

23       And we just caught up on life.  And we decided that we

24  would get back together at another time and he would take me on

25  a ride or something like that.

MYLES - DIRECT EXAMINATION / HOPKINS

1  Q.    Take you on a ride for what?

2  A.    In his district to see what Oakland had to offer.

3  Q.    Okay.  Did you have a follow-up conversation with Taj Reid

4  a few days later on February 25th, 2013?

5  A.    Yes.

6  Q.    And what was the general tone and nature of that phone

7  conversation?

8  A.    He was a little happy.  That tone was, I had talked to his

9  dad and I guess he got feedback from his dad.  And he thought

10  that his dad liked me and he just thought that we could do a

11  lot of good things.

12  Q.    I want to briefly turn your attention back to Taj Reid and

13  Eric Worthen.  Now, you said that they told you that they had a

14  PR business?

15  A.    Yes.

16  Q.    And did they tell you what the name of that business was?

17  A.    They used their names.  Reid Worthen was the name of the

18  business.

19  Q.    And at some point did either Taj Reid or Eric Worthen

20  provide you with a business card?

21  A.    Not the first time I met them.  They didn't have a

22  business card.  But this next time that we met, they had new

23  cards, yes.

24  Q.    Okay.  And if you could take a look at what's been marked

25  for identification as Exhibit 25?

```
 1          (Document displayed)

 2               MS. HOPKINS:  Don't show that yet.

 3          (Document removed from display)

 4   BY MS. HOPKINS

 5   Q.   Do you recognize that?

 6   A.   It just went off, but I did before it went off, yes.

 7   Q.   Okay.  And --

 8               THE COURT:  25 admitted.

 9          (Trial Exhibit 25 received in evidence)

10               MS. HOPKINS:  Okay.  Thank you.

11   BY MS. HOPKINS

12   Q.   What is that?

13   A.   This is their business card.

14   Q.   Is that a copy of the business card that they gave you?

15   A.   Yes.

16   Q.   What, if anything, did you learn about whether Taj Reid

17   was employed at the time?

18   A.   He wasn't employed.  He was trying to drum up work through

19   his PR or consultant.

20   Q.   And what about Eric Worthen?

21   A.   He had a job with the state.  So he did have a state job,

22   yes.

23   Q.   Do you know where in the state?

24   A.   I think he worked in the V.A. division of the state, and

25   he was a deputy.  I think a deputy director or something for
```

MYLES - DIRECT EXAMINATION / HOPKINS

1  the V.A.

2  Q.   And when you say V.A, what is V.A.?

3  A.   V.A. Administration.   I guess it's the state V.A. that he

4  worked at.

5  Q.   Is that Veteran's Administration?

6  A.   Yes, Veteran's Administration.

7  Q.   What, if anything, did you learn about where Taj Reid was

8  living at the time?

9  A.   He was living with his parents, his dad.

10  Q.   During the period of February and March of 2003, did you

11  travel in and out of the Bay Area?

12  A.   Yes.

13  Q.   And why did you travel?   Why did you leave?

14  A.   First of all, I don't live here, so I'm working here.   And

15  I have other cases, so I'm in and out all the time.

16  Q.   And did you continue to have conversations by phone with

17  Taj Reid and Eric Worthen?

18  A.   Yes.

19  Q.   And did you meet with them periodically when you were in

20  the Bay Area?

21  A.   Mostly every time I came with Taj.

22  Q.   With Taj?

23  A.   Yeah.

24  Q.   Mostly?   Okay.

25       And what, if anything, did they express to you in terms of

1  their level of interest of doing business with you?

2  **A.**   They -- they started off telling me the value of me having

3  a PR firm and what they brought to the table and what doors

4  they can open for me and how they would protect me.  So that

5  was their main concern.

6  **Q.**   You said protect you --

7  **A.**   Yeah.

8  **Q.**   -- also?

9  **A.**   Yes.

10  **Q.**   What did you understand --

11  **A.**    In the construction business, in the development business,

12  if you don't know nobody, you need to know somebody when you're

13  out of town.  You do need to know someone.

14  **Q.**   And in this time frame and in your role as William Joseph,

15  did you communicate to Taj Reid and Eric Worthen that you were

16  a developer willing to pay to play?

17  **A.**   Yes.  They knew that the first day.

18  **Q.**   And in your role as developer William Joseph, did you

19  eventually express an interest in any specific development

20  opportunities?

21  **A.**   With Taj?

22  **Q.**   Yes.

23  **A.**   Well, Taj was trying to get me into his father's district.

24  And so this -- Taj was a continuation.  We was really still

25  investigating Taj.  So Taj was looking for stuff for me to do.

MYLES - DIRECT EXAMINATION / HOPKINS

1   And so to further the investigation, I started looking for

2   things to keep us on the ground for a little time.

3        So I looked at maybe a possible hotel on the other side of

4   the water, on Hegenberger.  I believe that's how you pronounce

5   it.

6   **Q.**   So when you say "other side of the water," do you mean in

7   the East Bay?

8   **A.**   In Oakland, yes.

9   **Q.**   Okay.  And what kinds of things, if any, did Eric Worthen

10  and Taj Reid propose to do for you?  I know you said they could

11  open doors.

12  **A.**   Uh-huh.  The first deal that -- Eric came to me -- well,

13  he would let me know that he could -- he had an inside --

14  insider at Berkeley, the laboratory, and that he had somebody

15  there that could help me, and they would basically put their

16  finger on the scale to help me.

17       But that went away real quick.  Then a day or two later he

18  gave me a call and he proposed a deal to me.

19  **Q.**   Okay.  And we'll get into more detail about those

20  opportunities that Eric Worthen proposed to you.

21       What was your understanding of what Taj Reid and Eric

22  Worthen were trying to get from you?

23  **A.**   In simple words, money.  That's all they wanted to get,

24  money.  However they could get money from me.

25  **Q.**   And did you have to pursue Taj Reid or Eric Worthen?

1   **A.**   No, they pursued me.  I didn't even know them.

2   **Q.**   And did Taj Reid or Eric Worthen talk to you about paying

3   them?

4   **A.**   Yes.

5   **Q.**   Was it mainly Taj Reid or was it both?

6   **A.**   Taj did the most talking in front of me, but I also know

7   the conversations where I wasn't around.  They both were trying

8   to find a way to please me basically.

9   **Q.**   When you say conversations when you weren't around, are

10  these updates that you were receiving from FBI?

11  **A.**   Yes.  Ethan and Roahn would tell me what they heard on the

12  wiretaps.

13  **Q.**   And did Taj Reid and Eric Worthen introduce you to Len

14  Turner?

15  **A.**   Yes.

16  **Q.**   And what, if anything, did they tell you about Len Turner?

17  **A.**   Early on Taj was looking for a place --

18           **MR. RIORDAN:**  Objection, hearsay.

19           **THE COURT:**  Well, again, it's not being introduced

20  for the truth of the matter.  It's being introduced to explain

21  what this witness heard and then what action did he take.

22  **BY MS. HOPKINS**

23  **Q.**   So what, if anything, did -- let me rephrase.

24       Did Taj Reid and Eric Worthen tell you that Len Turner was

25  a contractor in Oakland?

MYLES - DIRECT EXAMINATION / HOPKINS

1   A.   Yes.

2   Q.   Did they tell you he was a black contractor in Oakland?

3   A.   Taj did.

4   Q.   Taj did?

5   A.   Yeah.

6   Q.   And that -- did they say whether or not he was a friend of

7   Larry Reid, Taj's father?

8   A.   Yes.

9   Q.   And had you sought out this introduction to Len Turner?

10  A.   I had been here almost a year and the Turner's name never

11  came up.  So we didn't know anything about the Turners.

12  Q.   But did you agree to take the introduction?

13  A.   Yes.

14  Q.   And why is that?

15  A.   Because when his name came up and his name was on tapes

16  and his name -- the attorney's name was in the debriefing, the

17  next day or later on that night the agent said, Well, take the

18  meeting.

19  Q.   Okay.  And at some point in March of 2013 did you pay Taj

20  Reid and Eric Worthen a thousand dollars?

21  A.   A thousand that I paid them?

22  Q.   1,000.

23  A.   Each, you mean?

24  Q.   Was it each or was it total 1,000?

25  A.   Which --

MYLES - DIRECT EXAMINATION / HOPKINS

1   Q.   Not in connection with any contracts.

2   A.   Ooh.   In what month?

3   Q.   In March of 2013.

4   A.   Ooh.   Without context...   Could you show me that in

5   context?   I can remember the payments that I paid them.

6   Q.   Was there any talk about you looking to find a place to

7   live?

8   A.   That wasn't Taj and Eric.   That was Taj.

9   Q.   That was Taj?

10  A.   Yes.   Taj went to -- I was interested in -- it looked like

11  the case was going to be longer than we wanted to and the

12  expenses was high in the hotel, so they -- the Government was

13  contemplating whether I get a place here.

14       And so we asked Taj, did he know of a place.   And he

15  looked around, and then he came back.   And he basically wanted

16  money for looking around.   So, yeah, we gave him a thousand

17  dollars for that.

18  Q.   Did you have any further interactions with Larry Reid

19  after that first introduction?

20  A.   Yes.

21  Q.   How many more times did you meet with Larry Reid?

22  A.   Ooh, don't hold me to the exact number, but after that

23  meeting I knew we went a drive around.

24  Q.   And was that to see the district?

25  A.   Yes.

MYLES - DIRECT EXAMINATION / HOPKINS

1   **Q.**   Okay.

2   **A.**   We also played a round of golf.  And I believe, if not

3   that time, we may have -- we went to lunch.  And I'm trying to

4   see was that a different time or did we go from the golf course

5   to it, but I think that it was a different time.

6   **Q.**   And did you discuss development opportunities with Larry

7   Reid during these get-togethers?

8   **A.**   Yes.

9   **Q.**   So I'd like to turn your attention to April 10th of 2013.

10  In terms of doing business with you, did Eric Worthen bring up

11  the subject of a contract with the Lawrence Berkeley National

12  Lab?

13  **A.**   Yes.

14  **Q.**   And did he mention this during a phone conversation with

15  you?

16  **A.**   Yes.

17  **Q.**   Did you record that call?

18  **A.**   Yes, I did.

19         **MS. HOPKINS:**  I think it's already been admitted.

20  It's Exhibits 58-1 and 58-2.

21      If we could play 58-1, please.

22      (Audiotape played in open court, not reported.)

23         **MS. HOPKINS:**  Can you stop right there?

24  **BY MS. HOPKINS**

25  **Q.**   What is a PLA?

1    **A.**   When you have unions on a job.  It's a Project Labor

2    Agreement, when you set out the terms of the labor and what

3    they are going to get paid and how they are going to get

4    breaks, the whole shebang; that this is how we're going do

5    operate labor-wise on this project.

6         (Audiotape played in open court, not reported.)

7    **Q.**   Are you familiar with RFQ?

8    **A.**   Yes.

9    **Q.**   What is an RFQ?

10   **A.**   Request for Qualifications.

11   **Q.**   What is that?

12   **A.**   Normally when you go do a job, a person want to know are

13   you qualified to do the job.  Give us a little history.  Do you

14   have -- what do you have that can prove to us that you're

15   qualified to do a job of this magnitude.  So you have to lay

16   that out.

17        (Audiotape played in open court, not reported.)

18   **Q.**   So in this conversation was this the first you had heard

19   of a contract with the Lawrence Berkeley National Lab in

20   Richmond?

21   **A.**   Yes.

22   **Q.**   And who brought that up?

23   **A.**   Eric Worthen.

24   **Q.**   And had you even mentioned a contract with the lab, the

25   National Lab?

MYLES - DIRECT EXAMINATION / HOPKINS

1    **A.**    No.

2    **Q.**    And had you ever mentioned a contract with any type of

3    University of California facility?

4    **A.**    No.

5              **MS. HOPKINS:**   All right.   If we could play 58-2?

6         (Audiotape played in open court, not reported.)

7    **BY MS. HOPKINS**

8    **Q.**    Mr. Myles, in your work as a developer and a contractor,

9    did you have any experience with bidding for construction

10   contracts offered by public agencies, such as a university or a

11   government entity?

12   **A.**    Yes.

13   **Q.**    And what generally is the process, in your experience?

14   **A.**    Well, I guess every state has a different procurement

15   process, but most construction bids start out with a

16   solicitation.   They put it out in journals and they put it on

17   the street.   So if anybody is interested in it, they can apply

18   for it.   So it starts with that.

19        It may move from that to, the next process could be a RFQ,

20   show us your qualification, Request For Qualifications.

21        And after you send that in, there was another step.   That

22   step -- and they evaluating you at each step, you know.   And

23   then the next step would be if you make it through the

24   qualification, they may ask you for a proposal.   And then with

25   the proposal you put a price in, which is a bid.

1   Q.   So within the proposal you submit your bid?

2   A.   Yes.  You can't propose something they can't afford, so

3   they want to know what did you propose and can we pay for it.

4   Q.   Now, based on your experience and your familiarity with

5   the process by which public agencies obtain and review bids,

6   was what Eric Worthen proposing, was that consistent with the

7   proper process?

8   A.   Nowhere close.

9   Q.   And why was it not?

10  A.   First of all, Eric had no insight of what's going on.

11  Eric worked for the state and he's trying to sell Lawrence

12  Berkeley stuff to me.

13       So that wasn't a process.  That was just a pay to play.

14  You give us the money.  I know people on the inside.  They will

15  put their finger on the scale for you.

16       So it wasn't a process.  It was how could he get money

17  from me -- out of me.

18  Q.   And based on this call, what was Eric Worthen proposing

19  that he could do for you?

20  A.   That he had friends and these friends would help me get

21  work.

22  Q.   And he had friends where?

23  A.   He had them in Richmond and, I guess, he had some in

24  Lawrence Berkeley as well.

25  Q.   Now, what was your response to his proposal?

MYLES - DIRECT EXAMINATION / HOPKINS

1  **A.**   I listened to it.  As you hear, I'm vetting him out.   I

2  told him if I can -- I believe I said in this one -- so many

3  things, but I believe I told him that if I can get an unfair

4  advantage, I'm interested, basically.

5  **Q.**   Now, I'd like to turn your attention to the next day.  Did

6  you have another telephone conversation with Eric Worthen?

7  **A.**   Yes.

8  **Q.**   And that was April 11th, 2013?

9  **A.**   Yes, I did.

10 **Q.**   And did that pertain to a construction contract with the

11 California state agency with whom he worked?

12 **A.**   Yes.

13 **Q.**   And what was the construction contract that he discussed

14 with you?

15 **A.**   The next day he called and he was trying to sell -- offer

16 me for money the Cal Vet contract.

17 **Q.**   In what city was the Cal Vet contract located?

18 **A.**   It was a housing contract building in Ventura, California

19 for vets.

20 **Q.**   And did you end up having discussions with both Eric

21 Worthen and Taj Reid about this Cal Vet contract in Ventura?

22 **A.**   Yes.

23 **Q.**   And what, if anything, were Taj Reid and Eric Worthen

24 offering you in regards to this contract?

25 **A.**   That they was giving me this contract; that Eric -- he

1   oversaw the contract from A to Z and they was going to make

2   sure everything came out on the other end; that I would win the

3   contract and all I had to do is find a number that they can

4   live with financially.

5   **Q.**   So find a number, do you mean pay them?

6   **A.**   Pay them for it.

7   **Q.**   Okay.  And who raised the subject of the Cal Vet contract

8   for the first time?

9   **A.**   Eric Worthen.

10  **Q.**   And at the time -- sorry.  You testified before that you

11  knew where Eric Worthen worked?

12  **A.**   Yes.

13  **Q.**   And was it with this agency?

14  **A.**   Yes.

15  **Q.**   And knowing where he worked, had it even occurred to you

16  to ask him about a Cal Vet contract?

17  **A.**   Oh, he used to come to the meetings all the time with

18  state I.D. around his neck.  And I would all the time let him

19  know we're doing dirty deals.  Don't come in here with that

20  state.

21        So it bothered me that he would do these dirty deals and

22  he would wear his job I.D.  So I would tell him that all the

23  time, "Take it off, take it off."

24  **Q.**   But had you ever thought to ask him about contracts within

25  Cal Vet knowing that he had worked there?

1    **A.**    No.

2    **Q.**    And had Agents Quinn or Wynar directed you to inquire

3    about a Cal Vet contract?

4    **A.**    No.   They wasn't even on the radar.

5    **Q.**    Now, going back to the telephone conversation on

6    April 11th with Eric Worthen, was that recorded?

7    **A.**    Yes.

8            **MS. HOPKINS:**   At this point the Government would like

9    to play 63-2, which has already been admitted into evidence.

10        (Audiotape played in open court, not reported.)

11    **BY MS. HOPKINS**

12    **Q.**    Now, did you understand what Eric Worthen was talking

13    about when he used the term "deliverables"?

14    **A.**    Yeah.

15    **Q.**    And what did you understand that to mean?

16    **A.**    That was a term I had introduced to them because everybody

17    would -- had their hand out.   And in the pay to play thing we

18    would have been giving money out all over the city.

19        So what I -- when they offered to do something for me, I

20    wanted deliverables back.   If you wanted money, we decided we

21    was going to do it, show us that you was going to do something

22    for the money.

23        So now he's using the term.   He done heard it enough that

24    now he's talking about deliverables.   He had delivered that

25    contract to me basically.

1  Q.   Why, if at all, were you interested when Eric Worthen

2  mentioned federal money?  I believe you said something like you

3  were awakening a sleeping giant?

4  A.   I was.  I was asleep when he called me, but I answered his

5  phone.

6       You heard me talking earlier about different things.  They

7  don't have money, you know, because I don't really believe in

8  the -- this Cal Vet at that moment, but then he keep talking

9  and then he said it has federal dollars.  It woke me up.

10  That's my job.  So, yeah, it got my attention.

11  Q.   And during the call Eric Worthen mentioned that his role

12  was to put the RFQ together.  And you just testified earlier

13  what the RFQ is, and that's the Request for Qualifications; is

14  that correct?

15  A.   Correct.  Yes.

16       MS. HOPKINS:  Now, if we can play Exhibit 63-3, which

17  has also already been admitted into evidence.

18       (Audiotape played in open court, not reported.)

19       MS. HOPKINS:  You can stop there.

20  BY MS. HOPKINS

21  Q.   Now, based on this conversation, what did you understand

22  Eric Worthen to be talking about?

23  A.   I understood that he had the lead position on the

24  contract; that he was -- he controlled the Request for

25  Qualification, meaning that what he would put out -- what he

 1   would put out would basically fit my resume.  Basically he said

 2   that; that you're -- you're maxed out.  It would fit you

 3   100 percent.

 4        So basically he's saying that if I played along with him,

 5   he was going to make sure that he gave me the proper stuff, as

 6   well as he was going to be the evaluator.  He was the last

 7   evaluator.  So he made the decisions on whether I get it.  And

 8   that's what he was telling me.

 9   **Q.**   So how, if at all, was what Eric Worthen was proposing

10   similar to what he had discussed with you the day before

11   regarding the Lawrence Berkeley Lab contract in Richmond?

12   **A.**   It was similar.  He just didn't go this far with it.  It

13   was similar.

14   **Q.**   Similar?

15   **A.**   Right.

16   **Q.**   And in this -- in that Lawrence Berkeley Lab contract, was

17   he the insider in that contract?

18   **A.**   He had people that was insider that he knew.

19   **Q.**   And then the Cal Vet contract?

20   **A.**   He is the insider.  He is the person that's going to make

21   sure it happened.

22   **Q.**   And did you and the agents discuss Eric Worthen's proposal

23   regarding that contract?

24   **A.**   Immediately.

25   **Q.**   And what did the agents decide in terms of whether or not

1  to explore it further?

2  **A.**   When I first called them -- I wasn't in town, I don't

3  believe, but anyway, they had to review the calls.  And when

4  they reviewed the calls and they thought about it, they got

5  back in touch with me and they thought that I should meet and

6  continue the conversation with them.

7         **MS. HOPKINS:**  Your Honor, are we going to be taking

8  another break?  Because this might be a good time; but if not,

9  I can keep going.

10         **THE COURT:**  Sure.  Let's take a short break though.

11  Let's take a 10-minute break.

12     Remember the admonition given to you.  Don't discuss the

13  case, allow anyone to discuss it with you, form or express any

14  opinion.  We'll be back at 3:15.

15     (Whereupon there was a recess in the proceedings

16         from 3:06 p.m. until 3:21 p.m.)

17         **THE COURT:**  Okay.  Please be seated.

18     Let the record reflect all jurors are present, parties are

19  present.

20     You may proceed.

21  **BY MS. HOPKINS**

22  **Q.**   Mr. Myles, I'd like to turn your attention to April 17th

23  of 2013.  Did you have a meeting with Taj Reid and Eric Worthen

24  where you further discussed that Cal Vet contract?

25  **A.**   Yes.

MYLES - DIRECT EXAMINATION / HOPKINS

1  **Q.**   And where did that meeting take place?

2  **A.**   In my hotel room, I believe.  Yes.

3  **Q.**   I'm sorry?

4  **A.**   I believe in the hotel room, yes.

5  **Q.**   Okay.  And did it -- did you move on from there to another

6  place after your hotel room?

7  **A.**   Did we --

8  **Q.**   Did you go out to eat?

9  **A.**   Yes.  After we discussed it, then we went out to dinner,

10  yeah.

11  **Q.**   All right.  So let's start with the meeting in your hotel

12  room.  What, if any, details did you get from -- that you

13  recall from Eric Worthen regarding that Cal Vet contract?

14  **A.**   This day?

15  **Q.**   Yes, on April 17th.

16  **A.**   Eric was giving me the confidence that I could get the

17  deal and what he was going to do for me to get the deal.

18       And I don't know how far you want me to go, but somewhere

19  in this conversation Eric was convincing me and Taj got

20  impatient.

21  **Q.**   Convincing you what?

22  **A.**   About that I could have the deal and what he was going to

23  do and how he was the evaluator of the deal.  He continued it.

24       Now he done went from the telephone.  Now he's in my hotel

25  room telling me about how I can get the deal.

1    Q.   And at this meeting did Eric Worthen bring any documents

2    with him?

3    A.   Yes.

4    Q.   And what were the documents that he brought?

5    A.   He brought some documents.  Some of them was email.  Some

6    of them was things about the project.  And a lot of them was

7    there for him to show me that this project was moving along and

8    that he was a part of this project.

9    Q.   And did you record the meeting that was in your hotel room

10   that day?

11   A.   Yes.

12        MS. HOPKINS:  If we can start with Exhibit 68-6,

13   which has already been admitted.

14   (Audiotape played in open court, not reported.)

15   BY MS. HOPKINS

16   Q.   What was your understanding of what they were telling you

17   about the Cal Vet contract?

18   A.   There was no "they" on that one.  That was Taj for the

19   most part.

20        Taj had got impatient when Eric kind of described the deal

21   to me and to tell me it's my deal.  So Taj say, Let's cut to

22   the chase.  We here and you here for a reason.  This is your

23   deal.

24        And he had other deals, and he wanted me to consolidate

25   them all together, and they can bring these deals home.  And

1    I'm telling him, no, we're not consolidating.  We're going to

2    do one deal at a time basically.

3              MS. HOPKINS:  So if we could listen to Exhibit 68-8,

4    which has already been admitted.

5         (Audiotape played in open court, not reported.)

6    BY MS. HOPKINS

7    Q.   So what was your understanding of when Eric Worthen said

8    "you'll know what everyone's final dollar is"?

9    A.   Well, that's illegal, but basically he was going to tell

10   me everybody else bid and then I could bid and win it.

11   Q.   So he was going to let you know everyone else's bid?

12   A.   Right.  That's why he said what their final dollar.  He

13   meant their final number.

14   Q.   And based on your experience in construction and as a

15   developer, how, if at all, would knowing the amounts that the

16   other bidders are bidding on that Cal Vet contract be helpful

17   or be of value to you?

18   A.   It gave me an unfair advantage.  I knew what they number

19   were, but they wouldn't know my number.  And so going in I know

20   I have it.

21        So it takes away competitive bid, fair competitive bid.

22   It was a deal cooked for me and me only.

23   Q.   And what were you talking about when you were discussing

24   equity?

25   A.   He asked for equity.  Now, equity can mean a lot of

MYLES - DIRECT EXAMINATION / HOPKINS

1    things.

2    **Q.**   You say "he."  Who is he?

3    **A.**   Taj wanted equity.  He wanted a fee plus equity.  My

4    understanding is equity -- a lot of time equity means

5    ownership, but in this case it means a share of the profits.

6            **MS. HOPKINS:**  If we could play 68-9, please.  And

7    it's already been admitted.

8         (Audiotape played in open court, not reported.)

9            **MS. HOPKINS:**  Thank you.

10   **BY MS. HOPKINS**

11   **Q.**   What was your understanding of Taj Reid's comment about

12   his father and kickbacks?

13   **A.**   Taj, I guess, is a double-edged sword with him.  Taj

14   didn't want his dad's name mentioned in none of these dirty

15   deals, but the only one that ever mentions Taj dad name was

16   Taj.  So he kept bringing it up.

17   **Q.**   And what's a kickback?

18   **A.**   Kickback?  It's someone does a deal and then they kick you

19   back some of the money.  That's a kickback.

20   **Q.**   Now, did you end up reaching a deal with Taj Reid and Eric

21   Worthen regarding this Cal Vet contract?

22   **A.**   Yeah.  Eventually we got to a number, yes.

23   **Q.**   And what was the agreement that you had with Eric and Taj?

24   **A.**   They would give me the deal and I would give them $10,000

25   the next day.

MYLES - DIRECT EXAMINATION / HOPKINS

1   **Q.**   $10,000, what did you say?

2   **A.**   For the Cal Vet deal.

3   **Q.**   For the Cal Vet deal?

4   **A.**   I would give them $10,000.  I would go to the bank the

5   next day, a couple banks, and give them $10,000.

6   **Q.**   And what about equity?  Did you decide anything on equity

7   that you recall?

8   **A.**   I think we moved from -- he didn't like my 5.1, so I think

9   we settled at 15 percent.

10  **Q.**   And who decided on the amount of $10,000?

11  **A.**   The FBI.

12  **Q.**   And who gave you approval for that?

13  **A.**   The FBI.

14  **Q.**   And who were you going to pay the money to?

15  **A.**   They had decided they wanted to make sure -- Eric

16  wanted -- since it was his agency, he wanted to be arm length

17  away from this deal.  So he decided that I -- Taj would accept

18  all the money and then Taj would pay him.

19  **Q.**   Now, after meeting with Eric Worthen and Taj Reid in your

20  hotel room, you said you went out afterwards to get something

21  to eat?

22  **A.**   Yes, yes.

23  **Q.**   Do you recall where you went to eat?

24  **A.**   No, but I can remember we ordered something I didn't like.

25  Sushi, wherever it was.  I can't remember all these places.  It

MYLES - DIRECT EXAMINATION / HOPKINS

1    was so many, six years ago.

2    **Q.**   And was that conversation recorded as well?

3    **A.**   Yes.

4    **Q.**   And when you record in public places, such as restaurants

5    or outside, how is the quality of the recording?

6    **A.**   Terrible.

7    **Q.**   So it's hard to hear?

8    **A.**   And the reason I say it's terrible, because you have

9    people eating.  They are not trying to be quiet for us.  You

10   have dishes.  You have all kinds of utensils.  You have people.

11   So it's really, really, really noisy.

12   **Q.**   And at some point during the end of the evening, did the

13   subject of the Turner Group come up?

14   **A.**   Yes.

15   **Q.**   I'd like to turn your attention --

16           **MS. HOPKINS:**  Let's go ahead and play Exhibit 69-1,

17   which has already been admitted.

18       (Audiotape played in open court, not reported.)

19   **BY MS. HOPKINS**

20   **Q.**   Okay.  So as you can tell, the quality of that's not

21   great, but I did want to ask you a quick question.

22       Taj Reid mentions that he wants you to meet with some 8-A

23   contractors.  Are you familiar with the term "8-A contractor"?

24   **A.**   Did he say 8-A?

25   **Q.**   8-A.

MYLES - DIRECT EXAMINATION / HOPKINS

1    **A.**    Yeah, I see 8-A, but a lot of times he used to say

2    minority contractors.  So it almost mean the same.

3    **Q.**    What is an 8-A contractor?

4    **A.**    8-A designation.  8, the number, numeral whatever you want

5    to call it, 8-A.  And it's an SBA small business association

6    designation for disadvantaged minorities, MWBE program,

7    Minority Women Business Enterprise.  So it's a -- it's a small

8    business program that advantage minorities.

9    **Q.**    And how do they advantage minorities or how do they help

10   them?

11   **A.**    Once you get in an 8-A program, they try to train you from

12   a business model.  You have a lot of -- they have a lot of

13   courses and classes you can go to.

14        And then because it's the federal government, they will --

15   whatever your expertise is, they may give you what they call

16   sole source.

17   **Q.**    Sole source?

18   **A.**    Sole, S-O-L-E.  Sole source contract, meaning that you

19   didn't go through a competitive bid.  The Government gave it to

20   you.  Or you might bid with one or two people.  It won't be ten

21   or 20.

22        And so all those people in that program learn how to do

23   competitive bid, how to fill out the form, how to get jobs and

24   perform on your job.  So it's like a feeder program for small

25   disadvantaged minorities.

1    **Q.**    Okay.

2              **MS. HOPKINS:**  If we could continue playing.

3         (Audiotape played in open court, not reported.)

4    **BY MS. HOPKINS**

5    **Q.**    So had you been expecting the subject of 8-A contractors

6    or the Turner Group to come up in this conversation?

7    **A.**    I didn't expect the Turner's name.  I didn't know the

8    Turners, so no.

9    **Q.**    And what was your understanding of Taj Reid's comment that

10   you need local contractors?

11   **A.**    No.  I always tell -- well, Taj told me that, but I had

12   told him earlier my philosophy was that -- and my philosophy

13   is --

14   **Q.**    William Myles' philosophy or William Joseph?

15   **A.**    William Myles' philosophy.

16   **Q.**    Okay.

17   **A.**    Posing as William Joseph.

18        That my philosophy is that if you've got big contracts in

19   your city, you ought to be using somebody from your city and

20   you ought to be hiring the people in your city.  It should be

21   an economic development.  I believe that in my heart.

22        If you use somebody like me to come into Oakland or

23   San Francisco, I'm going to bring my people.  And I tell them,

24   now my people going to come in, get the work.  And where will

25   they spend their money?  They going to spend their money back

MYLES - DIRECT EXAMINATION / HOPKINS

1   in Dallas where they came.

2        So I was letting them know the best thing to do is use the

3   local people and give them opportunity.  So that's what we're

4   talking about.

5   **Q.**   Now, you mentioned that you weren't -- that you hadn't

6   heard of the Turner Group, but is there more than one

7   contractor or construction group by that name?

8   **A.**   When I first heard the Turner Group and I went back and --

9   where I'm from in the Midwest, in the South, the Turners are

10  one of the big behemoths.  They are a big thousand pound

11  gorilla.  They all over the world.  They international.

12       And when they said Turner Group, that's what I thought.

13  And the record will show that later, but I thought it was the

14  Turner Group.  And I'm wondering what in the world that big old

15  company need with little old me.  So I didn't know.

16  **Q.**   Okay.  So that then you found out the Turner Group was not

17  the larger Turner -- Turner Group international company that

18  you thought?

19  **A.**   I talked to Keith and Eric and they said -- they still

20  gave me wrong information.

21  **Q.**   Okay.

22  **A.**   They told me that --

23  **Q.**   Let me stop you right here.

24  **A.**   Okay.

25  **Q.**   Okay.

1   **A.**   But other people told me they broke off from the big

2   Turner Group; right?

3   **Q.**   But you weren't sure about that.

4   **A.**   I didn't know anything.

5   **Q.**   I'm just going to stop you right there.

6   **A.**   Okay.

7   **Q.**   Okay, thanks.

8         Prior to this meeting, had you requested a meeting with

9   the Turners?

10  **A.**   No.

11  **Q.**   Had you requested a meeting with a contractor or a local

12  contractor?

13  **A.**   No.

14  **Q.**   And what was the reason why you held off agreeing to a

15  meeting right then and there when they proposed it?

16  **A.**   Well, that ain't how our system is.

17  **Q.**   Whose system?

18  **A.**   The FBI and my role and the rules that I follow.  I don't

19  take meetings with someone until I touch base and shoot, we

20  take a meeting with that person.  So sometimes you may hear me

21  saying, Okay, what day is available to you?

22        Well, the reason I'm picking another date is because I got

23  to touch base, in fact, with the agents in charge.  I just

24  don't go from one meeting.

25        Now, if he was just walking around and he take me, I could

MYLES - DIRECT EXAMINATION / HOPKINS

1    do that.  But normally they would say take the meeting or not

2    take the meeting, that kind of stuff.

3    **Q.**    All right.  So I want to turn your attention to the next

4    day, which is April 18th, 2013.  Did you meet with Taj Reid

5    that day?

6    **A.**    Yes.

7    **Q.**    And where did that meeting take place?

8    **A.**    April 18th?  In my moment room.

9    **Q.**    And why did you meet with him?

10   **A.**    This is -- this is the day I'm going to pay him the

11   $10,000, I believe.  April 18th?  Yes.

12   **Q.**    April 18th, yes.

13   **A.**    So I'm paying him the $10,000.

14   **Q.**    For what?

15   **A.**    For the Cal Vet deal that him and Eric has already offered

16   me.

17   **Q.**    And in what form did you pay the money?

18   **A.**    I paid him in cash.

19   **Q.**    And where did you get the money to make the payment?

20   **A.**    FBI funded the money.

21   **Q.**    And what, if anything, was your understanding at this

22   point of whether Taj Reid was going to keep all the money for

23   himself or what he was going to do with the money?

24   **A.**    They had already told me how they was going to do it in

25   front of me, to protect Eric in a sense; that Taj would get all

MYLES - DIRECT EXAMINATION / HOPKINS

1    the payments and then Taj will pay Eric.

2    **Q.**   Do you know if that happened?  Do you know if he paid

3    Eric?

4    **A.**   Absolutely.  I called on the telephone and asked him, "Did

5    you get your money?" to make sure.  And he said yes.

6    **Q.**   Now, based on your understanding with Taj Reid and Eric

7    Worthen, was there promise of some more money on this deal?

8    **A.**   Equity.  And I told them as they move, I might give them

9    money in phases just to see could they move it.  I didn't give

10   a dollar amount, but we did talk about the monies in phases.

11   **Q.**   Okay.  So I'd like to turn your attention to April 19th of

12   2013.  Did you have a phone conversation with Taj Reid and Eric

13   Worthen that day?

14   **A.**   Yeah.  I believe this is the -- yeah, this is the day

15   after.  Yes.

16   **Q.**   And was that conversation recorded?

17   **A.**   Yes.  All conversations are recorded.

18   **Q.**   Thank you.

19            **MS. HOPKINS:**  I'd like to play Exhibit 74-1, which is

20   already been admitted.

21       (Audiotape played in open court, not reported.)

22   **BY MS. HOPKINS**

23   **Q.**   So, Mr. Myles, when Taj Reid mentioned those minority

24   contractors in Oakland, did you know who he was talking about?

25   **A.**   No.

MYLES - DIRECT EXAMINATION / HOPKINS

1  **Q.**    Did you have an idea of who he was talking about?

2  **A.**    No.  I had never met them.  The agents hadn't told me

3  anything about them and that -- we wasn't even looking that

4  way, no.

5  **Q.**    So I know you didn't know them, but did you know who Taj

6  Reid was talking about when he mentioned those minority

7  contractors --

8  **A.**    No.

9  **Q.**    -- that he had talked about the day before?

10  **A.**    No.

11  **Q.**    And what was your understanding of what Taj Reid was

12  talking about when he said that the minority contractor has

13  something they wanted to talk to you about?

14  **A.**    He said that -- I asked them why do they want to meet me?

15  And he told me that they had something that they wanted to

16  discuss with me.

17       Normally in that kind of relationship contractor/developer

18  it's normally that.  The contractor might know of some projects

19  coming down the line or something like that.  I don't know.  I

20  didn't pay too much attention to it.

21  **Q.**    Well, based on your experience as a developer in

22  construction, did you have an idea of what they might be

23  interested in talking to you about?

24       **MR. RIORDAN:**  Your Honor, object.  Calls for

25  speculation.

1    **THE COURT:**  His state of mind.  Overruled.

2    **A.**   I believe later on you'll hear.  Because I have been doing

3    this a long time.  My state of mind was it's probably bonding.

4         Because I have been doing it so long, if a person -- if a

5    person have a weakness in construction, it's normally bonding.

6    Normally we have problems with that.

7    **BY MS. HOPKINS**

8    **Q.**   So based on your experience as a developer and in

9    construction, can you please explain what bonding is and how

10   bonding works?

11   **A.**   In a nutshell bonding is insurance.  It insures the owner

12   of a project -- excuse me.

13        It's called a performance and a pay bond and it guarantees

14   two things.  It guarantee performance, number one; that the

15   person who is building your building is going to give you a

16   building built correctly and on time.  That's the performance

17   side.  It guarantees that to the owner so he can have

18   confidence.

19        The second part of it, the pay part of that bond says that

20   you're going to pay all the bills, too.  That means all your

21   subcontractors are going to be paid.  All the supplies and

22   materials are going to be paid.  And at the end of the day

23   you're going to give a person a building without any liens on

24   it and built right.

25        That's what a bond -- that's the insurance.

1   **Q.**   And when one puts up cash to get the bond, generally how

2   long does it take to get that money back?

3   **A.**   Oh, forever.  That's called a cash -- that's a collateral

4   loan, bond.  They will tie your money up forever and hurt you.

5   **Q.**   I'm sorry?

6   **A.**   There is no set time on how to do that.  They can break

7   you like that.

8   **Q.**   They can break you like that?

9   **A.**   Yeah.  They will hold your cash until the job is over.  So

10  if the job is 18 months, that means they have $250,000, 300,000

11  cash that you can't do nothing with it.

12      Okay.  So if you small and you use a cash bond, it hurts

13  you in so many areas.

14  **Q.**   So you said there was two ways.  You can do a cash bond

15  and then did you say the other -- was there another?

16  **A.**   You can get a regular bond, but that's called a collateral

17  bond.

18  **Q.**   Collateral bond, okay.

19  **A.**   Yeah.  Where you pay for it, yeah.

20  **Q.**   In your experience, why, if at all, is getting bonding so

21  difficult for minority contractors?

22  **A.**   Oh, in my 30-some years it's difficult for a lot of

23  reasons.  One of the reasons it requires you to have a solid in

24  balanced balance sheet.  You've got to save your money.  You

25  can't make your money and just throw it away.  You've got to --

 1   you have to be balanced on who owe you money.

 2       You need to have a system to make sure you're getting

 3   paid, accounts receivable.

 4       And then the people that you owe, you need to be paying

 5   them on time, accounts payable.

 6       And so the bonding company look at the health of your

 7   company and so it's been hard for a lot of -- a lot of times a

 8   lot of the minorities contractor, they are small, very small,

 9   and they don't have that money.  So they have to grow.

10       So it's just been a big thing all over the country.  Every

11   state I have been in where minorities are it's a bonding

12   problem.

13           MS. HOPKINS:  So let's go ahead and listen to

14   Exhibit 74-3, which has already been admitted.

15       (Audiotape played in open court, not reported.)

16   BY MS. HOPKINS

17   Q.   Mr. Myles, you mentioned subguard.  What is subguard?

18   A.   It tells -- part of a bonding company that insures you

19   have something called subguard.

20       Subguard would allow you to use other individuals, like

21   minority contractors who may not have bonding.  You may have to

22   put more management over to make sure nothing get, you know,

23   out of place.  You want to keep the jobs going forward.

24   Q.   More management from where?

25   A.   Say it again?

MYLES - DIRECT EXAMINATION / HOPKINS

1  Q.   You say they might need more management?

2  A.   Yeah, because a lot of them had did big, big jobs that's

3  on a calendar.  You know, in major construction we -- we have

4  calendars.  We have so much we have to do today, tomorrow, this

5  week.  And so it's on time construction.

6       And so if you want to grow them, you've got to put the

7  right people there to help them grow.  And so subguard allows

8  me, in a minority area, to use them, the ones that are good,

9  and I cover them.  They don't have anything, so I can allow

10 them, but I've got them covered.

11      You have to watch them close, I don't want to lose money,

12 but you can allow the local minority community to play on your

13 big jobs, when they wouldn't have never ever had a chance to do

14 it without that.

15 Q.   Just so I make sure that I understand this.  Subguards

16 allows, is it different contractors to be able to be involved

17 in bigger contracts that they wouldn't normally be able to get?

18 But they would have someone overseeing them?

19 A.   Traditionally for the minority -- yes.  Traditionally

20 minority community, they would give you -- say, it's a -- I'm

21 using 50 million.  It's a $50 million contract.

22 Q.   Okay.

23 A.   But when minorities come to the table, they get a $50,000

24 contract.  It's something very small.  Nothing they can't do

25 anything with.  We can't even hide nobody.  Just enough for one

 1   person.  And that's a $50 million contract and here somebody

 2   got basically one percent of it or whatever it equates to.

 3       But if they have the expertise -- and I'm just using the

 4   Turners.  Like, the Turners can do bigger.  You can give them

 5   more work because they can do the work, and they can do it.

 6   Instead of a $50,000 job, which is nothing, they may can

 7   qualify for a three or four.  So subguard helps, help you a

 8   lot.

 9   Q.  And so why did you tell Taj Reid to talk to the minority

10   contractors that he was mentioning to you about subguard?

11   A.  Because I thought that's what they need and I didn't have

12   to meet them.  I told them -- I think my question was, Why do

13   they need me bonding; right?  And then he says, How did you

14   know that?  I said, Well that's normally the problem.  And then

15   I try to give him a cure.  And the cure were, why don't you

16   tell them to look into subguard.

17       This is before I even meet them.  If bonding was their

18   problem -- I didn't know that they -- they had real bonding.  I

19   didn't know none of that, but I would tell them that.

20   Q.  You said you didn't know they had real bonding?

21   A.  Yeah, I didn't know that.  So later on I found out that

22   they had $12 million of bonding, so they already know about

23   subguard.

24       But I didn't know that.  So I'm telling Taj if they needed

25   something, here is a tool that you can tell them and you will

1  look like a king when you tell them.

2  **Q.**   So when you're talking "they" and "them," who are you

3  referring to?

4  **A.**   The Turners.

5           **MS. HOPKINS:**  I'm going into a new day, another

6  subject, is now a good time to end?  I can keep going.

7           **THE COURT:**  No, let's end.  I think we have been at

8  it for awhile.

9       Ladies and gentlemen, we're going to take a recess.  As

10  you know, we are not meeting tomorrow, but we will meet sharp

11  at 9:00 o'clock on Thursday.

12      Remember the admonition given to you, don't discuss the

13  case, allow anyone to discuss it with you, form or express any

14  opinion.  And I'll see you all on Thursday morning.

15      Thank you very much.

16      (Whereupon at 3:56 p.m. further proceedings

17       were adjourned until Thursday, August 23, 2018

18       at 9:00 a.m.)

19

20

21

22

23

24

25

<u>**I N D E X**</u>

Tuesday, August 21, 2018 - Volume 1

<u>**GOVERNMENT WITNESSES**</u>                                   <u>**PAGE**</u>   <u>**VOL.**</u>

<u>**MYLES, WILLIAM**</u>
(SWORN)                                                    3      1
Direct Examination by Ms. Hopkins                          4      1

- - -

<u>**E X H I B I T S**</u>

<u>**TRIAL EXHIBITS**</u>                          <u>**IDEN**</u>   <u>**EVID**</u>   <u>**VOL.**</u>

25                                                  59     1

29, 30, 32, 33, 34 and 35                           26     1

37                                                  17     1

52-4                                                47     1

58-1, 58-2                                          47     1

63-2, 63-3                                          47     1

68-6, 68-8, 68-9                                    48     1

69-1                                                48     1

74-1, 74-3                                          48     1

75-1                                                48     1

84-2                                                48     1

88-5                                                48     1

– – –

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, August 23, 2018