Pages 1  -  121

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
   vs.                           )   No. CR 17-0175 CRB
                                 )
LEN TURNER and LANCE TURNER,     )
                                 )   San Francisco, California
                Defendants.      )   Thursday
                                 )   August 23, 2018
_____)   9:00 a.m.

**EXCERPT OF JURY TRIAL PROCEEDINGS**
**TESTIMONY OF WILLIAM MYLES**

**APPEARANCES:**

**For Plaintiff:**          ALEX TSE
                            Acting United States Attorney
                            450 Golden Gate Avenue
                            San Francisco, California  94102
                    BY:  **KIMBERLY HOPKINS**
                         **ANDREW DAWSON**
                         **ASSISTANT UNITED STATES ATTORNEYS**


**For Defendant**           RIORDAN & HORGAN
**Len Turner:**             523 Octavia Street
                            San Francisco, California 94102
                    BY:  **DENNIS RIORDAN, ESQ.**


**For Defendant**           BOERSCH SHAPIRO, LLP
**Lance Turner:**           1611 Telegraph Avenue
                            Suite 806
                            Oakland, California 94612
                    BY:  **MARTHA BOERSCH, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

MYLES - DIRECT EXAMINATION/ HOPKINS

1    **Thursday - August 23, 2018**                    **9:04 a.m.**

2                    **P R O C E E D I N G S**

3                         ---oOo---

4        (Defendants present, out of custody.)

5        (Proceedings held in open court.)

6            **THE COURT:**  Please be seated.

7        Let the record reflect all jurors are present, parties are

8    present.

9        Thank you, ladies and gentlemen, for being so prompt and

10   we'll resume the testimony on.

11       Go ahead, Ms. Hopkins.

12                    **WILLIAM   MYLES**,

13   called as a witness for the Government herein, having been

14   previously sworn, resumed the stand and testified further as

15   follows:

16                **DIRECT EXAMINATION RESUMED**

17   **BY MS. HOPKINS**

18   **Q.**   Good morning, Mr. Myles.

19   **A.**   Good morning.

20   **Q.**   So I'd like to turn your attention to April 21st, 2013.

21   Did you have another conversation with Taj Reid that day?

22   **A.**   Yes.

23   **Q.**   And were the Turners and bonding a topic of that

24   discussion?

25   **A.**    What?

1    Q.    Were the Turners and bonding a topic of that discussion?

2    A.    Yes.

3    Q.    And was that phone conversation recorded?

4    A.    Yes.

5              MS. HOPKINS:   Your Honor, at this time I'd like to

6    play the April 21st phone call between Mr. Myles and Mr. Reid,

7    and it's Exhibit 75-1 which has already been admitted as an

8    exhibit.

9         (Audiotape played in open court, not reported.)

10   BY MS. HOPKINS

11   Q.    I just wanted to note when you referenced you know the

12   game and what minority contractors are going through, what did

13   you mean when you said that?

14   A.    Letting them know that I -- I've lived that life.  I know

15   what problems we have in the black community and local minority

16   contractors.  I know it.

17   Q.    And what kind of problems is that?

18   A.    We have the finance game.  We can't get the loan that we

19   need.  We can't get the bonding that we need.  We can't get the

20   staff sometime that we need.  We can't get on jobs.  This list

21   can keep going.

22   Q.    Okay.

23        (Audiotape played in open court, not reported.)

24             MR. RIORDAN:   Your Honor, in light of the Court's

25   prior rulings, we would ask at this point to repeat the

 1    admonition that none of this is evidence as to the Defendants'

 2    guilt.  The Court did make a ruling in regard --

 3              THE COURT:  No, no, no.  I did understand that, but I

 4    wanted to get the date.

 5              MS. HOPKINS:  April 21st.

 6              THE COURT:  So is this prior to the --

 7              MS. HOPKINS:  This is prior to the meeting --

 8              THE COURT:  Prior to the Government's allegation that

 9    the conspiracy commenced?

10              MS. HOPKINS:  Correct.

11              THE COURT:  All right.

12        So ladies and gentlemen of the jury, you've heard

13    statements made on the tape by these two individuals and that

14    is -- those statements are by way of background to explain what

15    occurs subsequent to it.  It, in and of itself, is not evidence

16    of the Defendants' guilt.

17              MS. HOPKINS:  Okay.

18    BY MS. HOPKINS

19    Q.   So, Mr. Myles, did you engage in any additional bribe

20    schemes related to Cal Vet with Eric Worthen and Taj Reid?

21    A.   Yes.

22    Q.   And was this for the same Ventura construction contract or

23    was it something else?

24    A.   After the Ventura, it was a kitchen contract.

25    Q.   And what kind of kitchen contract?

MYLES - DIRECT EXAMINATION/ HOPKINS

1    A.    It was a veteran's kitchen, I believe that's what it was,

2    in some part of southern California; but it was a V.A. kitchen.

3    Q.    And how did the second project come up?

4    A.    They brought it to me and asked me did I want it.  Would I

5    pay for it basically.

6    Q.    And was this something that you had raised with Taj Reid

7    or Eric Worthen?

8    A.    No, didn't know anything about it.

9    Q.    Had you asked them for another deal?

10   A.    No.

11   Q.    And did Eric Worthen bring the contract up to you in a

12   phone conversation?

13   A.    Yes.

14   Q.    And what was your recollection of what Eric Worthen

15   proposed regarding that kitchen project?

16   A.    That he had a small kitchen.  I think he gave me the price

17   of it.  But it was a small V.A. kitchen that I could come in

18   and renovate and do the construction on it.  They were looking

19   for me to pay for that deal.

20   Q.    If you paid for that deal, what would you be getting in

21   exchange?

22   A.    They would deliver that contract to me to build that

23   facility.

24   Q.    And did you discuss the proposal for the kitchen contract

25   with the agents that you were working with?

1    **A.**    Yes.

2    **Q.**    And did they give you any direction in terms of how you

3    should follow up with Eric Worthen?

4    **A.**    Yes.

5    **Q.**    And what direction did they give you?

6    **A.**    One of the instructions was to take the meeting with him.

7    We decided that we didn't want to do it, but we'll go through

8    it with him.  And I tell them on the table a lot of times I

9    don't want the deal, but we'll go through with this deal

10   because they presented a pay to play situation to me, so I went

11   to meet them.

12   **Q.**    And so why didn't -- if you recall, why weren't you, as

13   William Joseph, and the FBI going to go forward with the deal?

14   **A.**    I don't know that the FBI's strategy behind it, but I just

15   know that they didn't -- that wasn't high on our list of things

16   to do but, we were going to take all meetings.

17   **Q.**    And so based on the direction from the agents, did you

18   provide any money to Eric Worthen or Taj Reid in relation to

19   that kitchen project?

20   **A.**    Yes.

21   **Q.**    And how much money did you provide?

22   **A.**    $2,000.

23   **Q.**    I'd like to turn your attention to May 1st of 2018 before

24   you paid for that contract.  Did you have a conversation with

25   Taj Reid about the Cal Vet contract?

 1  **A.**    Yes.

 2  **Q.**    And did Taj Reid also mention the Turner Group during that

 3  conversation?

 4  **A.**    Yes.

 5  **Q.**    And was this conversation recorded?

 6  **A.**    Yes.  All conversations are recorded.

 7              **MS. HOPKINS:**  I'd now like to play the May 1st phone

 8  call between William and Taj Reid, which has already been

 9  admitted as Exhibit 84-2.

10      (Audiotape played in open court, not reported.)

11  **BY MS. HOPKINS**

12  **Q.**    Now, in that call what, if any, promise did you make about

13  providing bonding to the Turners?

14  **A.**    None.

15  **Q.**    Now, I'd like to turn your attention to May 8th of 2013.

16  Did you meet with Taj Reid on that day?

17  **A.**    Yes.

18  **Q.**    Why?

19  **A.**    It was May 8th?  May 8th is a day -- I wanted to further

20  explain the deal to Taj because he was talking to the Turners,

21  and it's a dirty deal and I wanted to make sure that Taj was

22  telling them that it was a dirty deal.

23  **Q.**    So initially were you meeting with him regarding the Cal

24  Vet contract?

25  **A.**    That, too.

MYLES - DIRECT EXAMINATION/ HOPKINS

1   **Q.**   Okay.

2   **A.**   Yes.

3   **Q.**   And what were you meeting --

4   **A.**   I believe it's the 8th.  I had to pay them the $2,000 on

5   the 8th.

6   **Q.**   And at whose direction did you meet with him?

7   **A.**   FBI.

8   **Q.**   And where did you meet him?

9   **A.**   In my hotel room.

10  **Q.**   And you said you paid him $2,000.  In what form did you

11  pay him?

12  **A.**   I paid him cash.

13  **Q.**   And what were you paying for?

14  **A.**   They had gave me a deal under the table, the kitchen deal,

15  the veteran's kitchen deal.

16  **Q.**   And were you provided any documents regarding the Cal Vet

17  project?

18  **A.**   Yes.

19  **Q.**   Now, what was Taj Reid's attitude or demeanor regarding

20  whether the $2,000 was sufficient or not for that project?

21  **A.**   Oh, we had a fight.  We always have fights, but this was

22  a -- a fight.

23        He didn't think we was paying him enough money.  He

24  thought $2,000 wasn't enough.  He thought that they were taking

25  too much of a criminal risk.  He thought the risk was greater

1    than 2,000 for him, his dad -- I don't know how his dad got it

2    in -- and Eric.  But he thought the risk was far greater than

3    what I was paying him.

4    Q.   Did Taj Reid take the money anyway?

5    A.   Eventually he took it.

6    Q.   Now, in your -- so during the May 8th meeting, you

7    mentioned that you discussed the Turners with Taj Reid?

8    A.   Uh-huh.

9    Q.   And was that conversation recorded?

10   A.   Yes.

11   Q.   Okay.

12        MS. HOPKINS:  And I'd like to now play the May 8th

13   2013 recording, the meeting between William Myles and Taj Reid,

14   which has already been admitted as Exhibit it 88-5.

15        (Audiotape played in open court, not reported.)

16   BY MS. HOPKINS

17   Q.   What were you talking about when you said the "old

18   Turners"?

19   A.   At this point I still don't know the Turners.  Again, as I

20   testified Tuesday I believe, up until this time I'm thinking

21   it's the big Turners from where I live, a big national company.

22   I'm thinking they are 800-pound -- that's why I said that's an

23   800-pound gorilla, because the Turners that -- where I'm from,

24   they do a trillion dollar worth of work a year.

25   Q.   A what?

 1   **A.**   A trillion dollar worth of work.  They have billions of

 2   dollar worth of backlog work.

 3        So I don't know it's the Turners that's at the table right

 4   now.  I'm thinking that he's taking me to the big Turners.

 5   **Q.**   Okay.

 6        (Audiotape played in open court, not reported.)

 7             **MS. HOPKINS:**  Can we stop right here?

 8   **BY MS. HOPKINS**

 9   **Q.**   When you said that he sent them over a contract, what was

10   your understanding of what he was referring to?

11   **A.**   He's trying to get the Turners to pay him before he

12   allowed the Turners to meet me.  So he's trying to get paid.

13             **MS. HOPKINS:**  Continue.

14        (Audiotape played in open court, not reported.)

15   **BY MS. HOPKINS**

16   **Q.**   Mr. Myles, what was your understanding of Taj Reid's

17   mentioning that the Turner Group had concerns over someone

18   taking over their company?

19   **A.**   Well, he just thought that maybe -- they didn't want

20   someone to come in and help them, per Taj, that was trying to

21   take over their company basically.

22   **Q.**   Well, how would someone be taking over their company?

23   Like --

24   **A.**   I have no idea.  I just repeated.  I have no idea what

25   they meant by that.

MYLES - DIRECT EXAMINATION/ HOPKINS

1  Q.   Okay.  So I'd like to turn your attention to May 19th of

2  2013.  Did you generally meet with someone from Turner Group

3  Construction that day?

4  A.   On May 9th?

5  Q.   May 9th.

6  A.   Yes.

7  Q.   And by the time that that meeting took place, had Taj Reid

8  and Eric Worthen offered you the first Cal Vet contract?

9  A.   Yes.

10 Q.   And had they taken $10,000 from you for that?

11 A.   Yes.

12 Q.   And by the time the meeting with the Turner Group took

13 place, had they also, Taj Reid and Eric Worthen, offered you

14 that second Cal Vet contract?

15 A.   Yes.

16 Q.   And had they taken $2,000 from you for that?

17 A.   Yes, they had.

18 Q.   So who arranged the May 9th meeting with Turner Group?

19 A.   Taj.

20 Q.   And who decided whether or not you should take that

21 meeting?

22 A.   Case agents, the FBI.

23 Q.   And where did the meeting take place?

24 A.   May 9th?  In Oakland, at their office.

25 Q.   At whose office?

 1   **A.**   The Turners' new office off of Hegenberger.  I believe

 2   that's the name of the street.

 3   **Q.**   And who was present for that meeting?

 4   **A.**   Initially, I drove in a taxi.  I know Len, Len was there,

 5   Taj was there, and Eric came late.

 6   **Q.**   Okay.  And so was this the first time that you met Len

 7   Turner?

 8   **A.**   First time.

 9   **Q.**   Is this the first time that you spoke to Len Turner?

10   **A.**   Yes.

11   **Q.**   And what was the general tone of that meeting?

12   **A.**   It was a good tone.  I met him outside.  They was building

13   their office, a very nice office, and he showed me around his

14   office and we -- we just talked about things.

15        My reason for being there at that time was to find out,

16   could I help them with their bonding.  So it's a good meeting.

17   **Q.**   So how, if at all, was this similar to other introductions

18   that Taj Reid and Eric Worthen had made for you?

19   **A.**   In what regard?

20   **Q.**   Was it similar to -- I mean, development opportunity?

21   **A.**   Yes.  It was the same.  He would get paid money.  The next

22   thing you know I'm sitting in front of somebody.

23   **Q.**   And so what, if any, paperwork did Len Turner provide to

24   you during that meeting?

25   **A.**   I believe I received -- he gave me an overview of his

1    company.   I would call it a company brochure.   Overview of the

2    Turner Group.

3    **Q.**   I'm showing you what's been marked for identification as

4    Exhibit 38.

5        (Whereupon document was tendered to the witness.)

6    **BY MS. HOPKINS**

7    **Q.**   Do you recognize that?

8    **A.**   Yes.

9    **Q.**   What is that?

10   **A.**   It's the overview, a brochure of the Turner Group.

11   **Q.**   And is that an accurate copy of the documents that you

12   received from Len Turner that day?

13   **A.**   It look as --

14        **THE COURT:**  Admitted.

15       (Trial Exhibit 38 received in evidence)

16        **MS. HOPKINS:**  May I publish to the jury?

17        **THE COURT:**  Yes.

18       (Brief pause.)

19       (Document displayed)

20   **BY MS. HOPKINS**

21   **Q.**   All right.   You said you recognize this document?

22   **A.**   Yes.

23   **Q.**   Okay.   So let's take a look at Page 2.

24        Now, according to the organizational chart that we have on

25   the screen right here, does it appear that Len Turner, Lance

1   Turner and Fred MacKay are on the same corporate level?

2   **A.**   Only thing corporate level by the org chart, yes.

3   **Q.**   Okay.   What is Len Turner's role or title?

4   **A.**   Chief operating officer.

5   **Q.**   And what about Lance Turner?

6   **A.**   Lance, I can't hardly see it, but it looks like principal

7   in charge?   Yeah.

8   **Q.**   Yes, it's principal in charge.

9   **A.**   Principal in charge.

10   **Q.**   I'll have you take a look at page five.

11       (Document displayed)

12   **Q.**   So this discusses -- what does this discuss on this page?

13   **A.**   This is their, I guess, executive management team.

14   **Q.**   And how much experience does Len Turner have?

15   **A.**   Twenty-five years' experience.

16   **Q.**   Okay.   And what about Lance Turner?

17   **A.**   Lance Turner has 30 years.

18   **Q.**   Let's take a look at Page 7.

19       (Document displayed)

20   **Q.**   What information are we seeing on the screen?

21   **A.**   They are providing one of the services.   They showing one

22   of the services they provide.   And this is CM, construction

23   management services.

24   **Q.**   Okay.   And does it say that they provide in-depth analysis

25   of each project?

MYLES - DIRECT EXAMINATION/ HOPKINS

```
 1    A.    Yes.

 2    Q.    And that they have a knowledge of the required

 3    documentation?

 4    A.    Yes.

 5    Q.    Taking a look at Page 13.  It's actually 13 through 15,

 6    but I'll just put 13 on here right now.

 7          (Document displayed)

 8    Q.    Does this highlight some of the projects that the Turner

 9    Group Construction company has worked on?

10    A.    This is what their brochure said.  I hadn't verified it

11    independently, but yeah.

12    Q.    Okay.  According to the brochure?

13    A.    Yes.

14    Q.    Now, based on this pamphlet, what is your understanding

15    about the level of contractor or construction experience that

16    the Turner Group has based on this --

17    A.    Level of experience?  The Turner Group know what they

18    doing when it come to construction, period.  They know.

19    Q.    Now, back to the meeting -- I'm done with the Elmo -- were

20    you able to start recording from the moment that you first met

21    with Len Turner?

22    A.    May 9th?

23    Q.    May 9th.

24    A.    No.  May 9th I came in on, in essence, an Uber driver and

25    when he pulled me up to the building, I didn't have time to
```

1    turn on the equipment, because I didn't want to turn it on in

2    front of him, and outside of the car was Len.

3        So it was delicate.  How do you turn on the recording

4    equipment and get out of the Uber?  So I had to wait til I

5    could get to a position to turn it on.

6    **Q.**   So did you ultimately get to a position where you could

7    turn it on?

8    **A.**   Yes.

9            **MS. HOPKINS:**  Your Honor, in an effort to be

10   efficient, the Government was hoping they could lay a

11   foundation for the remaining recordings.  It's a May 9th

12   recording, and then recordings from September 5th through

13   October 19th.

14           **THE COURT:**  Okay.  What exhibit numbers are they?

15           **MS. HOPKINS:**  There's many.

16           **THE COURT:**  Okay.  Why don't you identify them?

17           **MS. HOPKINS:**  Okay.  So it's Exhibit 89-1.

18           **THE COURT:**  89-1.

19           **MS. HOPKINS:**  93-1.

20           **THE COURT:**  93-1.

21           **MS. HOPKINS:**  95-1.

22           **THE COURT:**  Okay.

23           **MS. HOPKINS:**  96-1, 97-1, 98-1, 102-2 through 102-12,

24   103-2 --

25           **THE COURT:**  Wait.  102 --

```
 1              MS. HOPKINS:  Sorry.  102-2 through 102-12.

 2              THE COURT:  I think I only have 11, but there is a

 3      12?

 4              MS. HOPKINS:  Yes.

 5              THE COURT:  Okay.

 6              MS. HOPKINS:  103-2 and 103-3, 104, 105-2, 105-4.

 7              THE COURT:  104 and then 105-2?

 8              MS. HOPKINS:  Yes.

 9              THE COURT:  And 105?

10              MS. HOPKINS:  -4.

11              THE COURT:  -4.

12              MS. HOPKINS:  106-2, 107-1, 107-2.

13              THE COURT:  107-2?

14              MS. HOPKINS:  Yes.

15         109-1, 111-1, 112-1.

16              THE COURT:  112-1.

17              MS. HOPKINS:  112-2, 112-3, 116-1, 117-1, 118-1,

18      118-2, 118-3, 118-5.

19              THE COURT:  I'm sorry.  118-3, 118-5?

20              MS. HOPKINS:  Yes.

21              THE COURT:  Okay.

22              MS. HOPKINS:  119-2, 119-3 and 121-1.

23              THE COURT:  Without objection, they are --

24              MR. RIORDAN:  Your Honor, there will be objections to

25      some of these excerpts.
```

 1        **THE COURT:**  Okay.  They are admitted subject to a

 2   motion to strike.

 3        **MR. RIORDAN:**  Thank you, your Honor.

 4        (Trial Exhibits 89-1, 93-1, 95-1, 96-1, 97-1, 98-1,

 5         102-2 through 102-12, 103-2, 103-3, 104, 105-2,

 6         105-4, 106-2, 107-1, 107-2, 109-1, 111-1, 112-1,

 7         112-2, 112-3, 116-1, 117-1, 118-1, 118-2, 118-3,

 8         118-5, 119-2, 119-3, 121-1 received in evidence).

 9        **THE COURT:**  Go ahead.

10   BY MS. HOPKINS

11   **Q.**   So I'd now like to play the May 9th recording.  It's the

12   May 9th meeting that you had with Len Turner and it's already

13   been admitted as Exhibit 89.

14        But before we play it, how easy or difficult is it to

15   understand or to hear?  How easy or difficult is it to

16   understand this recording?  Was there noise in the background?

17   **A.**   Oh, I can't remember, but it's pretty easy.  It's just Len

18   and I.  It's not too much going on.  You may hear some

19   construction every now and then because he's renovating his

20   office, but I don't think so.

21        **MS. HOPKINS:**  So let's go ahead and start.

22        (Audiotape played in open court, not reported.)

23   BY MS. HOPKINS

24   **Q.**   So, Mr. Myles, you mention that you had two lines of

25   bonding; that you had a $50 million bonding limit and a

MYLES - DIRECT EXAMINATION/ HOPKINS

1    47 million bonding limit.  Why did you tell them that?

2    **A.**    Because when we went out to make the contract, we did

3    joint ventures.  We did one joint venture with a mechanical

4    company out of Kansas and we did a joint venture with Floyd

5    Daniels, which out of L.A.

6          Actually, we had more bonding than that.  With Floyd

7    Daniels we have unlimited, whatever the job requires.  And then

8    the mechanical company, we used their bonding, too.  So we had

9    -- we were double vested.

10   **Q.**    So you were talking about projects that William Myles

11   engaged in?

12   **A.**    Yes.

13   **Q.**    But you're incorporating this into your William Joseph

14   role?

15   **A.**    As I spoke earlier, that this case sometimes mirrors my

16   real life, yes.

17   **Q.**    Okay.

18            **MS. HOPKINS:**  If we could keep going.

19        (Audiotape played in open court, not reported.)

20   **BY MS. HOPKINS**

21   **Q.**    So in this recording Len Turner says that he wants to be

22   the prime.  At this point had you offered Len Turner bonding?

23   **A.**    No.

24   **Q.**    And what did you mean when you said "everything I do, I

25   want to talk to you guys about doing.  That's why, because of

1    the risk"?

2    **A.**    Yes.   In furtherance of my role -- now, at this time we're

3    not investigating the Turners.   We are investigating Taj Reid

4    and whoever Taj is doing dirty deals with; right?

5         So this deal is not an investigated deal, but I'm telling

6    them to further this case, that there is risk.   I'm a developer

7    and to be a contractor, general contractor like them, it's a

8    lot of risk.   And so if I did anything, I wanted them to do it

9    because I'm not a builder.   They are.

10   **Q.**    Because you're a developer?

11   **A.**    Right.

12   **Q.**    Okay.

13          **MS. HOPKINS:**   So if we could continue.

14       (Audiotape played in open court, not reported.)

15   **BY MS. HOPKINS**

16   **Q.**    So what were you referring -- or what were you offering

17   Len Turner when you said "I'll show you how to increase your

18   bonding capacity.   I'll tell you how"?

19   **A.**    I probably was shooting in the dark because my first thing

20   was that I thought they needed bonding.

21       I help people all around the country with bonding.   That's

22   my passion.   But I quickly found out in the meeting that they

23   had $12 million worth of bonding.   And that's --

24   **Q.**    You said you help people all around the country.   Is that

25   under William Myles?

MYLES - DIRECT EXAMINATION/ HOPKINS

1   A.    That's what I -- that's what I do.  That's William Myles.

2   That's what I do.

3   Q.    Okay.

4   A.    I help.  If I build something, I want somebody that look

5   like me to build it.  I'm not ashamed to say that.

6         And so basically I'm just letting him know about -- you

7   threw me off.  What's the question again?

8   Q.    I'm sorry.  You said, "I will show you how to increase

9   your bonding capacity.  I will tell you how."

10  A.    Oh, yes, yes.  There is a lot of ways.  This whole day, as

11  we listen more, May 9th was, again, Len Turner -- the Turner

12  Group is not being investigated by us as of this point.

13        And so mainly I'm telling him a way that he can grow his

14  company the same way that we grew our company.  We did

15  partnership with a big company.  We did joint ventures with big

16  companies.  We did collateral bonding, like they did.

17        So this whole time everything that I tell him is the best

18  business practices.  And I do that everywhere I go.

19  Q.    And during this meeting, did you talk to him about being a

20  program manager?

21  A.    Yes.

22  Q.    What is a program manager?

23  A.    Program manager -- and I asked Len, you know, what is the

24  highest in construction, and he said construction manager, and

25  I said wrong.  I was trying to see did he know.  And I said

1    program manager.

2         A program manager is the highest you can get in the

3    position.  And if you doing multiple projects, public projects,

4    say you doing this courthouse and you doing a utility company,

5    state across the street in the third one.  Well, instead of

6    hiring three different companies to oversee that, they hire a

7    program manager, one company to be the eyes and ears over

8    everyone.

9         And I'm telling him to be a program manager because that's

10   what I did and that's what -- you don't need a bond and you

11   actually run all of the projects.  So I'm giving him another

12   tool in his gun to, why don't you look at being a program

13   manager instead of hard construction.

14        **MS. HOPKINS:**  If we can listen -- or resume the

15   recording, please.

16        (Audiotape played in open court, not reported.)

17   **BY MS. HOPKINS**

18   **Q.**   So why did you tell him to look at your website?

19   **A.**   Some of the projects that I told him to -- the Foxwoods

20   Indian casino, I did that.  Some of the stuff on the website is

21   what I actually did for a living.

22   **Q.**   So is this your website as to William Joseph or to William

23   Myles?

24   **A.**   It was an undercover website, but when they put the

25   undercover website up for William Joseph, they used my life.

1   **Q.**   Okay.

2   **A.**   Part of my life anyway.

3   **Q.**   All right.

4          **MS. HOPKINS:**  If we can continue.

5          (Audiotape played in open court, not reported.)

6   **BY MS. HOPKINS**

7   **Q.**   So you tell Len Turner "I can help you, but I don't want

8   to do a joint venture," what did you mean by that?

9   **A.**   That I wouldn't do a joint venture.  What I told them, I

10  can show you how you can get your own bonding and you can be in

11  control of your own self.

12         And, again, I'm telling him that I can show people that

13  you have value.  And they do have value.  They was the largest

14  minority contractor in this area that I know of.  They are a

15  decent size contractor.  They have political connections.

16  People want to see them grow, they said, in the area.  That's

17  value.

18         And so when you are established in an area -- I'm just

19  saying what I did.  When you're established in an area and

20  people know you in an area and you want to grow, you can't go

21  to the local people and say, Will you do a joint venture with

22  me?  Because they don't need to.  They already got you where

23  they want you at, underneath them.

24         But if you go outside of your area and you go -- I'm just

25  using the Turners.  If they jump on an airplane and went to

1   Kansas and talked to a big 800-pound gorilla and said, Look,

2   we're a decent sized construction company.  We in Oakland.  We

3   want to go to another level.  We need a joint venture partner.

4   Could you set up an LLC?

5       We wanted to keep it a minority, so the Turners would come

6   in and have 51 percent.  This what I'm telling him what he can

7   do.

8       You can grow without taking years to grow.  There's other

9   ways you can do it and don't hurt your company.  And I'm a

10  living witness.  So I'm giving him the explanation, you guys

11  are valuable.  You can bring value to this area basically.

12  **Q.**   Okay.

13          **MS. HOPKINS:**  If we could resume.

14      (Audiotape played in open court, not reported.)

15  **BY MS. HOPKINS**

16  **Q.**   So you mention a relationship with Floyd Daniels.  Was

17  that true?

18  **A.**   Yes.

19  **Q.**   Is that in your William Myles life?

20  **A.**   Yes.  They helped me win the $1 billion school in

21  Hartford, Connecticut.  It's on record.

22  **Q.**   And why are you telling this to Len Turner?

23  **A.**   Because that's the way you could do it.  It worked for me.

24  It worked for everybody else.  So that's why I wanted him to

25  know.

1  Q.   When you mentioned to Len Turner that you had a whole lot

2  of shady friends with cash if you needed it, did Len Turner

3  appear to be following or understanding what you were saying?

4  A.   He was there.  I can't gauge whether he was following me

5  but he was in the room, so.

6  Q.   Did he indicate anything to you that he was shocked by

7  that?

8  A.   No.

9  Q.   Did he interrupt you or ask you to clarify --

10          MS. BOERSCH:  Your Honor, the transcript speaks for

11  itself.

12          THE COURT:  Overruled.

13  BY MS. HOPKINS

14  Q.   Did he interrupt you or ask you to clarify what you meant

15  by "shady friends"?

16  A.   No.

17  Q.   Now, why did you mention your family and the projects and

18  that you were the first?

19  A.   Again, that is the truth.  Growing up without a father.

20  Mother died in the projects.  That was the furtherance of the

21  investigation, but I'm telling him the truth.  I'm not -- I'm

22  not ashamed of how I came up, but yes.

23      I just got to fill some talk time with him; right?  So I

24  just tell him about myself and how I overcame and how I was

25  able to go to Floyd Daniels.  Even though I started off with

 1   nothing, I was able to go to the world's largest engineering

 2   firm and tell them do a deal with me.  They did a deal with me.

 3   I was able.  This is -- look here, I came from nothing.  I was

 4   able to go to a mechanical company and asked them, and they did

 5   a deal with me.

 6        So I'm just letting them know I came from nothing and this

 7   is how I did it.

 8   Q.   And so did you make any promises to Len Turner regarding

 9   bonding?

10   A.   No.

11   Q.   And where did you leave things after this meeting?

12   A.   I -- let me tell you where I started.  I started and said

13   if I was a physician, let me see the health of this -- you

14   know, your bonding.

15        I found out later in the process they didn't really need

16   me.  Even my suggestions.  I assumed that they didn't need them

17   because they were bigger than I thought.

18        So I left it at, well, maybe we'll get back together and

19   we'll talk further on it.

20   Q.   Did you exchange numbers with Len Turner?

21   A.   Yes.

22   Q.   You did?

23   A.   Yes.

24   Q.   And so how were you going to communicate with him?  Were

25   you going to call him or did you have to go through Taj Reid?

MYLES - DIRECT EXAMINATION/ HOPKINS

1  A.   Well, the scenario they created, they wanted me to go

2  through Taj Reid for everything.

3  Q.   You say "they."  Who are you referring to?

4  A.   Taj started it off.  He -- he wouldn't let me see Len

5  until he got paid or until he got his deal together.

6       And then you'll see later on we fighting over it.  I guess

7  sometime in September you'll see that everybody is trying to

8  keep me with Taj and I'm telling them I didn't come out here to

9  be following one man.  But Taj, they tried to control when I

10  could talk to Len.

11  Q.   And what, if anything, did you find out as to whether Taj

12  Reid or Eric Worthen made any money from introducing you to Len

13  Turner?

14  A.   I found out that Len had paid him.

15  Q.   Do you know how much he paid them?

16  A.   The numbers change in there, but anywhere between $1200

17  and $1300 he paid him just to meet little old me.

18  Q.   So was there any immediate follow-up to the May 9th, 2013

19  meeting with Len Turner?

20  A.   Yes -- in a follow-up?  In May?

21  Q.   Yes.

22  A.   I didn't talk to Len Turner then for four months.

23  Q.   And so you didn't have any more meetings or telephone

24  conversations with Len Turner?

25  A.   No kind of communications after that meeting.

MYLES - DIRECT EXAMINATION/ HOPKINS

1    **Q.**    Okay.

2    **A.**    Until September.

3    **Q.**    Okay.  Did you -- and so you met Len Turner again in

4    September?

5    **A.**    Yes.

6    **Q.**    Did you ever meet Lance Turner?

7    **A.**    Yes.

8    **Q.**    And was that in the same time frame, September of 2013?

9    **A.**    Yes.

10   **Q.**    Now, in September 2013, when things started to pick up

11   again between you and Len Turner and then eventually Lance

12   Turner, did you have contact directly or was there somebody in

13   the middle?

14   **A.**    With?

15   **Q.**    Between you and the Turners.

16   **A.**    No.  It's always Taj Reid.

17   **Q.**    And was Eric Worthen involved?

18   **A.**    He was involved, but he wasn't a contact, the go-between

19   between Len -- the Turners and myself, no.

20   **Q.**    Now, in early September of 2013 did the FBI talk to you

21   about presenting a corrupt scenario to Taj Reid to then present

22   to the Turner Group?

23   **A.**    Yes.

24   **Q.**    And did that have to do with the Lawrence Berkeley

25   National Lab?

 1   **A.**   Yes.

 2   **Q.**   What was the scenario that you were going to present to

 3   Taj Reid?

 4   **A.**   That I had a friend at the Berkeley Lab that I had some

 5   experience with, a shady friend, and he was in a position to

 6   help me and that he was going to give me really a illegal

 7   contract.

 8   **Q.**   A what contract?

 9   **A.**   Illegal contract to build a building over there.  He was

10   going to go around all the systems and give me that contract.

11        And the scenario with Taj was I didn't want the contract,

12   because I'm not a builder, number one.  I'm a developer.  I

13   don't have license to build.  And that if he has some friends

14   that was willing to do this phony contract, then we can take it

15   to them.

16   **Q.**   And so what would the friend -- if he had friends that

17   were willing to help, what would they be doing?

18   **A.**   They would end up being on the contract and illegally bid

19   so I could win the contract.

20   **Q.**   What, if any, information would you be getting ahead of

21   time regarding this contract?  As part of the scheme, what --

22   **A.**   Any information that I would be getting from them?

23   **Q.**   From your insider at the Lawrence Berkeley National Lab.

24   **A.**   He would give me the price that I would need to come in

25   at, the price that my bidders need to come in at, and at the

1    end of the day I would get it.  So he gave me everything that I

2    needed to win the contract.

3    **Q.**    And so from whom did you take direction on this scheme?

4    **A.**    From the FBI, the one who started the scheme.  So that's

5    who I take direction from.

6    **Q.**    And do you know, based on your training and experience as

7    a developer, whether or not this is consistent with standard

8    practices for public agencies reviewing bids and awarding

9    contracts?

10   **A.**    No, it's not standard.

11   **Q.**    And what is your training and experience in the area of

12   standard practices for public agencies reviewing bids and

13   awarding contracts?

14   **A.**    What do you mean, what's my training?

15   **Q.**    What kind of experience do you have?

16   **A.**    I bidded on a lot of public projects.  Even the Hartford

17   schools was a public projects.  I bid on a lot of them.

18   **Q.**    So you know the process?

19   **A.**    Yes.

20   **Q.**    And was the scenario you were going to present -- that is,

21   that you had an arrangement with the contracting officer where

22   it had been decided that you would get the contract -- is that

23   consistent with standard practices?

24   **A.**    No.  It's illegal.

25   **Q.**    Why is it not consistent?

MYLES - DIRECT EXAMINATION/ HOPKINS

1    **A.**    You're not doing established procurement processes.

2    You're going around the processes.

3    **Q.**    And how about the other aspect of your scenario; that is,

4    where other bidders would agree that in order for you to be the

5    lowest bidder, that they would submit bids higher than yours?

6    Is that consistent?

7    **A.**    No.

8    **Q.**    And why not?

9    **A.**    I don't think -- well, first of all, it wouldn't be a fair

10   bid if everybody sat in the room and said, You bid this, you

11   bid that, and I'm going to bid this.   That defeat the purpose

12   of even having a bid, sealed bid or any other kind of bid.

13       It lowers the integrity.   Nobody want to bid if the game

14   is rigged like that, where one person going to get it or one

15   group.

16   **Q.**    And who decided that you would present this scheme to Taj

17   Reid?

18   **A.**    The FBI.

19   **Q.**    And who decided that you would suggest that the Turners

20   might be interested?

21   **A.**    The same, the FBI.

22   **Q.**    And why didn't you take the deal directly to the Turners?

23   **A.**    When I work in the city, I take instructions from people

24   that invited me.   And so they didn't never tell me to go to the

25   Turners.   We weren't allowed to place it before the Turners.

MYLES - DIRECT EXAMINATION/ HOPKINS

 1   Q.    Okay.  So were you instructed to go through Taj Reid by

 2   the FBI?

 3   A.    In regard to the Turners, yes.  But this was not the first

 4   place that we -- the FBI took us.

 5   Q.    Okay.  And so had you presented this deal to other

 6   subjects of the investigation, other than Taj Reid, without

 7   saying who, but --

 8   A.    Yes.

 9   Q.    Okay.  And at whose direction?

10   A.    FBI.

11   Q.    All right.  So I want to turn your attention to

12   September 5th of 2013.  Did you meet with Taj Reid at your

13   hotel that day?

14   A.    Yes.  I'm trying to keep these dates in my head.  I'm

15   sorry.  But, yeah.

16   Q.    And did you record that meeting?

17   A.    I record every meeting.

18   Q.    And during that meeting did you bring up the Turners?

19   A.    Yes.

20   Q.    And did you say something to the effect that you could

21   help get them some work?

22   A.    This is on September 15th?  Yes.

23   Q.    September 5th.

24   A.    Yes, yes.

25   Q.    Okay.  And did Taj Reid explore that with you?

1   **A.**    Yes.

2   **Q.**    And was this something that you raised on your own or was

3   it prompted by the FBI?

4   **A.**    It was part of the role.  The FBI told me to present that

5   to them.

6   **Q.**    And what were you referring to when you told Taj Reid that

7   you could help the Turners get some work?

8   **A.**    We -- basically we was about to unfold the scenario that

9   the FBI had told us to roll out.

10  **Q.**    The scenario about the lab?

11  **A.**    Yes.

12  **Q.**    Okay.  So I'd like to turn your attention to September 9th

13  of 2013.  Did you have a phone conversation with Taj Reid on

14  that day, September 9th?

15  **A.**    Yes.

16  **Q.**    And you recorded that conversation because you --

17  **A.**    Yes, I did.

18  **Q.**    -- you record every conversation?  Okay.

19          **MS. HOPKINS:**  So I'd now like to play the

20  September 9th phone call between William Myles and Taj Reid.

21  It's already been admitted as Exhibit 93.

22          **MR. RIORDAN:**  Can we ask for an admonition that this

23  recording is admissible only to establish Taj Reid's mental

24  state and is not admissible as evidence of the Defendants'

25  guilt.

1           **MS. HOPKINS:**  It's during the time of the conspiracy.

2           **THE COURT:**  Yes, yes.  This conversation may be a

3    statement in the furtherance of the conspiracy; isn't that

4    correct?

5           **MS. HOPKINS:**  Correct.

6           **THE COURT:**  And ladies and gentlemen, a statement in

7    the furtherance of a conspiracy can be considered by you.  It's

8    an exception to the hearsay rule.

9           **MR. RIORDAN:**  Your Honor, the exception to the

10   hearsay rule only applies if the Defendant on trial is a member

11   of the conspiracy at the time.

12          **THE COURT:**  They have to connect it up.  I understand

13   that, but I -- the admonition will be inappropriate in the

14   event that they connect it up.

15          **MR. RIORDAN:**  They would have to demonstrate that he

16   was a member of the conspiracy at the time.

17          **THE COURT:**  However, the evidence that the Government

18   has alluded to would -- if accepted by the jury, would

19   establish that he was a member of a conspiracy, if established.

20   So the objection is overruled.

21       Ladies and gentlemen, you can consider this evidence that

22   you're about to hear as evidence -- if accepted by you, as

23   evidence of guilt, depending on whether or not the Government

24   is able to demonstrate that one or both of the defendants were

25   a member of the conspiracy, the alleged conspiracy.

1          Okay.  You may proceed.

2          (Audiotape played in open court, not reported.)

3     **BY MS. HOPKINS**

4     **Q.**   So what did you mean when you said there was "fat" in the

5     deal?

6     **A.**   In this scenario we lay it out.  We tell them that the

7     real cost of building is 4.1, but the winning number would be

8     5.9.  And the difference between 4.1 and 5.9 would be profit.

9     And that's a big deal.  That's $1.8 million.  That's a lot of

10    money.

11    **Q.**   So "fat" is a large profit?

12    **A.**   Yeah.  "Fat" meaning that it's -- yeah.  We don't get big

13    deals like that.  We normally get ten plus five.  You get a

14    15 percent deal, you made a lot of money.  Here it is, this

15    deal is far better than 10 percent, 15 percent.

16    **Q.**   So you mentioned someone named Al.  Who and what were you

17    talking about?

18    **A.**   I don't know, do I have the right to call his name, last

19    name?

20    **Q.**   No last name.

21    **A.**   I won't call his last name.  But Al was a subcontractor on

22    the San Francisco side, one of the targets of this

23    investigation.  And we had went -- took this to Al before we

24    got to the Turners and Al had taken it to a big company.  And

25    so that's what I'm talking about.

1   **Q.**   Okay.  And so when you asked if the Turners wanted to play

2   on this deal, what did you mean?

3   **A.**   Do they want to look at this deal.  Do they want to get

4   involved in this deal.

5   **Q.**   Okay.

6        **MS. HOPKINS:**  If we could continue.

7        (Audiotape played in open court, not reported.)

8   **BY MS. HOPKINS**

9   **Q.**   Now, when you said "the bigger piece is for me after this

10  deal," what were you referring to?

11  **A.**   I was telling them that if you guys -- I'm giving them

12  this illegal deal.  If you guys do a good deal on that job,

13  then the government, the laboratory, would give me another job,

14  a bigger job.

15  **Q.**   So you're talking about future deals?

16  **A.**   Yes.

17  **Q.**   And when -- why did you say "have to find out from your

18  dad are they caps that can keep their mouth shut"?

19  **A.**   Well, we have heard during this investigation that they

20  was kind of tied to Taj father.  Taj done told us that they dad

21  helped them with deals.

22       And so I used him as a person.  I can go back to him and

23  ask them would they be willing to pay and play and keep their

24  mouth shut.

25  **Q.**   And when you're mentioning a deal at the Army Depot, what

1   were you referring to?

2   **A.**   When we first got here, there was a project going over in

3   the Army Depot and the agents let me see a lot of information

4   on what was going on.

5       And then when I did my little research, looking in the

6   newspaper, I saw that they had some -- some issues over there

7   at the Army Depot, the Turners.  And it was in the newspaper.

8   So I'm basically quoting what Taj then said and what I read in

9   the newspaper.

10  **Q.**   And so when you said "I don't need that kind of

11  attention," what kind of attention were you talking about?

12  **A.**   I don't need a whole lot of public attention, like going

13  before City Councils or newspapers on this deal for a lot of

14  reason.

15          **MS. HOPKINS:**  If we can continue.

16      (Audiotape played in open court, not reported.)

17          **THE COURT:**  Shall we take our recess?

18          **MS. HOPKINS:**  Sure.

19          **THE COURT:**  All right.  Go ahead.

20      (Audiotape played in open court, not reported.)

21  **BY MS. HOPKINS**

22  **Q.**   So, Mr. Myles, at this point had you explained the full

23  scheme to Taj Reid; that is, that you needed the Turner Group

24  to submit a phony bid?

25  **A.**   Yeah, but -- and I continued not fully, fully because Taj

1    needed more help.  So I continued to tell him.

2    **Q.**   So you had -- there was more to tell?

3    **A.**   As -- as I saw that he wasn't grasping it all, I wanted to

4    make sure.  And I said in there I want them to know.  I don't

5    want us to sneak up on them.  Tell them the truth.

6         So I wanted him to be able to tell the Turners, This is a

7    dirty deal and go through that.  Do not try to do it another

8    way.

9              **MR. RIORDAN:**  Your Honor, I move to strike as

10   nonresponsive.

11             **THE COURT:**  Overruled.

12        All right.  Ladies and gentlemen, we're going to take a

13   recess now.  We will be in recess until 20 to 11:00.

14        Remember the admonition given to you.  Don't discuss the

15   case, allow anyone to discuss it with you, form or express any

16   opinion.

17        (Jury exits the courtroom at 10:22 a.m.)

18             **THE COURT:**  Okay.  Let the record reflect the jurors

19   have retired.

20        Mr. Riordan.

21             **MR. RIORDAN:**  Your Honor, before the Government turns

22   to a conversation between Mr. Myles and Len Turner, we would

23   like to be heard on the objection we filed yesterday in writing

24   as to prohibiting the Government from asking Mr. Myles as to

25   what his understanding is of what the Turners said.  We've

MYLES - DIRECT EXAMINATION/ HOPKINS

1    cited the law on this.

2        We anticipate that he's going to say -- the words are the

3    words.  They are clear.  The jury can understand them.  That

4    he'll attempt to gild the lily by saying, well, I understood

5    that he was accepting a dirty deal.  I understood that he

6    wanted to commit a crime.

7        **THE COURT:**  But he's saying what his state of mind

8    is.  He's saying -- he's saying when Turner said X, I

9    understood that to be, whatever he says, and then the

10   conversation continues.

11       So it's up to the jury to conclude whether or not, number

12   one, he believes the witness.  If it's relevant -- and I have

13   to assume it's all relevant because it's all part and parcel of

14   it.  If, in fact, he believes that what -- if the jury believes

15   that what the witness said is accurate, that is a -- that is --

16   that was his state of mind at the time, then it's whatever

17   evidentiary value it may have.

18       **MR. RIORDAN:**  The law is clear that his state of mind

19   is irrelevant.

20       **THE COURT:**  No, it's not.  Not in any conversation.

21   What law says that the person to a conversation, the state of

22   mind is irrelevant.

23       You haven't cited a single case that says state of mind

24   that I know of.  I'll go look at it.  What case says in a

25   conversation the state of mind of one of the speakers is

1    irrelevant.

2         **MR. RIORDAN:**  Your Honor, we've cited several --

3         **THE COURT:**  Give me the case.  Just give me the case,

4    I'll go look at it.

5         **MR. RIORDAN:**  Well, I would refer the Court to the

6    memorandum that we filed --

7         **THE COURT:**  Just name the case.

8         **MR. RIORDAN:**  Okay.

9         **MS. BOERSCH:**  *Escobar*, your Honor.  The Ninth Circuit

10   held that --

11        **THE COURT:**  Wait a minute.  *Escobar*.  The cite?

12        **MS. BOERSCH:**  Hold on.

13        (Brief pause.)

14        **MS. BOERSCH:**  Let me start with *United States versus*

15   *Dicker*.

16        **THE COURT:**  And the cite?

17        **MS. BOERSCH:**  *United States versus Dicker* is 853 F.2d

18   1103-1108 --

19        **THE COURT:**  853 --

20        **MS. BOERSCH:**  F.2d 1103.

21        **THE COURT:**  Yeah.

22        **MS. BOERSCH:**  *United States versus Freeman*.

23        **THE COURT:**  *Freeman*, okay.

24        **MS. BOERSCH:**  730 F.3d 590.

25        **THE COURT:**  Okay.  I'll go look at them.

1          **MS. BOERSCH:**  Those --

2          **THE COURT:**  Before you argue them, I'll go look at

3    them.  Okay?  I mean, I got the brief ten minutes before we

4    started court today.

5          **MR. RIORDAN:**  I understand, your Honor.

6          **MS. BOERSCH:**  We understand.

7          **THE COURT:**  And I haven't looked at the cases.  Okay?

8       Thank you.  We're in recess.

9       (Whereupon there was a recess in the proceedings

10         from 10:25 a.m. until 11:43 a.m.)

11         **THE COURT:**  Let the record reflect the jurors are not

12   present.  The Court is present -- I mean, the parties are

13   present.  Of course the Court is present.

14      I've read both *Freeman* and *Dicker*.  One is a Sixth

15   Circuit.  The other is a Third Circuit, I think, or Second

16   Circuit.  And that -- that's not -- that doesn't make any

17   difference.

18      Both of those cases are 701 cases.  Both of those cases

19   are where a witness is giving his opinion as to the

20   significance of A, B, C and D, which is -- which is said.

21      In this case, as I understand the testimony, he is

22   testifying as to what he meant.  That's not opinion testimony.

23   That's the testimony of what he says.  I said X.  And it may be

24   I said X for reason Y, or it may be Defendant said this and so

25   I understood this to be something else, or whatever I

MYLES - DIRECT EXAMINATION/ HOPKINS

 1   understood it to be.

 2       All of those things aren't in the sense of 701, in my

 3   view, opinion testimony and, therefore, the objection is

 4   overruled.

 5           MR. RIORDAN:  Your Honor, we actually agree fully

 6   with what you just said, because you said that he was

 7   explaining what he meant when he said things.

 8           THE COURT:  And what he understood a Defendant to

 9   mean.

10           MR. RIORDAN:  Those are completely different things.

11           THE COURT:  In my view, since what he -- since his

12   understanding of what the Defendant meant then caused him or

13   affected his state of mind as to what the next thing that was

14   said and what he understood the conversation to be, I think

15   it's proper.

16       Now, it's -- if you want me to give the jury an admonition

17   that whatever he said can't be used as -- as to what the

18   Defendant thought, is not evidence of what the Defendant

19   thought, I'll be glad to give that.

20           MR. RIORDAN:  Thank you, your Honor.

21           THE COURT:  Okay.  Okay.  We're all on the same page.

22           MR. RIORDAN:  Thank you.

23           THE COURT:  Roughly.

24       Okay.  Bring in the jury.

25       (Jury enters the courtroom at 10:47 a.m.)

 1          **THE COURT:**  Okay.  Let the record reflect all jurors

 2    are present.  Parties are present.

 3          Ladies and gentlemen of the jury, at the last recess there

 4    was an objection as to the questioning that was occurring with

 5    respect to questions asked of this witness about what did he

 6    understand the conversation to mean.  That is a statement made,

 7    what was his understanding.  And, furthermore, what -- well, as

 8    to that, what was his understanding -- well, let me go back a

 9    minute.

10          There was a question asked as to why did this witness say

11    X or why did this witness say Y, okay, different things that he

12    said.  And he is entitled to say why he said what he said; that

13    is, what did he think at the time and that caused him to say

14    something.  Number one.

15          Number two.  He is also asked questions about what did you

16    understand the Defendant or the -- whoever the speaker was,

17    that he was having a conversation, what did you understand him

18    to mean.  As to that, to the extent that what his understanding

19    was of what the other person said influenced or caused or in

20    somehow related to actions that he either said or did in the

21    rest of the conversation, or in the conversation as a whole,

22    that's -- that evidence is admissible.

23          Now, having said that, I want you to understand, number

24    one, you have the audio.  You have the recording.  So you

25    listen to it and you form whatever opinions and conclusions you

1    wish to form based upon what you've heard, taking into account

2    what the witness said, but that's not controlling as to what it

3    really means.

4          In other words, you use your own judgment as to what it

5    meant, whether -- deciding whether it was reasonable.  You can

6    accept this witness's testimony as to it or you can reject it,

7    like any witness.

8          So I don't know how clear I am.  That's always a problem.

9    But I think it gives you some guidance as to what -- how to

10   approach your task.

11         I would just caution you and say that it is important that

12   you listen carefully to the tape.  You do have the aid of a

13   transcript, which is extremely helpful, at least it is for me,

14   but the transcript is not in evidence.  The tape itself is the

15   evidence and so that controls.

16         Thank you.  We'll continue.

17         Go right ahead, Ms. Hopkins.

18   **BY MS. HOPKINS**

19   **Q.**   So we left off with a phone conversation that you had with

20   Taj Reid on September 9th.  Did you also have a telephone

21   conversation --

22   **A.**   What day?  September?

23   **Q.**   September 9th with Taj Reid.  So now we're still on

24   September 9th.

25   **A.**   Okay.

1    Q.   But did you also have a telephone conversation with Larry

2    Reid that day?

3    A.   Yes.

4    Q.   And at whose --

5           THE COURT:   Can you pull the microphone right up to

6    you?

7           THE WITNESS:   Yes, your Honor.   It come back in my

8    ear so loud, but okay.

9    BY MS. HOPKINS

10   Q.   And your discussion with Larry Reid, was it about the

11   Lawrence Berkeley National Lab deal?

12   A.   Yes.

13   Q.   And at whose direction -- who told you to get in contact

14   with Larry Reid?

15   A.   The FBI wanted to talk to -- me to talk to Larry Reid

16   about it.

17   Q.   And was this after you had talked to his son, Taj Reid,

18   about it?

19   A.   Yes.

20   Q.   And what was the gist of the conversation with Larry Reid?

21   A.   I think I laid out the deal to Larry.   Told Larry that I

22   had an inside job, and that I was thinking about giving it to

23   the Turners, and were they the type of people that can keep

24   they mouth shut because it's an inside job.

25   Q.   Who is "they"?

 1   **A.**   The Turners.  Could the Turners keep their mouth shut if I

 2   gave them this inside job.

 3        And Larry said that they was -- they could do it and they

 4   was the right people for the job.

 5   **Q.**   So I want to -- actually, did you eventually talk to Len

 6   Turner about the Berkeley Lab deal?

 7   **A.**   Len Turner?

 8   **Q.**   Len Turner.

 9   **A.**   Yes.

10   **Q.**   And before you talked to Len Turner or Lance Turner about

11   the Department of Energy contract the lab, did you have further

12   conversations with Taj Reid about the scheme?

13   **A.**   Yes, I did.

14   **Q.**   And did you have one of those conversations by phone on

15   September 10th of 2013?

16   **A.**   With Taj?

17   **Q.**   Yes.

18   **A.**   Yes.

19   **Q.**   Okay.

20        **MS. HOPKINS:**  So I'd now like to play a clip from the

21   September 10th, 2013 phone call between Mr. Myles and Mr. Reid,

22   which has already been admitted as Exhibit 95-1.

23        (Audiotape played in open court, not reported.)

24   **BY MS. HOPKINS**

25   **Q.**   So based on the context in previous conversations that you

1    had with Taj Reid, who did you understand Taj Reid was talking

2    about when he said "they" accepted it?

3    **A.**    He was talking about the Turners -- I'm sorry, the

4    Turners.

5    **Q.**    So did you directly present the Berkeley Lab deal to the

6    Turners?

7    **A.**    No.

8    **Q.**    Who did?

9    **A.**    Taj Reid.

10    **Q.**    And in this conversation Taj Reid said he told the Turner

11    Group that they didn't need to bid, we already have the job,

12    was that accurate?

13    **A.**    What do you mean by "is that accurate"?

14    **Q.**    When you said they don't need to bid.

15    **A.**    Well, we had told him there wasn't going to be any

16    bidding -- he thought a straight-out bidding, but, no, that

17    wasn't accurate.

18    **Q.**    So why wasn't it accurate?

19    **A.**    Because the scenario was that they would bid and they

20    would bid higher than me.

21    **Q.**    And why would they be higher than you?

22    **A.**    Because I would be the ultimate winner because I would be

23    the lowest bid.

24    **Q.**    What was your understanding of when Taj Reid said him and

25    his partner just threw us a bone, they are getting a million

1    dollar bone?

2    **A.**    Taj was greedy and Taj counted on the profit.  And he feel

3    like the Turners should give him more money and take care of

4    him because they got a million dollars.

5         Replace the word "deal" with "profit."  A million dollar

6    profit, he saying.  He call it a million dollar bone.

7    **Q.**    And so the profit that -- what is the profit that he's

8    referring to?

9    **A.**    The anticipated profit from doing this construction deal

10   was a little over a million and a half.  And so Taj saying they

11   got a free million dollar bone and they ought to share that

12   bone with us -- with him, rather.

13   **Q.**    With Taj Reid?

14   **A.**    Yes.

15   **Q.**    All right.  Did you have a second phone conversation with

16   Taj Reid on September 10th, 2013?

17   **A.**    Yes.

18            **MS. HOPKINS:**    Okay.  I'd now like to play a clip from

19   that phone call.  It's already admitted as Exhibit 96-1.

20        (Audiotape played in open court, not reported.)

21   **BY MS. HOPKINS**

22   **Q.**    Did this conversation with Taj Reid hit the highlights of

23   the Department of Energy Berkeley Lab deal?

24   **A.**    Yes.

25   **Q.**    And was this conversation the first time that you had told

1  Taj Reid that you needed a phony bid from the Turner Group?

2  A.    Yes.

3  Q.    Now, why did you use the term "phony bid"?

4  A.    Because we putting up warning signs.   That is a warning

5  sign that this is an illegal deal.   Anybody can start -- you

6  know, when you hear it, it should be a follow-up what is a

7  phony deal, but we don't hear that.   And so we throwing these

8  little signs out there to see what they say.   Oh, this is a bad

9  deal.

10       So I kept saying it, letting them know this is a dirty

11  deal.   And sooner or later somebody is going to say, no, I

12  don't want to be a part of that, but we hadn't got there.

13  Q.    So you mentioned that you wanted Taj Reid to pick up plans

14  from your hotel and give them to the Turner Group?

15  A.    Yes.

16  Q.    What plans were you talking about?

17  A.    The plans to the laboratory.   We had used that scenario in

18  other places and we needed those plans back.   The FBI was

19  trying to control the plans.   So they didn't want their plans

20  all over California.   So we wanted the plans back from another

21  company so we can -- I would give them to Taj.

22  Q.    And so those building plans for the Berkeley Lab deal, is

23  that what's going to be -- that Taj needed to pick up?

24  A.    Yes.

25  Q.    And at this point in time did you know whether Taj Reid

1   would present the deal to Len Turner?

2   **A.**   Say the last part?  Do I know --

3   **Q.**   At this time did you know whether Taj Reid would present

4   this deal to Len Turner?

5   **A.**   He had already called me back and said I did and they

6   accepted it.  So, yeah, I know now when he tell me that.

7   **Q.**   So I want to turn your attention to the next day.  Did you

8   and Taj Reid pick up the conversation on September 11th, 2013?

9   **A.**   Yes.

10  **Q.**   And did you have further conversation about the Turner

11  Group's role in the Berkeley Lab deal?

12  **A.**   Yes.

13  **Q.**   And by this time had you spoken directly to Len Turner or

14  Lance Turner about the Berkeley Lab deal?

15  **A.**   No.  I think this is September the 11th?

16  **Q.**   Yes.

17  **A.**   And the last time I talked to the Turners in any kind of

18  way was May 9th.

19  **Q.**   But you did not -- and in this phone conversation -- this

20  is a phone conversation with Taj Reid?

21  **A.**   Yes.

22  **Q.**   And you hadn't spoken to the Turners yet about this deal?

23  **A.**   No kind of way.

24       **MS. HOPKINS:**  So now I'd like to play a clip from a

25  September 11, 2013 call with Taj Reid, and it's already been

MYLES - DIRECT EXAMINATION/ HOPKINS

1    submitted as Exhibit 97-1.

2         (Audiotape played in open court, not reported.)

3    **BY MS. HOPKINS**

4    **Q.**   Okay.  So what were you explaining to Taj Reid about the

5    Turners profiting from this deal?

6    **A.**   Because the deal had over a million dollars of profit

7    based on the scenario, so I was letting him know that.

8    **Q.**   And in your experience, is that profit margin normal?

9    **A.**   Absolutely not.  Nobody would do that.

10   **Q.**   And what were you, as William Joseph, supposed to be

11   getting out of this?

12   **A.**   If they did a good job, I told them that I would get the

13   job behind the job, a program management job.

14   **Q.**   So what do you mean "the job behind the job"?

15   **A.**   If we did a good job on this deal, then the laboratory

16   will possibly give me a bigger job.

17   **Q.**   Okay.  And what, if anything, would Taj Reid get out of

18   this deal?

19   **A.**   Oh, Taj was trying to get money from everybody.  It went

20   from $80,000 salary to $100,000 salary.  They want a percentage

21   of the deal.  Taj just wanted every -- his hand was out, so...

22   **Q.**   So was he negotiating, to your knowledge, with the

23   Turners?

24   **A.**   He was trying.  He negotiated with the Turners and if they

25   didn't feel -- the Turners didn't give him what he wanted, he

1  would come back and negotiate with me.  So he just kept going

2  wherever he can get some money.

3  **Q.**   At this point had you had any discussions yet about the

4  Berkeley Lab deal directly with either Len Turner or Lance

5  Turner?

6  **A.**   No.

7  **Q.**   And as you were setting out the key points of the scheme

8  to Taj Reid, was bonding a part of that discussion?

9  **A.**   No.

10  **Q.**   And when you told Taj Reid what you wanted the Turners to

11  do, was bonding a condition of offering them this Berkeley Lab

12  project?

13  **A.**   No.

14  **Q.**   And in these conversations with Taj Reid, did you offer to

15  provide the Turners with bonding on any of their projects?

16  **A.**   No.

17  **Q.**   Now, in any of your conversations that you had with Taj

18  Reid in September, before you actually spoke with the Turners

19  about the Berkeley Lab deal, what were you trying to accomplish

20  with the discussions with Taj Reid?

21  **A.**   The Government, the FBI wanted to make sure that Taj knew

22  that this was a dirty deal.  We said words "phony deal."

23       And since Taj took that deal to the Turners, we wanted to

24  make sure that he took the deal and said the right things.  We

25  wanted the Turners to know that this was an illegal deal.

MYLES - DIRECT EXAMINATION/ HOPKINS

1          We didn't just let Taj do it by hisself.  Taj could have

2     told me "I told the Turners that," but we wanted to make sure

3     that the Turners heard that.

4     **Q.**    So did you have a phone conversation later that day, and

5     we're still on September 11th --

6     **A.**    Yes.

7     **Q.**    -- with Taj Reid and Len Turner about the Berkeley Lab

8     deal?

9     **A.**    September the 11th?

10    **Q.**    Yes.

11    **A.**    Yes.

12    **Q.**    Okay.  Was this your first conversation with Len Turner

13    about the Berkeley Lab deal?

14    **A.**    Yes.

15    **Q.**    And had you had any conversations with Len Turner between

16    your last meeting with him on May 9th at his office and this

17    September 11th call?

18    **A.**    No.  This is the first one, four months later.

19    **Q.**    And in this call did you start off speaking with Taj Reid?

20    **A.**    Yeah.  Yes.  I had a meeting with him, I guess.

21           **MS. HOPKINS:**  And so I'd like to now play a clip from

22    this September 11th phone call, and it's already been admitted

23    as Exhibit 98-1.

24           (Audiotape played in open court, not reported.)

25

MYLES - DIRECT EXAMINATION/ HOPKINS

1   BY MS. HOPKINS

2   Q.   So at this point who just got on the phone?

3   A.   Len Turner.

4   Q.   And what did you understand Len Turner to mean when he

5   used the term "bid-bid"?

6   A.   You probably never heard bid-bid together, but basically

7   he was saying we don't need a real bid, right, that real bid

8   process.

9   Q.   And why did you tell him he didn't need a bid-bid?

10  A.   Because it was a dirty deal and we -- and the Government

11  has liability.  We know that it's a fake deal, and we don't

12  want the Turners or no one else to go out and spend just a ton

13  of money, you know.  We don't try to hurt them like that.

14  Q.   So when you're doing a bid-bid, it costs money?

15  A.   Absolutely.  To do a take-off on a bid, absolutely costs

16  money.

17  Q.   What kind of money does it cost and what are they doing?

18  A.   It's according to each -- it's 15 divisions, sometimes

19  they say 16.  Fifteen divisions in construction; plumbing,

20  electrical, dry wall, and all that.

21       So whatever your division is.  If you do the concrete part

22  of this job, you're going to pay money to get engineering

23  take-off.  That's an estimate.  So if you do your portion, it

24  going to cost you two or three.

25       But if you've got to do the whole thing, you're going to

1  spend 25-, $30,000 to do a real bid on a big project for all 15

2  divisions, yes.

3  **Q.**   So gathering the estimates is what costs money?

4  **A.**   For doing the estimates of it, yes.  Because you've got

5  people working.  You've got people doing a lot of different

6  things to make it -- to figure out what it cost.

7      So the Government does not want them to spend unnecessary

8  money.

9          **MS. HOPKINS:**  All right.  Can we continue?

10      (Audiotape played in open court, not reported.)

11  **BY MS. HOPKINS**

12  **Q.**   So what was your purpose in laying out this information to

13  Len Turner regarding how you got the deal and needing a phony

14  bid higher than your number?

15  **A.**   Again, we wanted him to know that it's illegal deal and

16  everything I'm saying is I've got a deal on the inside.  I know

17  the numbers on the inside.  I need you to get his number.

18      We telling him -- he's a veteran contractor.  So we

19  telling him this is illegal deal.  And that was our job, to

20  tell him, not to just sneak it up on him.  Just let him see

21  what we doing.

22  **Q.**   And was this arrangement that you had -- well, as part of

23  the scheme with the contracting officer, the standard manner in

24  which public contracts are reviewed and awarded?

25  **A.**   Not legally, no.

1    Q.    Okay.  And according to your explanation, why were phony

2    bids needed?

3    A.    To keep the scenario going.  A phony bid was used to let

4    them know it was illegal, but I'm telling them I need straw

5    bids.  In other words, straw bids.  You give me -- your bid is

6    higher than mine, that would make me the winner on the contract

7    lower than you.

8    Q.    And when you mentioned the 4.1 number, what is the

9    significance of that number?

10   A.    4.1 was the base number used in square footage.  And we

11   saying that's what would -- it would actually cost in real

12   money to build this building.

13   Q.    And what is the significance of the 5.9 number?

14   A.    The difference between 4.1 and 5.9, $1.8 million.  That

15   would be considered gross profit.

16   Q.    And whose number -- who would be coming in at 5.9?

17   A.    I would be coming in at 5.9.

18   Q.    And what were you referring to when you mentioned the

19   engineering numbers?

20   A.    A lot of time -- engineering numbers is when you have

21   plans like this, A and E, and plans like this, you -- a lot of

22   engineers do your take-off.  And so I'm taking about the

23   engineer's number.  Normally in my office the engineers do the

24   take-off.

25   Q.    And so does that correspond to the 4.1 number?

1    A.    Yes.

2    Q.    In your capacity as William Joseph, what was your profit

3    going to be on this deal?

4    A.    1.8 gross profit.

5    Q.    And you told Len Turner that you had been an 8-A

6    contractor.  Was that in your real life?

7    A.    No.  In my undercover role I was an 8-A contractor, yes.

8    Q.    And were you an 8-A contractor in your real life?

9    A.    No.

10         MS. HOPKINS:  All right.  So if we could resume?

11         (Audiotape played in open court, not reported.)

12   BY MS. HOPKINS

13   Q.    You mentioned scope and specs.  Is there a difference

14   between specs and building plans?

15   A.    The specs is part of your plans, yes.

16   Q.    Okay.  And in your experience, can you prepare a proper

17   bid without the specs and the scope?

18   A.    Can you -- ooh, that's a touchy one.  You shouldn't, but

19   we have seasoned pros that can do a lot in construction.  They

20   done seen a lot of it.

21         But -- I wouldn't say it, but it's not common to do a big

22   job and don't look at the specs because the specs means

23   specifics.  Plans can be one thing, but it won't tell you how

24   pretty this wood is going to look in this building and how the

25   wood is going to lay.  But the specs is going to be

MYLES - DIRECT EXAMINATION/ HOPKINS

1  specifically how we going to do the construction job.  So

2  that's a little different.

3  **Q.**    So at the end of this discussion did Len Turner give you

4  any indication that he did not understand the arrangement?

5  **A.**    No.  And that was the purpose of talking to him that day,

6  as I said earlier.  We wanted to make sure that he knew in case

7  Taj didn't cover it with him.

8  **Q.**    And based on this conversation, what was the plan in terms

9  of who was going to get the contract from the Department of

10  Energy?

11  **A.**    I would get the contract -- I would win because their

12  numbers would be higher, so that would make me the low bidder.

13  And then when I won, I would give the contract to them.

14  **Q.**    And during your phone conversation with Len Turner, was

15  there any discussion about bonding?

16  **A.**    No.

17  **Q.**    And by the end of the conversation, what was your

18  understanding as to whether you had an agreement with Len

19  Turner?

20  **A.**    Well, you just heard him.  He said it may be three, four

21  times.  "I got it."  "I got it."  "I got it."  "I'm clear now."

22  He knew it at that point.

23  **Q.**    And was that agreement conditioned in any way on you

24  providing bonding to the Turner Group?

25  **A.**    No.

1   Q.   Now, during a portion of the telephone conversation on

2   September 11th, when you were talking to Taj Reid, you

3   mentioned something about pre-qual paper?

4   A.   Yes.

5   Q.   What is that?

6   A.   Pre-qual is when you do a major construction, they want to

7   know whether you're qualified first.  So you have send in your

8   qualification, let them look at your history a little bit.

9   Q.   And did you provide a pre-qualification form for the

10  Berkeley Lab deal to Taj Reid?

11  A.   Yes.

12  Q.   And what was he supposed to do with that form?

13  A.   He was going to give it to the Turners.

14  Q.   And do you know if he gave it to the Turners?

15  A.   I believe he did.  They had it, yes.  I didn't think I had

16  it, but -- I didn't think I had gave it to him, but they

17  submitted it, so.

18  Q.   Okay.  Who submitted it?

19  A.   I would just say the Turner organization.  I don't know

20  who personally submitted the pre-quals.

21  Q.   So I would like to turn your attention to September 16th,

22  2013.  Did you meet in person with Len Turner and others that

23  day?

24  A.   Yes.

25  Q.   And did the subject of the Berkeley Lab deal come up in

1   that meeting?

2   A.   Yes.

3   Q.   Who was present for that meeting?

4   A.   September the 16th?  Is this in the hotel, I believe?

5   Q.   Yes.

6   A.   It was Len Turner and Lance Turner came over.  Taj Reid

7   was there.  Myself, I was there.  I don't think nobody else was

8   there.

9   Q.   Okay.  Was this the first time you had met Lance Turner or

10  had you met him previously?

11  A.   This is my first time meeting him I believe, yeah.

12  Q.   And where did this meeting take place?

13  A.   It started at the Marriott hotel in San Francisco.

14       MS. HOPKINS:  Okay.  I'd like to play clips from this

15  September 16th meeting, and they have already been admitted as

16  Exhibits 102-2 through 102-12.

17       So let's start with 102-2, please.

18       (Audiotape played in open court, not reported.)

19  BY MS. HOPKINS

20  Q.   So when Len Turner said, "I put this together like you

21  asked me to," what was he referring to?

22  A.   He was talking about he had sent over a pre-qual form.  He

23  had already sent it over to Berkeley Lab.

24  Q.   Okay.  Showing you what's been marked as Exhibit 40.

25       (Whereupon document was tendered to the witness.)

MYLES - DIRECT EXAMINATION/ HOPKINS

1   A.   Okay.

2   Q.   Do you recognize that?

3   A.   Yes.

4   Q.   What is it?

5   A.   It is their submittal.  It's a proposal for complete

6   renovation submitted by the Turner Group.

7   Q.   Okay.  And is there another document attached with that?

8   A.   It's about four or five of them.  Let me see.  It has a

9   cover page with the bid number on it.

10          THE COURT:  Admitted.

11      (Trial Exhibit 40 received in evidence)

12          MS. HOPKINS:  Okay.

13  BY MS. HOPKINS

14  Q.   All right.  So how long after Len and Lance Turner arrived

15  at the meeting, did Len Turner hand you the bid letter and the

16  pre-qual form?

17  A.   Less than a minute.  As soon as -- during the greeting.

18  You just saw it on the tape.  We hadn't even sat down yet.  He

19  had just walked in and, boom, he gave it to me right away.

20          MS. HOPKINS:  May I publish Exhibit 40, please?

21          THE COURT:  Yes.

22      (Document displayed)

23  BY MS. HOPKINS

24  Q.   And so how many conversations did you have with Len Turner

25  about the Berkeley Lab deal before you -- he handed you this

1  bid?

2  **A.**   One.

3  **Q.**   Now, looking at Page 40, is this the bid letter that you

4  were referring to?

5  **A.**   Yes.  The one on the screen?

6  **Q.**   I'm sorry?  Yes, the one on the screen.

7  **A.**   On the screen.

8        **MS. HOPKINS:**  If we could blow up --

9  **BY MS. HOPKINS**

10  **Q.**   What is the name on the letterhead?

11  **A.**   Turner Group Construction.

12  **Q.**   And what project does this pertain to?

13  **A.**   It reads "University of California, Lawrence Berkeley

14  National Laboratory, Building 84".

15  **Q.**   Okay.  And what is the proposed bid?

16  **A.**   $6,100,150.

17  **Q.**   Now, when you were at -- when you received this bid, did

18  you look at the number carefully?

19  **A.**   I didn't look at it that day, no.

20  **Q.**   Okay.  And so what, if anything, did you notice later

21  about this lump sum bid number?

22  **A.**   Oh, it's off.  It's supposed to be 6,150,000.

23  **Q.**   And what does it read right now?

24  **A.**   $6,100,150.

25  **Q.**   And so what was the Turner Group proposing to do in this

 1   letter?

 2   **A.**   The subject is complete renovation of the Berkeley

 3   Laboratory.

 4            **MS. HOPKINS:**  If we could just blow that up.

 5        (Document enlarged)

 6   **BY MS. HOPKINS**

 7   **Q.**   According to this letter, is the Turner Group -- are they

 8   proposing to do a portion of the job or be the general

 9   contractor for the whole job?

10   **A.**   In the subject matter it said "Proposal for Complete

11   Renovation."

12        But I have to give -- I have to say this cause it's only

13   fair.  Most prime -- they trying to be the prime, but that

14   don't mean that the prime going to do each than every thing.

15   It doesn't necessarily mean that.  You know, because you do

16   what you do.

17        They specialize in concrete.  They specialize, I believe,

18   in framing.  So even if they wanted, they still would have to

19   get other bids, just to be fair with it.  They wouldn't try to

20   do the whole thing.

21   **Q.**   This letter doesn't say that they are going to be doing

22   just concrete?

23   **A.**   No.  But just to try to put it in context, that bids --

24   this is a real bid and that's how real people do bids.  You

25   don't have to tell them what part of the work you're going to

 1   do.  You just say I want all of it and then you divide it up

 2   later.

 3   Q.   All right.  So if we can take a look at Page 2.

 4        (Document displayed)

 5   Q.   What information is shown on this page?

 6   A.   It talks about the escalation of wages.  It tell you about

 7   the wages.  It talks about building and framing.

 8        Some of the -- the division that they wanted to do, they

 9   talked about that division.

10   Q.   And taking a look at Page 3, who is submitting the

11   proposal?

12        (Document displayed)

13   A.   It's the Turner Group, but they have Len Turner as the

14   project manager and some lady named Ms. Hawkins.

15   Q.   And had you ever met -- it looks like LaTanya Hawkins?

16   A.   If I did, I wasn't introduced to her.  I wouldn't know

17   her.

18   Q.   Okay.  And so let's take a look at Page 4.

19        (Document displayed)

20   Q.   What is a this?

21   A.   That is a pre-qualification norm.

22   Q.   And is that the form that you were just discussing before?

23   A.   Yes.

24   Q.   And what does this form show?  What does it represent?

25   A.   It represents the Turners submitted a pre-qual for this

MYLES - DIRECT EXAMINATION/ HOPKINS

1    job to the laboratory.

2    **Q.**    And is it based on their qualifications?

3    **A.**    Yes.

4    **Q.**    And so what is the letterhead, the name on the letterhead?

5    **A.**    Lawrence Berkeley National Laboratory.

6    **Q.**    Okay.  And number one, what is the modification?  What

7    does that mean?

8    **A.**    It's actually the EMR, and it's Experience Modification

9    Rate.  And your Experience Modification Rate is what insurance

10   companies use to gauge your insurance and your Workman Comp.

11         And they -- the word "experience" mean that they look at

12   all the injuries that you previously had and based on the

13   injuries and the cost, then they can project what the risk and

14   the cost can be in the future.

15         And if you had a bunch of injuries, you'll have a high

16   number.  A one is average across the nation.  The Turners got

17   .77, so they was better than the average.

18   **Q.**    Now, if we can just look at, sort of in the beginning

19   where it says "Company Name and Information."  Whose

20   information is that?

21   **A.**    The Turner Group.

22   **Q.**    And who is the contact?

23   **A.**    Len Turner.

24   **Q.**    Okay.  And if we could look at number three?  Who is the

25   point of contact regarding the safety program within the Turner

1  Group Construction?

2  **A.**   On this line it said Fred MacKay.

3  **Q.**   And had you met Fred MacKay prior to this meeting?

4  **A.**   If I did, I wasn't introduced to him.  And I say that

5  because I was around a bunch of people and they may have been

6  in the room, but I don't know him, no.

7  **Q.**   All right.  And as to looking at number nine, which is on

8  Pages 4 -- so it starts on Page 4 and goes into Page 5.  What,

9  if any, information is provided in number nine?

10  **A.**   I guess the question was, they asked for three references

11  where they had performed work and they put -- I guess they put

12  at least two people here.  You want me to call the names that's

13  on it?

14  **Q.**   That's fine because we can see it on the screen.

15  **A.**   I guess it's some of the people that they had performed

16  work with in the past, joint venture.  It say "JV," so they

17  probably did a joint venture with that group.

18  **Q.**   So if we can look at the last page, who are they supposed

19  to submit the bid to?

20  **A.**   Well, that's Maria.  I call her Robles, but I hear it's

21  Robles.  So she's the contracting officer at Berkeley

22  Laboratory.

23  **Q.**   What did Len Turner say when you asked whether his guys

24  had done a take-off?

25  **A.**   Didn't even look at it, is what he said.

1   Q.   In your experience in the construction and development

2   industry, how common is it for a general contractor to make a

3   genuine bid on a project without doing a take-off?

4   A.   One of this magnitude?  With that many pages?  It's not

5   common.

6            MS. HOPKINS:  If we could resume the recording,

7   please.

8        (Audiotape played in open court, not reported.)

9   BY MS. HOPKINS

10  Q.   So who was present for this part of the conversation?

11  A.   Now Lance has joined.  You heard someone laughing in the

12  background.  That's Lance.

13       You also hear me say, "I'm talking to you two."  I'm

14  talking to Lance and Len at that time.

15  Q.   And what, if any, response did you get from Len Turner and

16  Lance Turner when you said the real cost is 4.1, but they were

17  letting you come in at 5.9 to get a profit?

18  A.   The response I got from Len at first was if these numbers

19  are right, yeah, I can do it.  As long as your numbers is

20  right, basically.

21       So I assumed that he had did the take-off.  I think I even

22  told him that; that he had looked at the numbers and did a

23  square footage deal.  And he knew that there was a profitable

24  deal, as I did.

25  Q.   And did anyone ask what you were talking about or for

1   further clarification?

2   **A.**   Not one time.

3          **MS. HOPKINS:**   All right.   If we can play

4   Exhibit 102-3, please.

5          (Audiotape played in open court, not reported.)

6   **BY MS. HOPKINS**

7   **Q.**   What is MEP?

8   **A.**   Mechanical, electrical and plumbing.

9   **Q.**   Now, based on your agreement at this point, could Len

10  Turner have walked away from this deal?

11  **A.**   Yes.   We was hoping.   At least me personally, I was

12  hoping.   I wanted to hear those magic words.

13  **Q.**   Why were you hoping?

14  **A.**   Because, you know, you do this.   The Government present

15  opportunities or decisions.   And if you have been doing it as

16  long as I have been doing this, I want to hear nos.   I would

17  love for him to walk away.   It wouldn't be no skin off my back.

18  It would make me feel good that he walked away.

19  **Q.**   Was Len Turner and Lance Turner, were they taking any

20  financial risks by submitting this bid letter to the Department

21  of Energy?

22  **A.**   Financial risk?   They weren't taking financial risk

23  because they didn't have any bid bond.   That's another bond

24  that protects you.

25          If they had tied a bid bond to it, they may have had a

1  financial risk, but they didn't have no risk here.

2  **Q.**   What's a bid bond?

3  **A.**   When you tell somebody when you bid, they're going to

4  require you to put a bid bond on it.  That means that you can't

5  walk away from that bid.  For instance, if you bid too low to

6  get it, they are going to make you do it for that low number.

7  **Q.**   Did you have any understanding of what Len Turner meant

8  when he said that the Turner Group was going to try and self

9  perform?

10  **A.**   Yes.

11  **Q.**   What does that mean?

12  **A.**   I just said earlier when I was talking about the bid was

13  for total renovation, he said that they were going to try to

14  self perform.  Meaning, that they were going to do as much as

15  they had the expertise to do and other stuff they were farming

16  out.  And that's just normal.

17  **Q.**   And why did you say that you were looking for someone of

18  color to do the job?

19  **A.**   Well, I'm playing a role and I'm around people of color.

20  That is the right thing to say, I think, at that point.

21        And in my life, I champion that all my life.  I don't run

22  away from my real life.  I champion helping people that look

23  like me.  That's a fact.

24        **MS. HOPKINS:**  Okay.  If we could play Exhibit 102-4,

25  please.

1          (Audiotape played in open court, not reported.)

2    **BY MS. HOPKINS**

3    **Q.**   So generally what were you all talking about regarding

4    bonding?

5    **A.**   What we talking about?  We just talking about the bonding

6    that goes with construction.  I think I told them that we may

7    have to do a partnership agreement, whatever.  Because

8    bonding -- at the end of the day it may take a bond, if we were

9    going to really build it, yeah, it takes a bond.

10   **Q.**   How did you leave the issue of bonding with the Turners?

11   **A.**   At this one I think I may have said, "I got bonding if we

12   need it, but I really don't want to do a joint venture."  And

13   soap I just left it hanging out there.  It wasn't nothing.

14        Number one, we know that we're not going to do this deal.

15   It's still an investigation.  I don't care who I'm talking to.

16   So I can talk about bonding to keep the investigation going,

17   but I know that this building is not going to get built.

18   **Q.**   So was there any agreement on your part to provide bonding

19   at this point?

20   **A.**   No, no agreements.

21   **Q.**   And at any point in your dealings with Len Turner, did you

22   try to persuade Len Turner to submit a bid on the Berkeley Lab

23   deal by telling him that you would provide bonding on some

24   other contract that they were trying to get?

25   **A.**   No.  In fact, when I met him the first time he was on the

MYLES - DIRECT EXAMINATION/ HOPKINS

1  tape, a couple tapes ago.  When he walk into the hotel he had

2  already done that.  He had already submitted it.

3       So, no.  It wasn't contingent on a bond.  He had already

4  sent his pre-quals over when he came to the hotel.  He was

5  already done.

6            **MS. HOPKINS:**  So if we --

7            **THE COURT:**  Well, let's take our noon recess.

8       Ladies and gentlemen, we're going to take our recess.

9  It's going to be short, 40 minutes, so we can get more

10 testimony in.  So I'll see you back here at 12:40.

11      Remember the admonition given to you.  Don't discuss the

12 case, allow anyone to discuss it with you, form or express any

13 opinion.

14      (Whereupon at 11:59 p.m. proceedings were adjourned

15       for noon recess.)

1                          **P R O C E E D I N G S**

2      **August 23, 2018**                                    **12:44 p.m.**

3                              ---oOo---

4          THE COURT:  Okay.  Please be seated.

5      Let the record reflect all jurors are present, parties are

6      present.

7          You may proceed.

8                    **DIRECT EXAMINATION RESUMED**

9      **BY MS. HOPKINS**

10     **Q.**  So, Mr. Myles, we're still on the September 16th, 2013

11     meeting at the Mariott.

12     **A.**  Okay.

13          **MS. HOPKINS:**  I would like to now play Exhibit 102-5,

14     please.

15     (Audiotape played in open court, not reported.)

16     **BY MS. HOPKINS**

17     **Q.**  So, Mr. Myles, you're discussing a hotel?

18     **A.**  Yes.

19     **Q.**  What were you talking about?

20     **A.**  We just talking about -- and it's still fictitious, but

21     I'm telling him about what my plans are in that area where I'm

22     at.

23     **Q.**  And your plan was to be involved in the building of a

24     hotel?

25     **A.**  In the role -- yes, in the role that I play, we have to

1    always come up with a way why we here, why you on the ground.

2        They can tell by my voice I'm not from here, so you have

3    to always answer that question either to them or in their head,

4    why am I here.  So we telling them about what our vision is for

5    this area, my vision.

6    Q.   Okay.  And did Len Turner then make a phone call at this

7    point --

8    A.   Yes.

9    Q.   -- in the recording?

10       And could you hear that on your recording of the meeting?

11   Could you hear him making the phone call?

12   A.   Yeah, I knew he was making a phone call.  I could hear it.

13           MS. HOPKINS:  Okay.  So if we could play 102-6,

14   please.

15       (Audiotape played in open court, not reported.)

16   BY MS. HOPKINS

17   Q.   So what did you understand was taking place when Len

18   Turner made the phone call in front of you?

19   A.   He was calling his office to -- he had sent off before we

20   came the pre-qualification form.

21   Q.   Who did he send it to?

22   A.   Sent it to the laboratory, to the contracting officer at

23   Berkeley Labs.

24   Q.   Okay.

25   A.   And then after we talked, he hadn't sent out the other

1    part.  So he calls his office and whoever is in his office, he

2    had them to send off the other part.

3    **Q.**   And when you say "other part," what are you referring to?

4    **A.**   Well, he -- the bid itself, but he had already sent off

5    the pre-qual.

6    **Q.**   And when you asked "how long have you been in

7    construction," who were you talking to?

8    **A.**   Well, at that time we're talking to Lance.

9    **Q.**   And was he at the table the entire time up to this point?

10   **A.**   Yes.

11   **Q.**   And did he appear to understand what was going on?

12   **A.**   Yes.

13   **Q.**   And did he say anything to indicate that he didn't

14   understand what you were talking about?

15   **A.**   No.  And Lance is vocal.  He'll let you know if he don't

16   like something.

17   **Q.**   What?

18   **A.**   He's vocal.  He'll let you know what he don't like.

19            **MS. HOPKINS:**  So we can listen to Exhibit 102-7,

20   please.

21       (Audiotape played in open court, not reported.)

22   **BY MS. HOPKINS**

23   **Q.**   So what, if anything, was Len Turner and/or Lance Turner's

24   reaction to you mentioning phony bid?

25   **A.**   Didn't get a reaction.

1   Q.   No reaction?

2   A.   No reaction.

3   Q.   And did Len or Lance say anything to the effect of they

4   didn't understand what you were talking about?

5   A.   No.

6          MS. HOPKINS:   If we can play 102-8, please.

7          (Audiotape played in open court, not reported.)

8   BY MS. HOPKINS

9   Q.   So your discussion regarding take-offs, something like you

10   can't do five take-offs, what are you talking about there?

11   A.   When a construction company bid, they have to give a -- do

12   an estimate what they are bidding on it.

13          In the industry we call it a take-off, but really you're

14   doing an estimate of what the work cost.  And it cost you money

15   because you have to put people together that's an expert in

16   that area, and so it cost you a lot of money.

17          And if you do five bids a day and if the average is 10,000

18   to 15,000, you would bid 2,000 a day.  If you keep losing five

19   times a day, $10,000 a day out the window, you won't be in

20   business long doing that.

21   Q.   Because you're spending so much money on take-offs?

22   A.   You're spending money and not winning anything.

23   Q.   And so what was your understanding to Len's comment, "I'm

24   going to spend it with somebody I know, I know a 90 percent or

25   higher chance of getting the project"?

1  **A.**   Well, he made that.  He said he doesn't spend his money

2  unless he has a 90 percent chance of winning.

3       Nobody has a 90 percent chance of winning unless you've

4  got an inside deal, or else it's not a -- it's not a fair bid

5  if one person has 90.  It's ten of us trying to bid and one man

6  has a 90 percent chance.  What is the other nine people's

7  chances of winning?

8            **MS. HOPKINS:**  So if we can go ahead and play

9  Exhibit 102-10?

10      (Audiotape played in open court, not reported.)

11  **BY MS. HOPKINS**

12  **Q.**   So who was present at the table for this part of the

13  conversation?

14  **A.**   Taj Reid, myself, and Len and Lance Turner.

15  **Q.**   And what was your understanding of Len Turner's comment

16  "You're going to pay, you're going to pay and you're going to

17  pay"?

18  **A.**   Yes.  I use a -- in this narrative I use an airplane, a

19  smaller airplane.  And I would say, "And how can this airplane

20  get off the ground?"

21      And it was my experience, we had been talking about pay to

22  play.  Everybody got they hand out even -- not just to me.

23  Everybody got their hands out to the Turners, too.  And so they

24  have more experience in this than me.

25      So when I said, "How do you get this airplane off the

MYLES - DIRECT EXAMINATION/ HOPKINS

1    ground, Len, if everybody got their hand out?"  Taj Reid chimed

2    in and said, basically, "This is California.  That's how we do

3    it in California."

4        So after everybody stopped laughing, I asked Len, "I will

5    be quiet, Len.  You tell me how do you do that."  And Len says,

6    "You got to pay.  You going to pay.  And you going to pay until

7    you recognize."

8        So your question to me whether I understand?  Well, we

9    just got there.  So when he said, "You've got to pay," that

10   means to me he already paid.  And so he says that three times,

11   "You got to pay.  You got to pay.  Until you recognize that's

12   how the game is played."  And then you would put that money

13   that you got to pay to play in your bid.

14   **Q.**   Why do you do that?

15   **A.**   Why did you do that?  Why would you do that?

16   **Q.**   Yes.  What's the point of incorporating it into your bid?

17   **A.**   Well, to take the direct hit out of your pocket.  You can

18   charge it to the job instead of yourself.

19   **Q.**   Okay.

20        **MS. HOPKINS:**  All right.  If we can play 102-11,

21   please?

22        (Audiotape played in open court, not reported.)

23   **BY MS. HOPKINS**

24   **Q.**   Why did you say in this the clip, "Before Taj told me

25   about Turner, I had already asked who was the biggest black

1    builder.  I already knew it was Turner."

2         Why did you say that?

3    A.   When the name first came up, we can go back to April --

4    around April when the Turners' name first came up.  By this

5    time when it got back to the Turners, I'm just placating.

6         The FBI had already gave me information on them.  We done

7    looked at the Turners since April and May.  We already heard

8    the Turners' name, if you heard it come up earlier, when Taj

9    said, "I want you to meet those Turners Group."  Well, the

10   agents heard that, too, on the tapes and they already done did

11   a workup and they already done tried to bring me up to speed

12   with the Turners.  So just keeping it going.

13        (Audiotape played in open court, not reported.)

14   **BY MS. HOPKINS**

15   Q.   Approximately how long did this meeting last?

16   A.   Oh, I didn't have a clock on it.  The one with all of us?

17   It was the best meeting we had, even Len admitted.  And I don't

18   know.  We lost the time.  It could be hours.  Two, three hours

19   here.

20   Q.   And was this in a restaurant?

21   A.   It was in a bar restaurant of the -- lounge.  I would say

22   the lounge of the Marriott.

23   Q.   And did everyone eat?

24   A.   Yes.

25   Q.   Did everyone drink?

1    A.    Yes.

2    Q.    And did you and the others discuss matters other than the

3    Berkeley Lab deal?

4    A.    We just talked about life and talked about business, but

5    that was the only deal we had on the table.

6    Q.    Do you recall talking about other types of matters during

7    this lunch?

8    A.    Yeah.  We talked about the pay to play.  We talked about

9    you got to pay.  That was the conversation about that.

10         I don't want to get ahead of the tape, but --

11   Q.    Did you talk about personal lives?

12   A.    We probably did, yeah.

13   Q.    Okay.

14   A.    Always.  I always -- I always had to tell something about

15   my personal life.

16   Q.    Okay.

17         **MS. HOPKINS:**  So if we can listen to Exhibit 102-12,

18   please.

19         (Audiotape played in open court, not reported.)

20   **BY MS. HOPKINS**

21   Q.    So what was the overall tone of this meeting?

22   A.    It was a joyous tone.  Even Len said this meeting was

23   better than the last meeting.

24         You heard me say at the beginning of this clip, "I didn't

25   know you."  And Len said, "I didn't know you either."  So we

 1   basically saying we helped buy it.  We didn't just run our

 2   mouth in front of each other.  We didn't know each other.

 3   **Q.**   You didn't know each other before?

 4   **A.**   The first meeting, the May 9th meeting.

 5   **Q.**   Did you enter into any kind of agreement to provide

 6   bonding to the Turner Group at this meeting?

 7   **A.**   No, no.

 8   **Q.**   And was anything discussed to the effect of, like, we'll

 9   send in the bid to help you out as long as you agree to provide

10   us with bonding?

11   **A.**   That word is just never said.

12   **Q.**   And did you reach any agreement with either Len or Lance

13   Turner to that effect about bonding?

14   **A.**   No.

15   **Q.**   And did either of them ask for bonding as a condition of

16   sending in the Turner Group bid letter?

17   **A.**   No, they didn't.  And they sent it off before I even had a

18   minute to talk to them, so it was gone.

19   **Q.**   Okay.

20          **MS. HOPKINS:**  So, your Honor, for the record I

21   realize that we inadvertently didn't play the entire May 9th

22   recording.  It was the meeting with Mr. Myles and Len Turner

23   and Taj Reid at Mr. Turner's offices.

24          Rather than go back and play the whole recording again, I

25   would like to just ask Mr. Myles a few follow-up questions

1    regarding that.

2              **THE COURT:**  Go ahead.

3    **A.**   You're saying May 9th?

4    **BY MS. HOPKINS**

5    **Q.**   The May 9th meeting at the Turner Group offices.

6         So during that meeting, did you talk about yourself and

7    some of your achievements?

8    **A.**   Okay.  Yes.

9    **Q.**   Yes?

10   **A.**   I'd have to say yes, because I did it all through the

11   tape, yes.

12   **Q.**   Okay.  And so did you talk about different businesses that

13   you had been involved in?

14   **A.**   Yes.

15   **Q.**   And what kind of businesses did you discuss?

16   **A.**   Are you talking about on May 9th?

17   **Q.**   Yes.

18   **A.**   Oh, that's hard for me to pull out businesses, but I have

19   been involved in a lot of them.  I may have told them about

20   dealerships at that time.

21        I had a lot of meetings.  This is six years.  So for me to

22   say what business, but I can give you a smorgasbord of what I

23   may have told them.

24   **Q.**   I want to focus on this call.  So let me just ask you, did

25   -- so you say you mentioned that you ran -- or you worked at a

MYLES - DIRECT EXAMINATION/ HOPKINS

1  dealership, that you ran a dealership?

2  A.   Yes.

3  Q.   And then what about having restaurants in airports?

4  A.   I have a restaurant to this very day.  I've always had

5  restaurants when I met them.

6      Even after this, I have a restaurant that you guys know

7  about that I built for people that give second chance.  We own

8  Blue Mesa franchise.  That's a massive development.  I own the

9  franchise to Gas Market, which is a popular venue.  So, yeah,

10  we have restaurants.

11  Q.   Okay.  So some of that conversation on May 9th was

12  discussing some of the businesses that you have --

13  A.   Yes.

14  Q.   -- correct?

15      Okay.  And what was your reason for telling them about

16  your business achievements?

17  A.   Building bona fides in the presence of this, this case.

18  Q.   Now, I'd like to turn your attention to September 17th,

19  2013.

20  A.   Okay.

21  Q.   Did you have a follow-up phone call with Taj Reid that

22  day?

23  A.   Yes.

24          MS. HOPKINS:   Okay.  I'd now like to play

25  Exhibit 103-2.

1          (Audiotape played in open court, not reported.)

2    **BY MS. HOPKINS**

3    **Q.**   So what was your understanding of what Taj Reid was

4    concerned about during this phone call?

5    **A.**   This phone and the last one that you played, Taj is

6    concerned about his money.  And I'm fighting him, letting him

7    know that when you heard me earlier say I'm a business

8    development guy, and we arguing back and forth, the Turners

9    trying to tell me that Taj is valuable to me.  If it wasn't for

10   Taj, I won't be in front of them.

11         So they was helping Taj justify his money.  And I'm

12   arguing back and say, I didn't come this far away from home.  I

13   don't need nobody to take me around.

14         So this is Taj continuing trying to get money from the

15   Turners at this point.

16              **MS. HOPKINS:**  Okay.  So if we can play 103-3, please.

17         (Audiotape played in open court, not reported.)

18   **BY MS. HOPKINS**

19   **Q.**   When you said "They had the other guy watching me and he

20   was going to make the decision," who are you referring to?

21   **A.**   I was talking about Lance at that time.  It was Len and

22   Lance at the meeting.

23   **Q.**   Okay.  At the September 16th meeting?

24   **A.**   Yeah.

25   **Q.**   Okay.

MYLES - DIRECT EXAMINATION/ HOPKINS

 1        (Audiotape played in open court, not reported.)

 2   **Q.**   Did you have any intention or did you mention an agreement

 3   on your part to provide bonding on other future deals?

 4   **A.**   No.  I talked about my bonding a lot, but no.  No

 5   commitment to use it to no one.

 6   **Q.**   Now, in the course of the investigation, did you learn

 7   whether the Turner Group sent in a bid to Maria Robles, who was

 8   the contact for the Berkeley Lab deal?

 9   **A.**   Yes.

10   **Q.**   And in your capacity as the undercover, did the agents

11   keep you up to date about events like this?

12   **A.**   Yes.

13   **Q.**   And why did they keep you informed?

14   **A.**   Because I'm the person on the ground.  I need to know what

15   happened.

16   **Q.**   And after Turner Group sent in its bid for the Berkeley

17   Lab project, the bid that you asked them to send in, did you

18   continue to have telephone conversations with Len Turner?

19   **A.**   Yes.

20   **Q.**   And did one of those conversations occur on September 18th

21   of 2018?

22   **A.**   Yes.

23   **Q.**   All right.

24          **MS. HOPKINS:**  So I'd now like to play a clip, it's

25   Exhibit 104.  And we do not have a transcript for it, so we're

MYLES - DIRECT EXAMINATION/ HOPKINS

1    just playing the recording.

2         (Audiotape played in open court, not reported.)

3    **BY MS. HOPKINS**

4    **Q.**    And when you're talking -- what's your understanding of

5    who he is referring to when he says he talked to "him"?

6    **A.**    I believe it's Taj.

7    **Q.**    Taj Reid?

8    **A.**    Yes.

9    **Q.**    Okay.

10        (Audiotape played in open court, not reported.)

11   **Q.**    Why did you ask Len Turner about his bonding capacity?

12   **A.**    They are not -- we're not talking about the lab at this

13   point.

14   **Q.**    Right.

15   **A.**    We're talking about some of the deals that they have on

16   the horizon that they think that they can play in; some school

17   deals, some other deals.

18        I asked them to tell me what it was and he went through,

19   you know, what he did and what they money is tied up on.

20   **Q.**    And why did you ask for this information?

21   **A.**    Because we -- this is an investigation.  I'm trying to

22   find out which way -- is anybody cutting a deal about it.  I

23   want to know.  That's why I'm there.  I'm not there to --

24   **Q.**    And what --

25   **A.**    -- talk to friends.

1    Q.   What, if any, solutions did you give him as far as

2    reducing his bond?

3    A.   Anything that I told the Turners, they wasn't

4    lightweights.   They already knew.   I told them about how they

5    work down a bond.   They know that, it happens.

6         You start off on a project and it's a $10 million bond and

7    you work 30 days.   If you -- how much work you have completed,

8    that's how much bond is released.   It's insurance.

9         So if you did a million dollars of work in that 30 days,

10   now you've got a million dollars of your bond released.   And so

11   that's what we talking about, working down, reducing your bond.

12   Q.   And so at the end of the call it sounded like Len Turner

13   said he was going to call you back?

14   A.   Yeah.   Yes.

15   Q.   And did he end up calling you back that day?

16   A.   Yes, he did.

17   Q.   Okay.

18        MS. HOPKINS:   I would like to play a few clips from

19   that second phone call.   Let's play 105-2, please.

20        (Audiotape played in open court, not reported.)

21        MS. HOPKINS:   Okay.   And if we could play the next

22   conversation, which is 105-4, please.

23        (Brief pause.)

24        MS. HOPKINS:   Actually, if you could stop.

25

1    BY MS. HOPKINS

2    **Q.**    During this call, during this conversation that you had

3    with him on September 18th, did Len Turner offer to introduce

4    you to Rebecca Kaplan?

5    **A.**    Yes.

6    **Q.**    And do you know who Rebecca Kaplan is?

7    **A.**    No more than she was a City Council member.  That's all I

8    know.

9    **Q.**    At that time?

10   **A.**    At the time.

11   **Q.**    And did Len, Len Turner, ultimately connect you with

12   Rebecca Kaplan?

13   **A.**    Yes, in an about way.  He did set up a deal that I could

14   go to a birthday party or something like that.  I went with

15   Lance, yes.  I met Lance, rather.

16          **MS. HOPKINS:**  Okay.  If we could play 105-4, please.

17      (Audiotape played in open court, not reported.) is

18   BY MS. HOPKINS

19   **Q.**    Did you have to exert any pressure on Len Turner to get

20   these introductions?

21   **A.**    No.

22   **Q.**    And based on your conversations thus far, did you have an

23   impression on how much work the Turner Group was getting at

24   this point?

25   **A.**    Impression?  The agents had told me some of the work they

1   did, and Taj had told me.

2   **Q.**   And what about what the Turners had told you?

3   **A.**   And the Turners had told me some of the work they had

4   done.

5   **Q.**   So what was your impression on how much work they were

6   getting based on what you had heard from them and the agents?

7   **A.**   I had heard from Taj they wasn't getting work, but just by

8   experience, when you have $12 million worth of bonding, you're

9   getting work.

10  **Q.**   And what was your impression of whether Len Turner needed

11  you, William Joseph, or your company in order to get work?

12  **A.**   They didn't need me.  $12 million worth of bonding, you

13  the big boy as far as I'm concerned.

14       And even Len says in the last clip that "I don't know what

15  my situation is.  I'm going to look at it and see what I need."

16  So, no.  They didn't need me.

17  **Q.**   All right.  And so was there a third phone call with Len

18  Turner that day?

19  **A.**   Yes.

20  **Q.**   All right.

21            **MS. HOPKINS:**  So if we can play -- I'd like to play a

22  clip from that.  It's clip 106-2, Exhibit 106-2.

23       (Audiotape played in open court, not reported.)

24  **BY MS. HOPKINS**

25  **Q.**   So quick question.  There was a term in there.  You

1   said -- he said doing it on the "strength."

2   **A.**   Yeah.

3   **Q.**   What does that mean?

4   **A.**   Oh, I guess that's a street vernacular.  People say, oh,

5   man, I'm doing it on the strength.  They say I'm doing it out

6   of love.  They ain't charging you.  I'm just doing it on the

7   strength.

8   **Q.**   Okay.

9   **A.**   But Taj turned around and tried to charge him and Len

10   said, "This is not the strength," so...

11          **MS. HOPKINS:**   Okay.

12      (Audiotape played in open court, not reported.)

13   **BY MS. HOPKINS**

14   **Q.**   All right.  So I'd like to turn your attention to

15   September 19th, 2013.  Did you have a follow-up call with Len

16   Turner that day?

17   **A.**   Yes.

18   **Q.**   Okay.

19          **MS. HOPKINS:**   I'd like to play this first clip.  It's

20   107-1, please.  Exhibit 107-1.

21      (Audiotape played in open court, not reported.)

22   **BY MS. HOPKINS**

23   **Q.**   So I'm showing you what's been marked as Exhibit 126.

24      (Whereupon document was tendered to the witness.)

25          **MS. HOPKINS:**   I've given a copy of this to defense

1    counsel and I have a copy for the Court as well.

2         (Whereupon document was tendered to the Court.)

3    **BY MS. HOPKINS**

4    **Q.**   Do you recognize this?

5    **A.**   Absolutely.

6    **Q.**   What is this?

7    **A.**   Oh, this was a letter that Len sent to someone that worked

8    with Kaplan and I guess his name is Jason Overman.

9    **Q.**   Okay.  And how did you receive this?

10   **A.**   I think he sent it to my email, but I'm in so many cities,

11   normally it would come to the agency locally and the agent got

12   it and then they gave it to me.

13   **Q.**   All right.  So this is an email that was sent to your

14   email account?

15   **A.**   Right.

16   **Q.**   And you -- you probably didn't open it first, but at some

17   point did you read it?

18   **A.**   I try.  If I'm not in a town, I don't want to be the first

19   one.  Because I'm in a lot of states, so I let the local agents

20   open the email first and then I go after them.

21   **Q.**   Okay.  And does this look like an accurate copy of the

22   email that was sent to your email address?

23   **A.**   Yes.

24        **MS. HOPKINS:**  At this time, your Honor, the

25   Government moves to admit Exhibit 126.

```
 1            THE COURT:  Any objection?

 2            MS. BOERSCH:  No objection.

 3            MR. RIORDAN:  No, your Honor.

 4            THE COURT:  Admitted.

 5        (Trial Exhibit 126 received in evidence)

 6   BY MS. HOPKINS

 7   Q.   So in the beginning of this phone call --

 8            MS. HOPKINS:  And if we could put the email up?

 9        (Document displayed)

10   BY MS. HOPKINS

11   Q.   So in the beginning of this phone call with Len Turner,

12   what are you responding to in that conversation?

13   A.   I had asked, I guess to meet someone and it was Kaplan.

14   And so Len, showing me that he had -- he was connected.  And so

15   Len calls and tried to get a meeting set for me that same day.

16   I think it was 2:30 or 3:00 the same day.

17        And the gentleman let Len know that we can't -- we don't

18   have any vacancies today.  And Len didn't like him telling me

19   that we couldn't meet today, so then Len send this back to him

20   and say we have to do -- and you can read what Len sent back,

21   to respond that we couldn't meet today.

22   Q.   So what we have here on the screen, is this what you were

23   discussing, that email that Len sent to Rebecca Kaplan's --

24   someone who works for Rebecca Kaplan?

25   A.   Yes.
```

 1    Q.    And according to this email --

 2          MS. HOPKINS:   If we could blow up the section where

 3    it says "Jason overman responded to Len Turner"?

 4          (Document enlarged)

 5    BY MS. HOPKINS

 6    Q.    Do you see that on the screen?

 7    A.    Yes.

 8    Q.    And is that what you were talking about when he said he

 9    didn't have any -- she didn't have any vacancies?

10    A.    Yeah.   It's another one right before that when Len said,

11    "Hi, Jason, I need Rebecca to meet someone."

12    Q.    Right.   So that's what he --

13    A.    And so he responded like this.

14    Q.    Oh, okay.   Got it.   Okay.

15          All right.   And so then -- so that's the first email.   And

16    then the response was this.

17          (Document displayed)

18    Q.    And what does it say that Jason Overman's position is on

19    this email?

20    A.    Campaign Manager, Kaplan for Oakland.

21    Q.    Okay.   And so this was the Campaign Manager's response,

22    and then it appears that Len Turner responded to that email

23    right here.

24          (Document displayed)

25    Q.    And this is what you were talking about in your

MYLES - DIRECT EXAMINATION/ HOPKINS

1   conversation?

2   **A.**   That's why I was saying wow, because I thought there was

3   -- I thought that was just strong words to tell somebody on the

4   short notice.

5            **THE COURT:**  May I see parties at sidebar, please?

6        Ladies and gentlemen, you can talk.

7        It doesn't have to be on the record.

8        (Side bar held off the record.)

9            **THE COURT:**  Okay.  Thank you very much, ladies and

10  gentlemen.

11       You want to stand up?  I don't know if you want to take a

12  little stretch.  We're together to take a break in about 15

13  minutes anyway.

14       Okay.  Go ahead.  Thank you.

15           **MS. HOPKINS:**  Okay.  All right.

16  **BY MS. HOPKINS**

17  **Q.**   And so, okay.  I think we're done with this email.

18       So in the email Len Turner mentioned that -- or in the

19  call he said that he sent you these emails "so that when you

20  meet him tonight, you'll have a different type of greeting."

21       Who is he referring to when he said when you meet "him"

22  tonight?

23  **A.**   Me.  When they meet me tonight.

24  **Q.**   Okay.

25  **A.**   He was telling me, when I meet -- when I meet Jason

 1  tonight, what the greeting would be.  I'm sorry.

 2  **Q.**  All right.  And so did you end up going to the party?

 3  **A.**  Yes.

 4  **Q.**  And where was the party held, do you remember?

 5  **A.**  I keep forgetting the name.  The barbecue place downtown.

 6  It's Jones and Everett or something like that.  I think it was

 7  something like that.

 8      Everett and Jones.  I heard somebody tell me, yeah.  I

 9  know it was something like that, but yeah.

10          **MS. HOPKINS:**  So if we can listen to Exhibit 107-2,

11  please.

12      (Audiotape played in open court, not reported.)

13  **BY MS. HOPKINS**

14  **Q.**  So what were you proposing to Len Turner about bonding in

15  these conversations?

16  **A.**  They were talking my other work.  And he had told me

17  earlier about if my numbers was right, they was in.  You know,

18  they was in on this deal.  And so now I'm telling him if he got

19  the hook-up, I got the bonding basically.

20  **Q.**  All right.  So in these conversations did you and Len

21  Turner come to any agreement about bonding on a specific

22  project?

23  **A.**  We didn't have a specific project, so no.

24  **Q.**  All right.  And -- okay.  I think I'm going to move to the

25  October 1st -- I can keep going?  I'll keep going.

MYLES - DIRECT EXAMINATION/ HOPKINS

```
 1   BY MS. HOPKINS

 2   Q.   So did you have another conversation with Len Turner on

 3   October 1st --

 4   A.   Yes.

 5   Q.   -- about the Lawrence Berkeley National Lab deal?

 6   A.   Yes.

 7           MS. HOPKINS:  And so if we could play Exhibit 109-1,

 8   please.

 9       (Audiotape played in open court, not reported.)

10   BY MS. HOPKINS

11   Q.   So what are you referring to in this -- in this part of

12   the conversation?

13   A.   In terms of?

14   Q.   In terms of you're going to be having a conference call

15   with somebody.

16   A.   Well, we're going to have a conference call.  The FBI had

17   set up a conference call and in this conference call we're

18   going to have a conference call with the Turners.

19       Again, we're going to show them some red flags to see do

20   they stop.  And we tell them about a conference call that is

21   about to happen in a day or two.

22   Q.   Who is going to be on the call with you and the Turners?

23   A.   It's going to be Special Agents on the phone, but the

24   Turners think it's somebody from the laboratory, from Berkeley.

25           MS. HOPKINS:  Okay.
```

1           (Audiotape played in open court, not reported.)

2     BY MS. HOPKINS

3     Q.    So I want to turn your attention -- that was October 1st.

4     I want to turn your attention to October 3rd.  Did you have a

5     conversation with Lance Turner that day?

6     A.    Yes.

7     Q.    Okay.

8           MS. HOPKINS:  I'd like to play --

9     A.    Briefly.

10          MS. HOPKINS:  -- it's a short clip, it's Exhibit 111.

11          (Audiotape played in open court, not reported.)

12    BY MS. HOPKINS

13    Q.    So when you said she will be calling around 1:45, who are

14    you referring to?

15    A.    The Special Agent who was posing as a contracting officer.

16    Q.    From where?

17    A.    Lawrence Berkeley Lab.

18    Q.    And when -- why did you mention that she was on furlough?

19    A.    Because we were.  The Government had a shutdown during

20    that time.  I was on furlough, too, but was still working.

21    Q.    Okay.

22    A.    So everybody was -- all the Government agents was on

23    furlough at that time.

24    Q.    And did Len and Lance Turner meet you at your hotel that

25    day?

MYLES - DIRECT EXAMINATION/ HOPKINS

1   **A.**   Yes.

2   **Q.**   So where did the meeting and the speakerphone call take

3   place?

4   **A.**   Say that again?

5   **Q.**   Where did the meeting with Len and Lance Turner take

6   place?

7   **A.**   I'm sorry.  It was in my hotel room, at the conference

8   table in my hotel room.

9   **Q.**   Okay.  And by this time had the Turner Group already sent

10   in their bid, the bid that you asked them to send in about the

11   Berkeley Lab project?

12   **A.**   Yes.

13   **Q.**   And what was the purpose of this meeting and having the

14   contracting officer on the speakerphone?

15   **A.**   The Government was again attempting to put red flags up,

16   see what the Turners -- how would they react.  Would they say,

17   no, this is illegal.  It smells through heaven.  So we putting

18   up another red flag to let them see.

19   **Q.**   What do you mean "red flag"?

20   **A.**   When do you get someone on the Government agency on the

21   inside call you on the telephone, tell you a deal about a job,

22   how we're going to get taken care of, the whole nine yards.

23         So the Government decided to let them hear it and then see

24   how they react.  And at this time they can say, oh, this don't

25   smell right.  This don't sound right.  So that's why we having

1    a meeting.

2    **Q.**   Whose decision was it to set up the scenario, the phone

3    call?

4    **A.**   The Special Agents and the FBI.

5    **Q.**   And did the phone call take place?

6    **A.**   Yes, it did.

7    **Q.**   And who was in the room at the time?

8    **A.**   Lance, Len and myself.  Yeah.

9    **Q.**   And did you make an agreement before the call regarding

10   whether Len or Lance Turner could speak or stay silent while on

11   the phone?

12   **A.**   I told them to be quiet because they didn't know you was

13   in the room.  I told Len that.

14   **Q.**   Okay.

15          **MS. HOPKINS:**  Is now a good time to take a break,

16   your Honor, before I start the call?

17          **THE COURT:**  Well, ladies and gentlemen, we'll be in

18   recess for 15 minutes.

19      Remember the admonition given to you.  Don't discuss the

20   case, allow anyone to discuss it with you, form or express an

21   opinion.  We'll be -- resume at 2:30.

22      (Jury exits the courtroom at 2:15 p.m.)

23          **THE COURT:**  So how much more of this witness do you

24   think you have, roughly?

25          **MS. HOPKINS:**  Probably a half hour.

 1              THE COURT:  Okay.

 2              MS. HOPKINS:  I think.  Maybe 45 minutes.  What do

 3   you think?

 4              MR. DAWSON:  I don't know.

 5              MS. HOPKINS:  I think about 45 minutes.

 6         THE COURT:  What?

 7              MS. HOPKINS:  Forty-five minutes.

 8         THE COURT:  Thanks.

 9       (Whereupon there was a recess in the proceedings

10         from 2:16 p.m. until 2:35 p.m.)

11              THE COURT:  Let the record reflect all jurors are

12   present.  Parties are present.

13       You may proceed, Ms. Hopkins.

14   BY MS. HOPKINS

15   Q.   So, Mr. Myles, before we took a break, we were discussing

16   the October 3rd 2013 meeting.

17   A.    Okay.

18   Q.   And we were going to play a clip.  It was a meeting with

19   Len and Lance Turner at your hotel.

20              MS. HOPKINS:  So we're together to play a clip of the

21   speakerphone call.  It's Exhibit 112-1.

22         (Audiotape played in open court, not reported.)

23   BY MS. HOPKINS

24   Q.   When you're talking about "he's a construction person,"

25   who are you talking about?

MYLES - DIRECT EXAMINATION/ HOPKINS

1    A.    I'm talking about Lance.

2            MS. HOPKINS:   Okay.

3        (Audiotape played in open court, not reported.)

4    BY MS. HOPKINS

5    Q.    So what was your understanding of Maria's comment that the

6    deal would be public in November?

7    A.    Well, Maria is letting them know that this deal that we

8    done cooked up, that she was going to do the proper thing; that

9    she was going to go out and get us solicitations.  She was

10   going to put a notice out in November.

11   Q.    Okay.  And you asked Maria a question about mobilization

12   fees.  Was that a question that the Turners wanted you to ask?

13   A.    No.  We talked about that, but no, I don't think so at

14   this part of it.

15   Q.    Okay.  What about the question about demolition?  Did that

16   come from the Turners?

17   A.    No.  They had already put out a demolition package, and I

18   think --

19   Q.    And what about --

20   A.    -- Len knew about that package.  I think it was Len.

21   Q.    Okay.  And what about the questions regarding

22   spectrometers and mechanical machines?  Did those questions

23   come from the Turners?

24   A.    In one light -- it didn't come that day, but I do know

25   that Len did ask one day which was the proper question that

MYLES - DIRECT EXAMINATION/ HOPKINS

 1    time.  He did ask about some of their equipment.  He did.

 2    Q.    And so what, if any, questions were -- because you said

 3    they were staying silent on the phone?

 4    A.    Yes.

 5    Q.    And so were they asking you questions to ask her?

 6    A.    Yes.  The last question they was -- they wrote one down,

 7    but we had already talked.  I had put paper on the table.

 8         It might have been -- I had forgot about the mobilization

 9    that I had already told them about and they just reminded me of

10    stuff that we had talked about.

11    Q.    So how did they communicate their questions to you?

12    A.    Just write it on the sheet of paper.  We was at -- I sat

13    at the conference table, but it was at the dining table.

14    Q.    Okay.  Did you keep those pieces of paper?

15    A.    No, they left.

16    Q.    They took them with them?

17    A.    Yeah, they went away.

18    Q.    And so you also asked about 8-A contractors and the 14-day

19    turnaround paycheck.  What were you talking about with that?

20    A.    When I was a part of the 8-A program, even in an

21    undercover role, in Louisiana they did have a 14-day, where you

22    get paid in 14 day for small contractors, because they don't

23    have the money to carry the job 30, 60, 90 days.  So we was

24    talking about that.

25    Q.    Why were you asking about it?

 1   A.   Just going along with the scenario that we -- the

 2   Government had.

 3              MS. HOPKINS:   Now, let's take -- let's listen to

 4   Exhibit 112-2, please.

 5         (Audiotape played in open court, not reported.)

 6   BY MS. HOPKINS

 7   Q.   So why did you tell the Turners it was the -- that she,

 8   meaning Maria, wasn't saying that the Turner bid was

 9   disqualified?

10   A.   I told them that because if Maria had to say it, eliminate

11   the Turners, that would have been bad for this scenario.

12   Q.   And how was getting another bid supposedly going to help

13   you in this scenario?

14   A.   To make it -- to cover Maria's butt.  To make it look like

15   it was a competitive bid so that she would have three bids.

16   Q.   And how does getting another bid supposedly help the

17   Turners?

18   A.   That would have made Maria look good and then the Turners

19   would have got the job.

20   Q.   After you won the job?

21   A.   Yes.

22   Q.   Who suggested Fred MacKay as a third bidder?

23   A.   I believe it was Len.  Now, looking back at the tape, it

24   was Len because I think Lance says "will that not come back to

25   us" or something like that.  So, yeah, it was Len.

1   Q.   So Lance was concerned about it coming back to Turner

2   Group?

3   A.   Yes.

4        MS. HOPKINS:  And if we could take a look quick at

5   Exhibit 38?

6        SPECIAL AGENT QUINN:  It's the wrong way, so put it

7   on the Elmo.

8        MS. HOPKINS:  Oh...

9     (Document displayed)

10  BY MS. HOPKINS

11  Q.   So we're looking at the organizational chart again from

12  the Turner Group pamphlet.  Do you see Fred MacKay's name on

13  there?

14  A.   Yes.  Can you kind of adjust it a little bit?  I know I'm

15  blind, but I can't see that.

16  Q.   Oh, sure.

17  A.   Now I can see a little.

18  Q.   Is that better?

19  A.   Yeah, yeah, yeah.

20  Q.   And what's his role?

21  A.   Here he is the Client Relations Manager.

22  Q.   Okay.  And where does he stand in comparison to Len and

23  Lance Turner?

24  A.   Same executive level.

25       MS. HOPKINS:  Now, if we could play 112-3, please.

MYLES - DIRECT EXAMINATION/ HOPKINS

1   A.   He has two jobs on here though, you know.  I didn't --

2   BY MS. HOPKINS

3   Q.   So there's two.  I'm not sure if it's the same person

4   though.

5   A.   Yeah.  It may not be.  One is Fred and one Frederick.  I

6   don't know Frederick from Fred.  It could be.  But the other

7   one said Project Manager, so I don't know.

8   Q.   Okay.

9        (Audiotape played in open court, not reported.)

10  BY MS. HOPKINS

11  Q.   So was what Len Turner was relating about his discussions

12  with Taj Reid consistent or inconsistent with what Taj Reid

13  told you what -- that he wanted from the Turners?

14  A.   That's a tough question.

15  Q.   I'm sorry.

16  A.   Could you repeat that question again?

17  Q.   Was what Len Turner was telling you about what Taj Reid,

18  the --

19  A.   Was demanding salary wise?

20  Q.   Yes, salary wise.

21  A.   Yes.  It was consistent with that.

22  Q.   Okay.  And what was Lance Turner's reaction and demeanor

23  when discussing what Taj Reid wanted?

24  A.   Oh, money and -- you said Lance?

25  Q.   Yes.

MYLES - DIRECT EXAMINATION/ HOPKINS

1   **A.**   Oh, lance wasn't going for that.  You heard him loud and

2   clear.  He thought that you needed to -- Lance is a guy that

3   work in the field.  He ain't letting nobody get no money if

4   they ain't out there doing something similar to him.

5       So he just thought -- and I would have said the same

6   thing.  You need to work for the money.

7   **Q.**   Okay.  So I want to show you Exhibit 38 again.

8       (Document displayed)

9   **Q.**   Now, so they were discussing Kenny Houston.  Do you see

10  his name on this organizational chart?

11  **A.**   I did at one time.  Yes.

12  **Q.**   Okay.  And what is his title or his role?

13  **A.**   Project Manager.

14  **Q.**   Okay.  Thank you.

15      Did you have any further meetings with Len Turner after

16  this?

17  **A.**   What date is this?

18  **Q.**   This is October 3rd.

19  **A.**   Yes, yes.  I may have.  The 3rd?  October 3rd?

20  **Q.**   Any meetings.

21  **A.**   Meetings, no.  No, no meetings.

22  **Q.**   And what about with Lance Turner, any meetings?

23  **A.**   None.

24  **Q.**   And did they end up providing you or the Department of

25  Energy a third bid?

1    A.    Yes.

2    Q.    A third bid?

3    A.    No, no.

4    Q.    Okay.

5    A.    I'm just thinking that because the bid didn't come in on

6    time, you know, when we said it.

7          I made a mistake because I remember the pre-qual came in

8    and then he had called his office and told them to send it in

9    and it didn't come right away.

10   Q.    Right.  So, but when we're talking about the conference

11   call and you had Maria saying she needed a third bid and you're

12   trying to figure out where that third bid would come from, was

13   a third bid actually provided by Turner Group?

14   A.    No.  We didn't get that.

15   Q.    Okay.

16   A.    They offered him, but we didn't get it.

17   Q.    Okay.  In or about October 2013 were you still actively

18   involved in the undercover investigation in the Bay Area or

19   were you starting to withdraw?

20   A.    We was withdrawing at that time.  We really started early

21   October, but we was winding down.

22   Q.    Whose decision was that?

23   A.    FBI.

24   Q.    In October of 2013 did you continue to have phone

25   conversations with Taj Reid?

MYLES - DIRECT EXAMINATION/ HOPKINS

```
 1    A.    Yes.

 2              MS. HOPKINS:  And if I could play Exhibit 116-1.

 3    This is an October 5th phone call.

 4         (Audiotape played in open court, not reported.)

 5    BY MS. HOPKINS

 6    Q.    So what was your understanding of Taj Reid's comment "the

 7    Turners had been spoon fed this whole process"?

 8    A.    He's believing or he's stating that they didn't have to do

 9    anything.  I gave him the job and all they had to do was have a

10    couple drinks and submit some forms.

11         And he just believed that his value to them was worth --

12    he went up now, he said, 150,000 all of a sudden, so he just

13    keep going up.

14    Q.    And when he -- Taj Reid said all they had to do was submit

15    two documents --

16    A.    Right.

17    Q.    -- what was your understanding of the two documents that

18    he was referring to?

19    A.    The pre-qualification form and the bid on the laboratory.

20    Q.    Okay.  And so did you have a similar conversation with Taj

21    Reid on October 8th?

22    A.    Yes.

23              MS. HOPKINS:  Okay.  And I'd like to play a short

24    clip from that --

25              THE COURT:  Before we get there, there is one
```

```
 1   question I have.  It relates to an earlier conversation.
 2       There was a discussion from the Government agent that she
 3   was requiring a third bid.
 4               THE WITNESS:  Yes, sir.
 5               THE COURT:  Okay.  Now, and I think your testimony
 6   was that you never submitted a third bid.
 7               THE WITNESS:  The third bid, no, we didn't --
 8               THE COURT:  Let me ask my question.
 9               THE WITNESS:  Okay.
10               THE COURT:  Did anyone offer to furnish with you a
11   third bid?
12               THE WITNESS:  Not to offer.  They just suggested the
13   third bid.
14               THE COURT:  I'm sorry.  I don't understand that.
15               THE WITNESS:  They didn't offer a bid.
16               THE COURT:  I don't know who the "they" is.
17               THE WITNESS:  The Turners came up with to use one of
18   their employees for the third bid.
19               THE COURT:  Pardon me?
20               THE WITNESS:  They suggested that we use one of their
21   employees, a Mr. MacKay, but we never did it.
22               THE COURT:  Okay.  Thank you.
23       And is that -- that conversation recorded?
24           MS. HOPKINS:  Yes.
25               THE WITNESS:  Yes.
```

1          **THE COURT:**  Okay.  Thank you.

2          **MS. HOPKINS:**  So if we could play Exhibit 117-1,

3    which is an October 8th phone call with Taj Reid.

4      (Audiotape played in open court, not reported.)

5    **BY MS. HOPKINS**

6    **Q.**   All right.  So continuing on this day, did you have a

7    phone conversation later on with Len Turner?  And this is still

8    October 8th.

9    **A.**   I think I did on this one.  Yeah.

10   **Q.**   Sorry?

11   **A.**   Yes.

12         **MS. HOPKINS:**  And so I'd like to play a clip from the

13   call.  It's 119-2.

14     (Audiotape played in open court, not reported.)

15   **BY MS. HOPKINS**

16   **Q.**   So why did you say "I was just looking for someone black"?

17   **A.**   Just part of -- it didn't mean too much.  My whole

18   conversation had been black and sometime we used -- I had never

19   used it, but the "N" word.  So it was naturally, we just

20   talking.

21        I said that if you recall early on -- Taj brought the

22   Turners to me.  Said, Do you want to meet the minority

23   contractors?  I said, Who?  He said, The Turners.

24        And then when Taj said that, of course, the FBI had did

25   the background on the Turners and then they called me.  This is

1    way back in April.  So I already knew the Turners way after

2    they called their name.  The FBI gave me a rundown who the

3    Turners was.  I knew they was black through the means that I

4    have with the FBI.  I knew all of that.

5          So when I'm sitting there talking about I'm looking for

6    somebody black, the FBI done already -- they the one who told

7    me about this Turner to go, so we knew that.

8    Q.   Okay.  Was that part of your persona?

9    A.   Persona?  The --

10   Q.   Right, right.  The --

11   A.   I didn't really think nothing of it because we were

12   talking about black guys.

13         For instance, let's go back to -- it didn't mean nothing

14   to me.  I'm just trying to answer your question in a bigger

15   frame.

16   Q.   Okay.

17   A.   Let's go back to September 16th, I believe it was.  If I

18   hadn't stayed in my role, and my role was a black developer --

19              **MR. RIORDAN:**  Objection.  Narrative.

20              **THE COURT:**  Overruled.

21   **BY MS. HOPKINS**

22   Q.   If you could just briefly finish what you were saying?

23   A.   Yeah.  In September if I had said the wrong thing in this

24   role, and that was Amarosa deal, you can hear back then that

25   Len Turner and all of them said "Is that a white company?"

1    That white company wouldn't have been here.  We wouldn't --

2    they wouldn't have made it.  They were talking about Amarosa.

3         So I already know the tone of the people.  Part of the

4    undercover role is you've got to adapt.  You got to know what

5    people are saying around you and you better make sure that when

6    they laugh, you laugh.  When they clap, you clap.  So you stay

7    in your role, and that was my role.

8    **Q.**    Thank you.

9              **MS. HOPKINS:**  If we could just finish.

10        (Audiotape played in open court, not reported.)

11   **BY MS. HOPKINS**

12   **Q.**    So what was your understanding of Len Turner's comment

13   "The lady said she was going to award him the project, but it

14   has to go out to bid"?

15   **A.**    Finally, Len is saying how it's supposed to go.  He let us

16   know how it's supposed to go.

17        Even though this deal is a deal that's cut and we done

18   talked about it, Len understood that to make this deal legal,

19   that it had to go back out to bid.  To make it legal.  He says

20   it in his own word.

21        It still got to -- they going to give it to him, but it

22   still has to go out to make it look good on the street.  So he

23   knew then.  And I was hoping that he would say that earlier,

24   but, yeah, he knew.

25   **Q.**    Okay.

1          **MS. HOPKINS:**  And if we could play Exhibit 119-3,

2     which is a little further down in this conversation.

3          (Audiotape played in open court, not reported.)

4     **BY MS. HOPKINS**

5     **Q.**   So what was your understanding of Len Turner's comment

6     that he needs to understand "what you bringing to him, what I'm

7     bringing to him and what he's bringing to you"?

8     **A.**   My understanding of it?  I can -- it kind of speaks for

9     itself.  Len is upset with Taj, and rightly so.  And Taj don't

10    care about nothing.  He don't care about the work in the real

11    world, if there was a real deal.

12         It's a lot of stuff that you have to do to do

13    construction.  All he wanted his money.

14         So Len just letting him know, we got to make some money

15    basically before we pay somebody some money, to sum it up.

16    **Q.**   Lastly, I would like to turn your attention to October

17    19th, 2013.  Did you have another conversation with Taj Reid

18    that day?

19    **A.**   Yes.

20         **MS. HOPKINS:**  I would like to play another clip from

21    that call on October 19th.  It's Exhibit 121-1 and it's already

22    been admitted.

23         (Audiotape played in open court, not reported.)

24    **BY MS. HOPKINS**

25    **Q.**   So what was your understanding of Taj -- Taj Reid's

PROCEEDINGS

1   comments about the Turners' relationship to his father, Larry

2   Reid?

3   **A.**   All through this case he said that the Turners lean on his

4   father in the time and they -- his dad made them.

5        But he didn't like to talk about his dad because he always

6   said I'm not going to mention my dad, but he constantly leaning

7   on his dad for the so-called power that he has.

8   **Q.**   Did contact with Len and Lance Turner basically dry up?

9   **A.**   Yes.

10  **Q.**   Did you continue to have periodic conversations with Taj

11  Reid and Eric Worthen through the end of the year?

12  **A.**   Yes.

13  **Q.**   And were you told to keep your phone on until the end of

14  the year?

15  **A.**   Yes.

16  **Q.**   By who?

17  **A.**   The agents.

18  **Q.**   The FBI?

19       **MS. HOPKINS:**  May I have one moment, your Honor?

20       (Discussion held off the record between government

21        counsel.)

22       **MS. HOPKINS:**  I have no further questions.

23       **THE COURT:**  Okay.  Ladies and gentlemen, we're going

24  to take our recess.  We will return on Monday morning at 9:00

25  to resume testimony.  I'm going to talk to the parties and get

PROCEEDINGS

```
 1   some estimates as to how we're going.

 2       So remember the admonition.  Don't discuss the case, allow

 3   anyone to discuss it with you, form or express any opinion.

 4       I'll see you on Monday.  Have a nice weekend.

 5       (Jury exits the courtroom at 3:42 p.m.)

 6           THE COURT:  Okay.  Let the record reflect the jurors

 7   have left.

 8       So we have cross and then what?  Turning to the

 9   Government.

10           MS. HOPKINS:  Then we have two more witnesses for the

11   Government.

12           THE COURT:  And they are?

13           MS. HOPKINS:  Eric Worthen and Special Agent Jason

14   Miller from the Department of Energy.

15           THE COURT:  Special Agent is fairly brief, isn't he?

16   What's he testify to?

17           MR. DAWSON:  So he's going to get into evidence, some

18   emails that were received from the Turner Group, and he also

19   interviewed Len Turner.

20           THE COURT:  Oh, okay.  All right.

21       Okay.  Can I just ask a couple questions?  Have a seat.

22   I just want to make sure I sort of have the basic facts, which

23   I'm not quite sure I do.

24       But is it -- is it that -- obviously, the Government

25   agent, I'm now talking about the -- well, they are all
```

 1   Government agents, but, I mean, the -- it was known to the

 2   Government in this sting operation that the Turners are going

 3   to do, quote, the work on the contract?

 4           **MR. RIORDAN:**  They were going to be the prime.

 5           **THE COURT:**  That wasn't concealed.

 6           **MR. RIORDAN:**  They were going to be the prime

 7   contractor on the work.

 8           **THE COURT:**  So the -- so the -- the contract, the --

 9   now I'm going to get my amounts wrong.  5.9 contract was going

10   to be given to the undercover --

11           **MR. DAWSON:**  Correct.

12           **THE COURT:**  -- Mr. Myles.

13           **MR. RIORDAN:**  Under the sting abrasion.

14           **THE COURT:**  Under the sting operation.

15       And he was going to then hire the -- or I don't know what

16   the process would be, but the prime -- the subcontractor, the

17   contractor on the job would be the Turners.

18           **MR. RIORDAN:**  Yes.

19           **THE COURT:**  And this was known to -- this is part of

20   a -- this was disclosed.

21           **MR. RIORDAN:**  Yes.

22           **THE COURT:**  So you have a situation where the -- I'm

23   just trying to figure this out.

24       So you have a situation where the Turners made a bid,

25   whatever you want to call it, 6.1 million, with the Government

PROCEEDINGS

1  knowing that actually -- or six-point -- what was it?

2          MR. RIORDAN:  6,150,000.

3          THE COURT:  Okay.  Knowing that they were going to do

4  the work on a 5.9 contract.

5          MR. RIORDAN:  That's the sting, your Honor.

6          THE COURT:  Well, wait.  That was known -- I mean,

7  that's --

8          MR. RIORDAN:  That's the design.

9          THE COURT:  That, to me, I don't even get that.  Can

10  you understand why I don't even get that?

11          MR. DAWSON:  Your Honor, if I may explain?

12          THE COURT:  Yeah.

13          MR. DAWSON:  The theory was the actual cost of the

14  job would be 4.1.  And in order for anybody to get the inflated

15  price of 5.9, they needed to come up with a bid rigging scheme

16  where you had William submitting 5.9, the Turners submitting

17  6.15.

18          THE COURT:  Well, I got that part.  Do you understand

19  what I don't get?

20          MR. DAWSON:  Well, the kickback effectively in

21  exchange for the 6.15 bid is William saying, Once we get the

22  inflated contract, I'll pitch it to you and you get the

23  benefit.

24          THE COURT:  But the Government knows that the -- that

25  the Turners are willing to do the job, not for 6.1 but for 5.9.

PROCEEDINGS

1              **MR. DAWSON:**  Which is $1.7 million more than what

2      they expect a competitive bid would result in.

3              **THE COURT:**  Well, be that as it may.  I almost look

4      at it and say, well -- the 6.1, that's irrelevant.

5          I mean, you have -- you have the Turners coming in and

6      they say, Hey, we'll do it for 6.1.  And by the way, we'll also

7      do it for 5.9.

8          That's what's known.  That's -- everybody -- the Turners

9      know that and the Government knows that; is that correct?  Have

10     I got that fact right?

11             **MR. RIORDAN:**  That's the design of the sting.

12             **THE COURT:**  Okay, okay.  I got -- that's the design

13     of the sting.

14         I mean, it's just bizarre.  I mean, I've never seen

15     anything like that.  Not -- not the least of which -- and I

16     have to try to figure out if, in fact, in that conversation

17     that I heard the Turners are told, By the way, we don't have a

18     deal.  They said, We don't have a deal.  We need a third bid.

19         Now, that -- and they never get it.  And everybody knows

20     they never got it yet.

21             **MR. DAWSON:**  There wasn't anything to get.  It was a

22     sting, so --

23             **THE COURT:**  No, no.  No, no.  That's not true.  There

24     was a phony third bid.  But that could have been gotten.

25         I don't know that this makes any legal difference at all,

1  but I'm just trying to figure out if the Turners as of a

2  particular date don't have -- they are not told by the

3  Government it's -- it's a contract -- I mean, they are told,

4  yeah, it's a contract provided that we get a third bid.

5          MR. DAWSON:  They are conspiring to get the contract.

6  They are attempting to get the contract.

7          THE COURT:  Okay.  This is all a big attempt.

8          MR. DAWSON:  It's a conspiracy, which, as your Honor

9  knows --

10          THE COURT:  Well, a conspiracy to get something.

11  It's an attempt.

12          MR. DAWSON:  That's what the charge is, a conspiracy

13  to defraud.

14          THE COURT:  Okay.  I think I sort of got it.  I mean,

15  it may make no legal difference, all these facts, but, I mean,

16  it adds incredible confusion because, in fact, given what the

17  -- what the Defense has said, they said, Hey, the Turners

18  thought they would have a contract for five -- I don't know

19  what that amount was, but they thought that they would -- they

20  thought that in a sense -- I don't know where this is going, so

21  maybe I shouldn't ask, but they -- if I heard Mr. Riordan

22  correctly, he said in his opening that the Turners knew that

23  the undercover agent wasn't going to get the bid.  And, I mean,

24  I guess that's right.

25          MR. RIORDAN:  Your Honor, he couldn't fill out the

PROCEEDINGS

1    pre-qual because he didn't have a contractor's license, and he

2    didn't have any experience, and they knew that nobody --

3    somebody who couldn't fill out that form couldn't get the bid.

4         **MR. DAWSON:**  This was a crooked insider who could

5    hand out the deal.  The whole premise was that this wouldn't

6    follow the rules, which was on the tapes that we've been

7    listening to.

8         **THE COURT:**  Now we're going -- but we're going to the

9    Turners' state of mind.  I mean, look who is the Defendant in

10   the case.  Not some theoretical defendant.  The Defendant in

11   the case are the Turners.  What did they think?

12        **MR. DAWSON:**  They submitted a bid --

13        **THE COURT:**  What did they know?  If they know -- if

14   they know that there is no -- that the people -- even if they

15   submit false document "A," they know that the deal can't go

16   forward as constituted.  I don't know that that's a crime.

17   Maybe it is.  Maybe it is.

18        Anyway.  Everybody have a nice weekend and I'll -- I'll

19   see you on Monday and we'll see where we go.

20        (Whereupon at 3:49 p.m. further proceedings

21         were adjourned until Monday, August, 27, 2018

22         at 9:00 a.m.)

23

24

25

**I N D E X**

Thursday, August 23, 2018 - Volume 1

**GOVERNMENT WITNESSES**                              **PAGE**   **VOL.**

**MYLES, WILLIAM**
(PREVIOUSLY SWORN)                                      2        1
Direct Examination Resumed by Ms. Hopkins              2        1

- - -

**E X H I B I T S**

**TRIAL EXHIBITS**                              **IDEN**   **EVID**   **VOL.**

38                                                        13        1

40                                                        61        1

89-1                                                      18        1

93-1                                                      18        1

95-1                                                      18        1

96-1                                                      18        1

97-1                                                      18        1

98-1                                                      18        1

102-2 through 102-12                                      18        1

103-2, 103-3                                              18        1

104                                                       18        1

105-2, 105-4                                              18        1

106-2                                                     18        1

107-1, 107-2                                              18        1

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 109-1 | | 18 | 1 |
| 111-1 | | 18 | 1 |
| 112-1, 112-2, 112-3 | | 18 | 1 |
| 116-1 | | 18 | 1 |
| 117-1 | | 18 | 1 |
| 118-1, 118-2, 118-3, 118-5 | | 18 | 1 |
| 119-2, 119-3 | | 18 | 1 |
| 121-1 | | 18 | 1 |
| 126 | | 91 | 1 |

—   —   —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, August 24, 2018